**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| The Travelers Indemnity Company, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:07-cv-00638 |
| | ) | |
| Shaffin Ali Mohamed, M.D., | ) | |
| Stein Pain Management Associates, P.A., | ) | |
| Advanced Rehabilitation & Pain | ) | **JURY DEMANDED** |
| Management, P.A., | ) | |
| Pain Institute of Texas, P.A., | ) | |
| Orthopedic Pain Management, P.A., | ) | |
| | ) | |
| Collectively "The Mohamed Defendants" | ) | |
| | ) | |
| Nishat Alibhai, | ) | |
| Nizamudin Alibhai, | ) | |
| Mirage Medical Group, Ltd., | ) | |
| Mirage Medical Group – TX, Inc., | ) | |
| Oasis Medical Group, Inc., | ) | |
| NC Consulting Group, Inc., | ) | |
| New Frontier Medical Consultants, Inc., | ) | |
| Orange Grove Health Services, Ltd., | ) | |
| Orange Grove Health Services – TX, Inc., | ) | |
| Orange Grove Health Services, Inc., | ) | |
| Renaissance Health Services, Ltd., | ) | |
| Renaissance Health Services – TX, Inc., | ) | |
| Renaissance Health Services, Inc., | ) | |
| Woodward Health Services, Ltd., | ) | |
| Woodward Health Services – TX, Inc., | ) | |
| Woodward Health Services, Inc., | ) | |
| | ) | |
| Collectively "The Alibhai Defendants" | ) | |
| | ) | |
| Eddie Cerday, M.D., | ) | |
| Southwest Pain and Injury, P.A. | ) | |
| | ) | |
| Collectively "The Cerday Defendants" | ) | |
| | ) | |

Johnathon Y. Boyd,                                              )
Satex Management Services, Inc.,                                )
Inner Houston Medical Management, Inc.,                         )
Wildwood Medical Management, Inc.,                             )
                                                               )
  Collectively "The Boyd Defendants"                 )
                                                               )
Houston Community Hospital, Inc. d/b/a                         )
Renaissance Hospital                                          )
                                                               )
  "The Hospital Defendant"                           )
                                                               )
Khyati Undavia,                                                )
Minu RX, Ltd., d/b/a Plaza Medical Center                     )
Pharmacy and Memorial Compounding                             )
Pharmacy, and                                                  )
Minu GP, L.L.C.                                                )
                                                               )
  Collectively "The Undavia Defendants"              )
                                                               )
Kenneth S. Bayles, D.O.,                                       )
Tim Chowdhury, M.D.                                            )
John  C. McConnell, M.D.,                                      )
Will E. Moorehead, M.D.,                                       )
Bobby Pervez, M.D.,                                            )
Jose Ramon Reyes, M.D.,                                        )
Ernest T. Roman, M.D.,                                         )
Ihsan Fahmi Shanti, M.D., and                                 )
Omar Damaso Vidal, M.D.,                                       )
                                                               )
  Collectively "The Prescribing Dr. Defendants"      )
                                                               )
        Defendants.   )

## SECOND AMENDED COMPLAINT

The Travelers Indemnity Company ("Travelers"), for its Second Amended Complaint against the defendants, alleges as follows:

## I.    NATURE OF THE ACTION

1.    This action seeks to recover more than $4,200,000 that the defendants have stolen through a mail and common law fraud scheme by submitting, and causing to be submitted, to Travelers hundreds of fraudulent charges for: (a) nerve block injections ("Nerve Blocks") that

were either medically unnecessary or never performed by Shaffin Ali Mohamed ("Dr. Mohamed") and Eddie Cerday ("Dr. Cerday"), (b) unlawful facility fees relating to the Nerve Blocks and other procedures purportedly performed by Drs. Mohamed and Cerday in ambulatory surgery centers ("ASCs") and hospitals with which the defendants had illegal and secret kickback arrangements, (c) medically unnecessary trans-dermal compound gels ("Compounds") which were purportedly prescribed for pain relief by Drs. Mohamed, Cerday, Bayles, Chowdhury, McConnell, Moorehead, Pervez, Reyes, Roman, Shanti, Vidal, and other doctors, pursuant to illegal and secret kickback arrangements with Minu RX, Ltd. ("Minu RX") and Khyati Undavia ("Undavia"), (d) all services rendered by Dr. Mohamed on or after September 1, 2003, regardless of the nature of the service or whether it was medically necessary, based upon his intentional affirmative concealment of his financial interests in several health care providers to which he made referrals, which he was required to disclose pursuant to V.T.C.A. Labor Code §§ 413.041(a)-(c) and 418.001(2), as well as 28 T.A.C. § 180.24(b)(1) and (2), and (e) all services rendered by Dr. Cerday on or after February 1, 2007, regardless of the nature of the service or whether it was medically necessary, based upon his intentional affirmative concealment of his financial interests in Minu RX to which he made referrals, which he was required to disclose pursuant to V.T.C.A. Labor Code §§ 413.041(a)-(c) and 418.001(2), as well as 28 T.A.C. §§ 180.24(b)(1) and (2).

2.      The defendants' fraud scheme has involved:

a)      a pattern of fraudulent representations by Drs. Mohamed and Cerday to induce Travelers and other insurers into authorizing the performance of Nerve Blocks on patients who are eligible for workers' compensation benefits,

b)      the submission of bills to Travelers and other insurers for the performance of Nerve Blocks which were either medically unnecessary or never performed, and which have fallen into three distinct patterns over several

years, with each iteration of the pattern resulting in significantly greater fraudulent charges to Travelers up to more than $15,000 per procedure,

c)    the submission to Travelers and other insurers of cloned Operative Reports which indicate that every patient had exactly the same condition, needed and received exactly the same Nerve Blocks and had exactly the same results—no one improved,

d)    the manipulation of billing codes to maximize the profits from the Nerve Blocks, regardless of whether they were performed and necessary, by duplicating charges (i.e., using two billing codes and two charges to describe and collect twice for one service), unbundling charges (i.e., using at least two billing codes and at least two corresponding charges which should be bundled together into one code for a lesser charge), and charging for related services that were never performed (i.e., placement of a medicine pump under a patient's skin, or representing that six Nerve Block injections were made when, in fact, no more than one or two were made),

e)    performing the Nerve Blocks and other procedures at ASCs and hospitals in which Dr. Mohamed had an undisclosed ownership interest or secret and illegal kickback arrangements which enabled him, as well as his relatives Nishat Alibhai and Nizamudin Alibhai ("the Alibhais") or Johnathon Boyd ("Boyd"), to secretly, unlawfully and substantially profit from the facility fees charged to Travelers and other insurers for each procedure,

f)    the creation of Texas and Nevada companies ("the Shell Companies") which Dr. Mohamed, the Alibhais and Boyd formed to secretly, unlawfully and substantially profit from the facility fees charged to Travelers and other insurers for the Nerve Blocks and other procedures purportedly performed by Drs. Mohamed and Cerday at ASCs and hospitals,

g)    the use of false and misleading information on bills from the Shell Companies to Travelers and other insurers to create the illusion that the Shell Companies were seeking to collect facility fees on behalf of the ASCs and hospitals that provided the items and services constituting the facility component of the Nerve Blocks and other procedures purportedly performed by Drs. Mohamed and Cerday,

h)    recruiting and facilitating the efforts of Boyd and Dr. Cerday to continue with precisely the same fraud scheme after May 25, 2005, when the Texas Workers' Compensation Commission ("TWCC") effectively barred Dr. Mohamed from collecting workers' compensation benefits,

i)        forming a sham "management" company, Satex Management Services, Inc., with Boyd as the nominee officer, director and shareholder, as a ruse to funnel to Dr. Mohamed most of the fraudulent proceeds from Dr. Cerday's services, after Dr. Mohamed was barred by the TWCC from collecting workers' compensation benefits,

j)        thousands of prescriptions by Drs. Mohamed, Cerday, Bayles, Chowdhury, McConnell, Moorehead, Pervez, Reyes, Roman, Shanti, Vidal, and other doctors, of medically unnecessary Compounds for purported pain relief, pursuant to secret and illegal kickbacks amounting to millions of dollars from Minu RX and Undavia, who is Dr. Mohamed's ex-wife and business partner,

k)       the submission to Travelers and other insurers by Minu RX and Undavia of thousands of bills for the Compounds with letters of medical necessity falsely representing that the Compounds were medically necessary and that the Compounds and their ingredients were FDA approved for topical use, along with inflated charges based upon misrepresentations regarding the suppliers of the ingredients for the Compounds and their average wholesale costs, and

l)        Drs. Mohamed's and Cerday's intentional affirmative concealment of their financial interests in health care providers to which they made referrals, which they were required to disclose pursuant to V.T.C.A. Labor Code §§ 413.041(a)-(c) and 418.001(2), as well as 28 T.A.C. §§ 180.24(b)(1) and (2), which barred them from collecting workers' compensation benefits for any services that they rendered during their period of non-compliance with the disclosure requirements, regardless of the nature of the service or whether it was medically necessary.

3.       The defendants' scheme began at least seven years ago and has continued uninterrupted since that time. As a result of this scheme, Travelers has incurred damages of more than $4,200,000 million.

4.       Based upon defendants' material misrepresentations and other affirmative acts to conceal their fraud from Travelers, which are described in detail below, Travelers did not discover and should not have reasonably discovered that its damages were attributable to fraud until shortly before it filed this complaint.

## II. JURISDICTION AND VENUE

5. Pursuant to 28 U.S.C. § 1332(a)(1), this Court has jurisdiction over all claims because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states. Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. § 1961 et seq. ("RICO") because they arise under the laws of the United States. Pursuant to 28 U.S.C. § 1367, this Court also has jurisdiction over the state law claims because they are so related to the RICO claims as to form part of the same case and controversy.

6. Venue is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this district. Venue is also proper pursuant to 18 U.S.C. § 1965(a) and (b) because defendants reside, are found, have an agent and transact affairs in this district, and the ends of justice require it. In addition, venue is proper in this judicial district pursuant to 28 U.S.C. § 1409(a).

## III. PARTIES AND THEIR ROLES

### A. Plaintiff

7. Travelers is a Connecticut corporation with its principal place of business in Hartford, Connecticut. Travelers is authorized to conduct business and to issue workers' compensation insurance policies in the State of Texas. Travelers brings this action in its own right and as assignee of all claims and causes of action set forth herein which belonged to The Travelers Insurance Company, The Travelers Indemnity Company of Connecticut, The Travelers Indemnity Company of Illinois, The Travelers Indemnity Company of America, Travelers Casualty & Surety Company, The Charter Oak Fire Insurance Company, and The Phoenix Insurance Company, all of which are Connecticut corporations, as well as St. Paul Fire & Marine Insurance Company, which is a Minnesota corporation, and all of its subsidiaries and affiliates.

B. **Defendants**

1. **The Mohamed Defendants**

8. Shaffin Ali Mohamed is a citizen of and is licensed to practice medicine in the State of Texas. Dr. Mohamed is a defendant in the First through Eighth Claims for Relief.

9. Between 1999 and May 2005, Dr. Mohamed knowingly: (a) induced Travelers and other insurers to pre-authorize medically unnecessary Nerve Blocks, (b) submitted bills to Travelers and other insurers for Nerve Blocks that were either medically unnecessary or never performed, (c) formed Shell Companies with the Alibhais to illegally charge for and profit from the facility fees paid by Travelers and other insurers for procedures that he purportedly performed in ASCs and hospitals, including Nerve Blocks that were medically unnecessary or never performed, through undisclosed ownership interests and secret and illegal kickback arrangements, (d) prescribed thousands of medically unnecessary Compounds, pursuant to a secret and illegal kickback arrangements with Minu RX and Undavia who is his former wife and business partner and (e) submitted charges to Travelers for services rendered after September 1, 2003, despite his intentional and affirmative concealment of the existence and/or true nature of his financial interest in several health care providers to which he made referrals including, Minu RX, the Shell Companies, Houston Community Hospital, Inc., and other hospitals and ASCs which are described below, Chartwell Distributors, Inc., Fountainview Rehab, LLC, Elite MRI, Inc., Medical Spine Care Clinics of America, Inc., Medical Spine Care Clinic of Houston, Inc. and Medical Spine Care Clinic of San Antonio, Inc., which rendered him ineligible to collect workers' compensation benefits for any service regardless of the nature of the service or whether it was medically necessary. Dr. Mohamed received more than $9 million as a result of his undisclosed financial interest in these entities, and continued to affirmatively conceal the

existence and/or true nature of these interests in documents filed under oath, subject to penalties of perjury, in his personal divorce and bankruptcy proceedings.

10.     On May 25, 2005, the TWCC, which is now known as the Division of Workers' Compensation of the Texas Department of Insurance, issued a notice ("the May 25, 2005 Notice") to Dr. Mohamed informing him that his application to be on the Approved Doctor List for workers' compensation was denied.  The May 25, 2005 Notice is attached hereto as Ex. A. The TWCC randomly reviewed four of Dr. Mohamed's patient files and concluded, among other things, that Dr. Mohamed "administered multiple [Nerve Blocks] despite a lack of continued improvement, as well as a lack of clinical evidence to support their use in all four cases."  In other words, the TWCC's conclusions regarding the fraudulent nature of Dr. Mohamed's Nerve Block practices are entirely consistent with those of Travelers.  As a practical matter, the effect of the May 25, 2005 Notice was to preclude Dr. Mohamed from collecting workers' compensation benefits for services rendered to injured employees.

11.     After May 25, 2005, Dr. Mohamed recruited Dr. Cerday to continue with the same fraudulent practices and, with the help of Johnathonathan Boyd, to funnel most proceeds from those practices to Dr. Mohamed disguised as "consulting fees."

12.     Stein Pain Management Associates, P.A. ("Stein Pain") is a professional association that was organized under the laws of Texas on or about December 14, 2000.  Stein Pain was involuntarily dissolved on November 1, 2005.  At all times relevant, Dr. Mohamed was a member, officer, and director of Stein Pain, and Stein Pain is one of the entities through which Dr. Mohamed submitted fraudulent charges to Travelers for services, including Nerve Blocks, that he purportedly performed in Houston, Texas.  Stein Pain is a defendant in the First through Fourth Claims for Relief.

13.     Advanced Rehabilitation & Pain Management, P.A. ("Advanced Rehab") d/b/a Orthopedic Rehabilitation Institute is a professional association that was organized under the laws of Texas on or about July 1, 1998.  At all times relevant, Dr. Mohamed was a member, officer, and director of Advanced Rehab, and Advanced Rehab is one of the entities through which Dr. Mohamed submitted fraudulent charges to Travelers for services, including Nerve Blocks, that he purportedly performed in McAllen, Texas.  Advanced Rehab is a defendant in the First through Fourth Claims for Relief.

14.     Pain Institute of Texas, P.A. ("Pain Institute") is a professional association that was organized under the laws of Texas on or about March 9, 1995.  At all times relevant, Dr. Mohamed was a member, officer, and director of Pain Institute, and Pain Institute is one of the entities through which Dr. Mohamed submitted fraudulent charges to Travelers for services, including Nerve Blocks, that he purportedly performed in Houston, Texas.  Pain Institute is a defendant in the First Through Fourth Claims for Relief, as well as the Sixth and Eighth Claim for Relief.

15.     Orthopedic Pain Management, P.A. ("Orthopedic Pain") is a professional association that was organized under the laws of Texas on or about March 7, 2003.  At all times relevant, Dr. Mohamed was a member, officer, and director of Orthopedic Pain, and Orthopedic Pain is one of the entities through which Dr. Mohamed submitted fraudulent charges to Travelers for services, including Nerve Blocks, that he purportedly performed in San Antonio, Texas and cities in the Rio Grande Valley.  Orthopedic Pain is a defendant in the First through Fourth Claims for Relief.

16.     Dr. Mohamed, Stein Pain, Advanced Rehab, Pain Institute, and Orthopedic Pain were not entitled to collect from Travelers: (a) any charges for Nerve Blocks that were medically unnecessary or never performed, (b) any duplicative or unbundled charges for Nerve Blocks,

regardless of whether they were medically necessary, and (c) any charges for any service performed by Dr. Mohamed on or after September 1, 2003 based upon Dr. Mohamed's knowing failure to comply with his obligations to disclose the existence and/or true nature of his financial interests in several health care providers to which he made referrals, including Minu RX, the Shell Companies, Houston Community Hospital, Inc., other ASCs and hospitals described below, Chartwell Distributors, Inc., Fountainview Rehab, LLC, Elite MRI, Inc., Medical Spine Care Clinics of America, Inc., Medical Spine Care Clinic of Houston, Inc. and Medical Spine Care Clinic of San Antonio, Inc.

17.    Dr. Mohamed, Advanced Rehab, Pain Institute and Orthopedic Pain are currently debtors in a jointly-administered Chapter 11 bankruptcy proceeding.  By order dated November 17, 2006, the United States Bankruptcy Court lifted the automatic stay and authorized Travelers to litigate the claims set forth herein against all the debtors.

### 2.    **The Alibhai Defendants**

18.    Nishat Alibhai is a citizen of the State of Texas.  She is Dr. Mohamed's niece and Nizamudin Alibhai's daughter.  She is a defendant in the First through Fourth Claims for Relief, as well as the Sixth and Eighth Claims for Relief.

19.    From approximately mid-2002 through at least May 2005, Nishat Alibhai was a principal advisor and manager for Dr. Mohamed and his businesses, including the formation, operation and financial accounting for all the Shell Companies and other health care provider entities to which Dr. Mohamed made referrals.  Nishat Alibhai served as a nominee director, officer and shareholder of: (a) the Shell Companies which had undisclosed ownership interests in and secret and illegal kickback arrangements with Houston Community Hospital, Inc., and other hospitals and ASCs in Texas where Dr. Mohamed purportedly performed procedures, including medically unnecessary Nerve Blocks, so that he and the Alibhais could secretly, unlawfully and

substantially profit from the facility fees relating to all such procedures, and (b) at least five other health care providers to which Dr. Mohamed made referrals for MRIs (Elite MRI, Inc.), physical therapy (Fountainview Rehab, LLC) and Vax-D treatments (Medical Spine Care Clinics of America, Inc., Medical Spine Care Clinic of Houston, Inc. and Medical Spine Care Clinic of San Antonio, Inc.), so that he could secretly and substantially profit from the proceeds collected by those entities for such services without disclosing his financial interest in them.

20.     Nizamudin Alibhai is a citizen of the State of Texas.  He is Dr. Mohamed's relative and Nishat Alibhai's father.  He is a defendant in the First through Fourth Claims for Relief, as well as the Sixth and Eighth Claims for Relief.

21.     From approximately 2000 through at least May 2005, Nizamudin Alibhai was a principal advisor to and manager for Dr. Mohamed and all of his businesses, including the formation, operation and financial accounting for all the Shell Companies and other health care provider entities for which Nishat Alibhai served as a nominee director, officer and shareholder to conceal Dr. Mohamed's financial interest in those entities.  Nizamudin Alibhai did so even after serving a lengthy period of incarceration in the federal correctional system for concealing his own illegal financial activities.  Specifically, on September 29, 1989, in *United States v. Nizamudin Alibhai*, 89 CR 00167, he pleaded guilty to conspiring to transport, and transporting, currency from the United States to another country for use in carrying on an unlawful activity, without filing required reports of those transactions.

22.     Until they were replaced by Boyd in approximately May 2005, the Alibhais were Dr. Mohamed's chief lieutenants in setting up and overseeing on a daily basis all of Dr. Mohamed's operations, including all of the activities described herein.

### a.     Background for the Creation of the Shell Companies

23.     From January 1, 2000 through September 1, 2002, Dr. Mohamed secretly owned a 40% interest in Memorial Surgical Center ("Memorial Surgical"), an ASC in Houston, Texas. Although Dr. Mohamed had agreed to pay Memorial Surgical $1,000,000 in return for his ownership interest--$50,000 in cash and $950,000 through a promissory note--Dr. Mohamed never actually paid a cent for this ownership interest.

24.     Dr. Mohamed performed hundreds of procedures at Memorial Surgical during the period that he held an ownership interest in that facility, including medically unnecessary Nerve Blocks. Stein Pain and the Pain Institute submitted charges to Travelers and other insurers for Dr. Mohamed's performance of these procedures. Memorial Surgical, on the other hand, submitted charges to Travelers and other insurers for the facility fees relating to all such procedures.

25.     Dr. Mohamed profited substantially from all such charges by virtue of his complete ownership of Stein Pain and the Pain Institute and his secret 40% ownership in Memorial Surgical. In fact, for the years 2000 and 2001 Memorial Surgical distributed millions of dollars to Dr. Mohamed based upon his 40% interest in that facility.

26.     Dr. Mohamed continued to perform Nerve Blocks and other procedures at Memorial Surgical until approximately April 2002. At about that time, the other shareholders in Memorial Surgical initiated steps to force Dr. Mohamed to relinquish his ownership interest in that facility so that his interest would not become subject to execution by one of his former patients who had obtained a $1.7 million dollar malpractice judgment against him in *Castro v. Pain Institute of Texas, P.A. et al.*, No. 00-28574, 1133rd District Court, Harris County, Texas. On September 1, 2002, Dr. Mohamed agreed to sell his interest in Memorial Surgical to the

remaining shareholders in consideration for which the entire $1,000,000 that he had agreed to pay for that interest was forgiven and he received an additional $150,000 as a final payment.

27.     Dr. Mohamed and his fellow shareholders in Memorial Surgical affirmatively concealed Dr. Mohamed's 40% ownership interest in the facility from licensing authorities.  In fact, Memorial Surgical's March 2002 application for an ASC license falsely stated that the applicant, Memorial Surgical Center 2, Ltd. (one of the entities through which Dr. Mohamed held his ownership interest in Memorial Surgical as of March 2002), was an "individual proprietorship" and that Philip Salkinder was its sole owner.  Dr. Mohamed's substantial ownership interest was not disclosed.

28.     To continue the concealment of his interest in Memorial Surgical, Dr. Mohamed did not report on his 2002 federal income tax returns any of the $1,000,000 of his debt which was forgiven when he relinquished his interest in the facility on September 1, 2002. Furthermore, in documents filed under penalties of perjury in his personal bankruptcy proceeding in October 2005, Dr. Mohamed failed to disclose his former interest in Memorial Surgical.

29.     Whether viewed as involving free stock or the forgiveness of a $1,000,000 debt, Dr. Mohamed's ownership interest constituted unlawful remuneration for Dr. Mohamed's patronage of and referrals to Memorial Surgical, in violation of V.T.C.A. Occupations Code § 102.001 and 28 T.A.C. § 180.25. Likewise, the millions of dollars in distributions that he received from Memorial Surgical while he held that ownership interest constituted kickbacks in violation of these provisions.

30.     After Dr. Mohamed was forced to relinquish his undisclosed ownership interest in Memorial Surgical, he stopped performing Nerve Blocks and other procedures at that facility. Furthermore, as set forth next, Dr. Mohamed worked with the Alibhais to set up a complex series

of Shell Companies which would enable Dr. Mohamed and the Alibhais to continue to secretly, unlawfully and substantially profit from: (a) facility fees for all procedures that he purportedly performed at hospitals and ASCs, including medically unnecessary Nerve Blocks, and (b) kickbacks from Minu RX and Undavia based upon thousands of prescriptions for medically unnecessary Compounds.

### b.     Formation of the Shell Companies With The Asset Protection Group

31.     In or about the fall of 2002, Dr. Mohamed and the Alibhais paid Asset Protection Group, Inc. ("APGI") to create the Shell Companies to facilitate their fraud scheme.

32.     The principals of APGI were William Reed ("Reed") and Richard Neiswonger ("Neiswonger"), both of whom have a checkered past. In 1997, Reed's law license was suspended by the Supreme Court of Colorado based upon his stipulation that he violated several Colorado Rules of Professional Conduct by engaging in conduct: (a) involving dishonesty, fraud, deceit or misrepresentation; (b) prejudicial to the administration of justice; (c) adversely reflecting on his fitness to practice law; and (d) which constitutes the improper practice of law in the form of a professional corporation or association without complying with the relevant rules. *See People v. Reed*, 942 P.2d 1204 (Colo. 1997).

33.     In 1998, Reed and Neiswonger formed APGI, a Nevada corporation. At the time, Neiswonger was about to begin serving an 18-month sentence of incarceration based upon his guilty plea to charges of wire fraud and money laundering in *United States v. Neiswonger*, Case No. 4:98CR364RVS. The criminal charges against Neiswonger stemmed from a scam in which he was deceptively marketing to consumers, in return for approximately $10,000, an opportunity to earn six-figure incomes by becoming business consultants in the areas of finances and expense reduction. In addition to his criminal conviction relating to that scam, on April 23, 1997 a permanent injunction had been entered against Neiswonger in *Federal Trade Commission v.*

*Neiswonger, et al.*, Case No. 4:96CV2225SNL (E.D. Mo.), enjoining him and any other person from engaging in any business activities without written notice to the FTC and the posting of a performance bond.

34.     Despite the above-described criminal conviction and permanent injunction, Neiswonger and Reed formed APGI without notice to the FTC or the posting of a performance bond.   Reed and Neiswonger then marketed the opportunity to consumers to become "asset protection consultants" to assist clients "wishing to hide assets from potential litigants and creditors, government agencies and the courts" by hiring APGI to form and act as the agent for Nevada corporations and offshore business companies. *See Federal Trade Commission v. Neiswonger, et al.*, 494 F. Supp. 2d. 1067, 1072 (E.D. Mo. 2007).  As a result of these activities, Neiswonger, Reed and APGI were found to be in civil contempt of the above-described 1997 permanent injunction, as well as a temporary restraining order that the court had entered in 2006 prohibiting Reed from, among other things, making any further undisclosed asset transfers. *Id.*

35.     Reed is also the author of *Bulletproof Asset Protection*, and teaches seminars and sells books on "how to become 100% lawsuit and creditor-proof" using APGI's "Ultimate Asset Protection and Financial Privacy System."  That program involves a product called the "Ultimate Nevada Incorporation Package," which, as set forth on APGI's website, includes: (a) a "prestigious" Nevada business address for the corporation; (b) preparation and filing for a Federal Tax ID number "without revealing your Social Security Number;" (c) a private Nevada corporate bank account; and (d) "a nominee officer/director for your corporation, enabling you to own and control your corporation with total privacy and anonymity."

36.     The "Ultimate Nevada Incorporation Package" is exactly what Dr. Mohamed and the Alibhais purchased from APGI to conceal Dr. Mohamed's financial interest in the Shell Companies and to enable him and the Alibhais to secretly and illegally profit from: (a) facility

fees relating to procedures purportedly performed by Dr. Mohamed at ASCs and hospitals, including medically unnecessary Nerve Blocks, and (b) Minu RX's charges for thousands of prescriptions of medically unnecessary Compounds.

   c. **The Shell Companies' Structures And Their Secret And Illegal Arrangements With ASCs And Hospitals**

  37. Working with APGI in late 2002 and 2003, Mohamed and the Alibhais created five sets of Shell Companies to secretly and illegally profit from the facility fees relating to Nerve Blocks and other procedures performed by Dr. Mohamed at ASCs and hospitals.

  38. Each set of Shell Companies consisted of: (a) a Texas limited partnership ("the TX LP"), (b) a Texas corporation ("the TX Corp.") which was the general partner and 1% stakeholder in the Texas LP, and (c) a NV corporation ("the NV Corp.") which was the sole shareholder of the TX Corp. and the sole limited partner and 99% stakeholder in the Texas LP. Nishat Alibhai purported to be the sole director, as well as the President and Treasurer, of all the TX Corps. Reed purported to be the sole director and officer of all the NV Corps, and agreed that he and APGI would not disclose to any third party the true owner of any of the NV Corps (i.e., Dr. Mohamed).

  39. Reed also established bank accounts at the First Bank of Nevada for each of the NV Corps., identifying himself as the sole signatory for all such accounts. In fact, Reed had no actual control over or involvement with the accounts. Instead, he provided Dr. Mohamed and the Alibhais with his signature stamp to enable them to control all deposits and withdrawals for the accounts.

  40. The TX LPs either acquired an undisclosed ownership interest in or entered into secret and illegal "use" agreements with several ASCs and hospitals in Texas. Through these arrangements, the TX LPs were able to substantially profit from the facility fees arising from all

16

procedures performed by Dr. Mohamed, including medically unnecessary Nerve Blocks. In fact, Dr. Mohamed performed all such procedures only in ASCs and hospitals in which he had a significant and improper financial incentive for doing so as a result of the undisclosed ownership interests or secret and illegal "use" agreements.

41.     The TX LPs funneled the facility fees to Dr. Mohamed and the Alibhais through disbursements to the TX Corps., the NV Corps. or other entities that were established by Dr. Mohamed and the Alibhais with nominee directors, officers and shareholders to conceal Dr. Mohamed's interest in those companies.

42.     The "use" agreements that the Shell Companies had with hospitals and ASCs were virtually identical. The Shell Companies were not licensed to operate a hospital or ASC. Nevertheless, the "use" agreements permitted the Shell Companies to "use" the operating room facilities in return for hourly fees that ranged from approximately $1,500 to $3,000 per hour. The "use" agreements also authorized the Shell Companies to bill all non-governmental payors, including Travelers, for the facility fees during those hours of "use." The facility fees routinely exceeded $6,000 for the procedures purportedly performed by Dr. Mohamed on each patient. Therefore, if Dr. Mohamed performed procedures on three patients in one hour, the Shell Companies stood to collect at least $18,000 in facility fees relating to those procedures. The $15,000 differential between the hourly cost to "use" the facility, and the facility fees that the Shell Companies stood to collect for the procedures purportedly performed by Dr. Mohamed during each hour of "use" provided powerful and improper financial incentives for Dr. Mohamed to patronize the hospitals and ASCs while ensuring those facilities a steady stream of patients and income.

43.     The "use" agreements between the Shell Companies and hospitals were illegal for at least seven reasons. First, the arrangements were illegal on their face under Section 241.003

of the Texas Hospital Licensing Law because they allowed the unlicensed Shell Companies to "use" hospital facilities without a license. Second, the arrangements permitted more than one entity to "use" the same portion of a hospital facility, in violation of 25 T.A.C. § 133.21. Third, the arrangements required the hospital licensees to abdicate responsibility for facility fee billing and collections to the Shell Companies, in violation of V.T.C.A. Health and Safety Code § 311.002 and 25 T.A.C. § 133.46. Fourth, the arrangements were illegal under 25 T.A.C. § 133.21 because the hospitals effectively transferred or assigned their licenses to the Shell Companies during the hours that the Shell Companies were paying a fee to "use" the hospital facilities. Fifth, the arrangements constituted a criminal kickback scheme, in violation of V.T.C.A. Occupations Code § 102.001, because they enabled the Shell Companies to capture and funnel the significant differential between the fees paid by the Shell Companies to the hospitals for each hour of "use" and the facility fees that the Shell Companies stood to collect for that "use" to Dr. Mohamed as remuneration for his patronage of the hospitals and the patients that he referred. Sixth, for the same reasons, the arrangements provided unlawful remuneration and inducements to Dr. Mohamed in return for his referrals to the hospitals, pursuant to 28 T.A.C. § 180.25. Seventh, by vesting the Shell Companies with the right to bill and collect the facility fees for procedures purportedly performed by Dr. Mohamed, the arrangements violated 28 T.A.C. §§ 133.20(d) and (e) (post May 2, 2006) and § 134.801(e) (from July 15, 2000 through May 1, 2006).

44.     The "use" agreements between the Shell Companies and ASCs were illegal for at least eight reasons. First, the arrangements were illegal on their face under Section 243 of the Texas Ambulatory Surgery Center Act because they enabled the unlicensed Shell Companies to operate the ASCs without a license. Second, the arrangements permitted more than one entity to "use" the same ASC facility, in violation of 25 T.A.C. § 135.23. Third, the arrangements

required the ASC licensees to abdicate responsibility for facility fee billing and collections to the Shell Companies, in violation of 25 T.A.C. § 135.4(j). Fourth, the arrangements were illegal under 25 T.A.C. § 135.23 because the ASCs effectively transferred and assigned their licenses to the Shell Companies during the hours that the Shell Companies were paying to "use" the facilities. Fifth, the ASCs unlawfully ceded control over surgeries conducted in the ASC facilities to the Shell Companies, in violation of 25 T.A.C. § 135.19. Sixth, the arrangements constitute a criminal kickback scheme, in violation of V.T.C.A. Occupations Code § 102.001, because they enabled the Shell Companies to capture and funnel the significant differential between the fees paid by the Shell Companies to the ASCs for each hour of "use" and the facility fees that Shell Companies stood to collect for that "use" to Dr. Mohamed as remuneration for his patronage of the ASCs and the patients that he referred. Seventh, for the same reasons, the arrangements provided unlawful remuneration and inducements to Dr. Mohamed in return for his referrals to the ASCs, pursuant to 28 T.A.C. § 180.25. Eighth, by vesting the Shell Companies with the right to bill and collect the facility fees for procedures purportedly performed by Dr. Mohamed, the arrangements violated 28 T.A.C. §§ 133.20(d) and (e) (post May 2, 2006) and § 134.801(e) (from July 15, 2000 through May 1, 2006).

45.    Dr. Mohamed, the Alibhais, the ASCs and the hospitals knew that the above described "use" arrangements were illegal and that only health care providers, such as the licensed hospitals and ASCs which provided the goods or services upon which the facility fees were based were entitled to charge for or collect workers' compensation benefits, pursuant to 28 T.A.C. §§ 133.20(d) (post-May 2, 2006) and 134.801(e) (from July 15, 2000 through May 1, 2006). In fact, when these regulations were adopted, the TWCC explained that their purpose was to prohibit "the practice whereby one entity pays a reduced fee to the health care provider that provided the treatment(s) and/or service(s), then bills the workers' compensation insurance

carrier a higher fee. This practice increases cost to the system without adding value to the system. . ." 25 Tex. Reg. 2140 (March 10, 2000). Therefore, Dr. Mohamed, the Alibhais, the ASCs and hospitals agreed that they would not voluntarily disclose to any third party the existence or terms of the kickback arrangements with the Shell Companies. In fact, that concealment continues to this very day. Specifically, counsel for Houston Community Hospital, Inc. on November 7, 2007 informed this Court on the record that that his client denied the existence of any such agreement with Dr. Mohamed, the Alibhais or the Shell Companies. In fact, Houston Community Hospital, Inc. has had at least one such agreement (which is attached hereto as Ex. B) and received more than $245,000 pursuant to that agreement from one of the Shell Companies, Woodward Ltd. between May 2002 and October 2004.

46.     In September 2003, within two months after Dr. Mohamed filed for a divorce from his then-wife Deborah Mohamed, the shares of the NV Corps were transferred into two Delaware Trusts ("the Trusts"). On paper, the sole beneficiary of these Trusts was Nishat Alibhai and the second trustee was Nizamudin Alibhai. In fact, Dr. Mohamed continued to be the major—albeit undisclosed—beneficiary of the income being funneled to the NV Corps while they were held in the Trusts. Dr. Mohamed and the Alibhais arranged to transfer the NV Corps. into the Trusts, in part, to unlawfully impair and impede the ability of Deborah Mohamed to discover the existence of and Dr. Mohamed's continuing stream of income from the NV Corps. which continued to profit from the secret and illegal financial arrangements with ASCs and hospitals around the State of Texas, as well as with Minu RX.

47.     Dr. Mohamed, with the help of the Alibhais, continued to affirmatively conceal his ownership interests in and substantial revenue stream from the Shell Companies: (a) in February 2005 when he knowingly filed under oath in his divorce proceedings with Deborah Mohamed in the Harris County District Court, 247th Judicial District, a false inventory of his

assets which did not disclose such interests or income, and (b) in October 2005 when he knowingly filed in his personal bankruptcy proceedings in the United States Bankruptcy Court for the Southern District of Texas, under penalty of perjury, false original and amended statements of financial affairs and schedules of assets and liabilities which did not disclose such interests or income.

48.     The Shell Companies are defendants in the First through Fourth Claims for Relief, and the specific circumstances regarding the fives sets of Shell Companies that Dr. Mohamed and the Alibhais created with APGI in late 2002 and 2003 to secretly and illegally profit from the facility fees relating to Nerve Blocks and other procedures performed by Dr. Mohamed at ASCs and hospitals are described next.

### 1.     The Brompton Medical Shell Companies

49.     Brompton Medical Group, Ltd. ("Brompton Ltd.") was formed as a limited partnership under the laws of Texas on or about November 26, 2002, with its principal place of business at 22 Waugh Drive in Houston, TX.

50.     Brompton Medical Group—TX, Inc. ("Brompton TX") was incorporated under the laws of Texas on or about November 20, 2002, with its principal place of business at 22 Waugh Drive in Houston, TX.  Brompton TX was the general partner and 1% stakeholder in Brompton Ltd.  Nishat Alibhai purported to be the sole director, as well as the President and Treasurer of Brompton TX.

51.     Brompton Medical Group, Inc. ("Brompton NV") was incorporated under the laws of Nevada on or about October 1, 2002, with its principal place of business at 4601 West Sahara Avenue, Suite I, Las Vegas, Nevada 89102.  Brompton NV was the sole shareholder of Brompton TX, and Reed purported to be the sole officer and director of Brompton NV.  In fact,

Dr. Mohamed was the undisclosed owner, and he and the Alibhais were the beneficiaries of, Brompton NV. Its corporate status was revoked on December 1, 2005.

52.     Brompton Ltd., Brompton TX and Brompton NV were created to enable Dr. Mohamed and the Alibhais to secretly and illegally profit from an undisclosed, substantial ownership interest in Cypress Ambulatory Surgery Center ("Cypress ASC") in Houston TX.

53.     In approximately August 2002, Dr. Mohamed paid approximately $1,000 per share for 24 limited partnership shares in Cypress Surgery Associates, LLP which owned the Cypress ASC. Shortly thereafter, Dr. Mohamed and the Alibhais formed Brompton Ltd., Brompton TX and Brompton NV. They then caused Dr. Mohamed's shares in Cypress Surgery Associates, LLP to be transferred to Brompton Ltd. for "$10 and other valuable consideration." Brompton Ltd. then held and benefited from those shares until July 21, 2003 when Dr. Mohamed, Cypress Surgery Associates, LLP and one of its founders, Dr. Robert Bell, entered into an agreement terminating their relationship with a full and final distribution of $525,000 to Brompton, Ltd.

54.     Neither Dr. Mohamed's nor Brompton Ltd.'s ownership interest in Cypress Surgery Associates, LLP was ever disclosed to the Texas Department of Health, Division of Ambulatory Surgical Center Licensing, in the applications for the issuance or renewal of the license to operate the Cypress ASC. Furthermore, in documents filed under penalties of perjury in his personal bankruptcy proceeding in October 2005, Dr. Mohamed failed to disclose his former interest in Cypress Surgery Associates, LLP.

55.     From approximately August 2002 through July 2003, Dr. Mohamed performed most, if not all, Nerve Blocks and other procedures on his Houston patients at the Cypress ASC. During that period, Cypress Surgery Associates LLP disbursed more than $1.6 million to Brompton, Ltd. Furthermore, in a personal financial statement for the calendar year 2002, Dr.

Mohamed valued his personal interest in the Cypress ASC at $14.4 million. The relevant pages from Dr. Mohamed's personal financial statement are attached hereto as Ex. C.

2.     <strong><u>The Woodward Health Shell Companies</u></strong>

56.     Woodward Health Services, Ltd. ("Woodward Ltd.") was formed as a limited partnership under the laws of Texas on or about December 31, 2002, with its principal place of business at 22 Waugh Drive in Houston, TX.

57.     Woodward Health Services—TX, Inc. ("Woodward TX") was incorporated under the laws of Texas on or about December 31, 2002, with its principal place of business at 22 Waugh Drive in Houston, TX. Woodward TX was the general partner and 1% stakeholder in Woodward Ltd. Nishat Alibhai purported to be the sole director, as well as the President and Treasurer of Woodward TX.

58.     Woodward Health Services, Inc. ("Woodward NV") was incorporated under the laws of Nevada on or about November 18, 2002, with its principal place of business at 4601 West Sahara Avenue, Suite I, Las Vegas, Nevada 89102. Woodward NV was the sole shareholder of Woodward TX, and Reed purported to be the sole officer and director of Woodward NV. In fact, Dr. Mohamed was the undisclosed owner, and he and the Alibhais were the beneficiaries, of Woodward NV. Its corporate status was revoked on December 1, 2005.

59.     Woodward Ltd., Woodward TX and Woodward NV were created to enable Dr. Mohamed and the Alibhais to illegally profit through secret kickback arrangements with Houston Community Hospital, Inc. which is licensed to operate the Houston Community Hospital (which on December 31, 2004 became known as Renaissance Hospital) in Houston, TX ("HCH"). That kickback arrangement began as early as May 2002, and Dr. Mohamed's referrals to HCH grew significantly in approximately the spring of 2003, at about the time that Dr. Mohamed, the Alibhais and Brompton Ltd. were terminating their relationship with Cypress ASC.

60.     Specifically, in May 2002, HCH paid Dr. Mohamed at least $25,000 purportedly for "OR Director" services. This characterization was false. Dr. Mohamed was not the Operating Room Director for HCH, and provided no such services. This payments was an unlawful kickback to compensate Dr. Mohamed for his patronage and the patients that he referred to HCH for procedures, including medically unnecessary Nerve Blocks. HCH then submitted charges to Travelers and other insurers for the facility fees relating to all such procedures.

61.     In early 2003, when Dr. Mohamed and Cypress ASC were terminating their relationship, Dr. Mohamed resumed his unlawful kickback arrangement with HCH. Specifically, on or about February 15, 2003, HCH entered into a secret and illegal kickback arrangement with Woodward, Ltd. ("the HCH Use Agreement"). The HCH Use Agreement is attached hereto as Ex. B. Pursuant to the HCH Use Agreement, Woodward Ltd. agreed to pay HCH $2,000 an hour to "use" HCH's operating room facilities. In return, HCH agreed to allow Woodward Ltd. to bill all non-governmental payors, including Travelers, for the facility fees relating to Nerve Blocks and other procedures purportedly performed by Dr. Mohamed. The facility fees billed to Travelers for Nerve Blocks that Dr. Mohamed purportedly performed on each patient at HCH were typically more than $8,000. Therefore, if Dr. Mohamed performed Nerve Blocks on three patients per hour, Woodward Ltd. stood to collect facility fees of at least $24,000. In this scenario, Woodward Ltd. would stand to collect $22,000 an hour more than its cost for each hour that it was allowed to "use" HCH's operating room facilities. From at least may 2002 through October 2004, Woodward Ltd. paid Houston Community Hospital, Inc. at least $245,000 for the "use" of HCH's operating room facilities.

62.     Since approximately May 2002, Travelers has been fraudulently induced to pay Woodward Ltd. more than $320,000 for facility fees relating to procedures purportedly

performed by Dr. Mohamed at HCH. Woodward Ltd. did not provide any of the items or services upon which the facility fees were based for any procedure purportedly performed by Dr. Mohamed at HCH. Therefore, Woodward Ltd. had no authority to charge for or receive facility fees from Travelers or any other insurer for any such procedures, regardless of the nature of the item or service or whether they were medically necessary.

63.     To mislead Travelers and other insurers to believe that Woodward Ltd. was collecting facility fees on behalf of HCH, Dr. Mohamed and the Alibhais typically submitted the bills from "Woodward Health Service @ Houston Community Hospital," used an address of PO Box 4824, Houston, TX 77210-4824 which had no obvious connection to Dr. Mohamed or the Alibhais, and used HCH's "Provider No." of 450795 on the bills. A representative bill from Woodward Ltd. is attached hereto as Ex. D.

64.     In addition to allowing Woodward Ltd. to fraudulently bill Travelers and other payors for the facility fees relating to Nerve Blocks and other procedures purportedly performed by Dr. Mohamed at HCH, in at least 9 instances both HCH and Woodward Ltd. billed Travelers for the facility fees relating to Nerve Blocks and other procedures purportedly performed by Dr. Mohamed. This amounted to double billing. For example, in claim no. BOV9906, HCH billed Travelers $8,005 for the facility fees relating to a Nerve Block purportedly performed by Dr. Mohamed on November 17, 2004 at HCH. Woodward Ltd. also billed Travelers $6,800 for the facility fees relating to the same procedures on the same patient on that date. This fraudulent double billing of facility fees by Woodward Ltd. and HCH also occurred one or more times in claims nos. AGH1345, AGH2216, ANQ8299, B5Z6297 and BOV9906.

65.     As recently as four weeks ago, on November 6, 2007, HCH attempted to double bill Travelers for facility fees relating to Nerve Blocks and other procedures that Dr. Mohamed purportedly had performed at HCH in 2003 and 2004. Specifically, on or about November 6,

2007, HCH submitted $500 charges to Travelers for "OR Services" relating to at least 12 Nerve Blocks and other procedures that Dr. Mohamed purportedly had performed at HCH in 2003 and 2004, and for which Woodward Ltd. already had billed Travelers.

### 3. The Renaissance Health Shell Companies

66. Renaissance Health Services, Ltd. ("Renaissance Ltd.") was formed as a limited partnership under the laws of Texas on or about October 1, 2003, with its principal place of business at 22 Waugh Drive in Houston, TX.

67. Renaissance Health Services—TX, Inc. ("Renaissance TX") was incorporated under the laws of Texas on or about December 26, 2002, with its principal place of business at 22 Waugh Drive in Houston, TX. Renaissance TX was the general partner and 1% stakeholder in Renaissance Ltd. Nishat Alibhai purported to be the sole director, as well as the President and Treasurer of Renaissance TX.

68. Renaissance Health Services, Inc. ("Renaissance NV") was incorporated under the laws of Nevada on or about October 1, 2002, with its principal place of business at 4601 West Sahara Avenue, Suite I, Las Vegas, Nevada 89102. Renaissance NV was the sole shareholder of Renaissance TX, and Reed purported to be the sole officer and director of Renaissance NV. In fact, Dr. Mohamed was the undisclosed owner, and he and the Alibhais were the beneficiaries, of Renaissance NV. Its corporate status was revoked on December 1, 2005.

69. Renaissance Ltd., Renaissance TX and Renaissance NV were created to enable Dr. Mohamed and the Alibhais to illegally profit through secret kickback arrangements with the Renaissance Surgical Center of South Texas in McAllen, TX ("Renaissance ASC") and North Point Surgical Center in Edinburg, TX ("North Point ASC").

70.     Specifically, from at least January 2004 though July 2004, Renaissance Ltd. paid Renaissance ASC an hourly fee that resulted in monthly payments of $10,000 to $15,000 to use its operating room facilities.  In return, Renaissance ASC agreed to allow Renaissance Ltd. to bill all non-governmental payors, including Travelers, for the facility fees relating to Nerve Blocks and other procedures purportedly performed by Dr. Mohamed.  The facility fees billed to Travelers for Nerve Blocks that Dr. Mohamed purportedly performed on each patient at Renaissance ASC were typically more than $8,000.  Therefore, if Dr. Mohamed performed Nerve Blocks on five patients per month, Renaissance Ltd. stood to collect facility fees of at least $40,000.  In this scenario, Renaissance Ltd. would likely stand to collect at least $25,000 per month more than its cost for each month that it was allowed to "use" Renaissance ASC's operating room facilities.

71.     On information and belief, Renaissance Ltd. had a similar secret and illegal agreement to pay North Point ASC an hourly fee to "use" its facility.  In return, North Point ASC agreed to allow Renaissance Ltd. to bill and collect the facility fees for Nerve Blocks and other procedures performed by Dr. Mohamed during the times that Renaissance Ltd. paid the hourly fee to "use" the facility.

72.     Since approximately January 2004, Travelers has been fraudulently induced to pay Renaissance Ltd. more than $19,000 for facility fees relating to procedures purportedly performed by Dr. Mohamed at Renaissance ASC and North Point ASC.  Renaissance Ltd. did not provide any of the items or services upon which the facility fees were based for any procedure purportedly performed by Dr. Mohamed at Renaissance ASC and North Point ASC. Therefore, Renaissance Ltd. had no authority to charge for or receive facility fees from Travelers or any other insurer for any such procedures, regardless of the nature of the item or service or whether they were medically necessary.

73. To mislead Travelers and other insurers to believe that Renaissance Ltd. was collecting facility fees on behalf of Renaissance ASC, Dr. Mohamed and the Alibhais typically submitted the bills from "Renaissance Health Services @ Renaissance Surgical Center of South Texas," or Renaissance Health Services @ North Point Surgical, used an address of PO Box 4253, Houston, TX 77210-4253 which had no obvious connection to Dr. Mohamed or the Alibhais, and used the "Provider Nos." of Renaissance ASC and North Point ASC on the bills. A representative bill from Renaissance Ltd. is attached hereto as Ex. E.

**4.      The Mirage Medical Shell Companies**

74. Mirage Medical Group, Ltd. ("Mirage Ltd.") was formed as a limited partnership under the laws of Texas on or about January 3, 2003, with its principal place of business at 22 Waugh Drive in Houston, TX.

75. Mirage Medical Group—TX, Inc. ("Mirage TX") was incorporated under the laws of Texas on or about December 27, 2002, with its principal place of business at 22 Waugh Drive in Houston, TX. Mirage TX was the general partner and 1% stakeholder in Mirage Ltd. Nishat Alibhai purported to be the sole director, as well as the President and Treasurer of Mirage TX.

76. Oasis Medical Group, Inc. ("Oasis NV") was incorporated under the laws of Nevada on or about October 1, 2002, with its principal place of business at 4601 West Sahara Avenue, Suite I, Las Vegas, Nevada 89102. Oasis NV was the sole shareholder of Mirage TX, and Reed purported to be the sole officer and director of Oasis NV. In fact, Dr. Mohamed was the undisclosed owner, and he and the Alibhais were the beneficiaries of, Oasis NV. Its corporate status was revoked on December 1, 2005.

77. Mirage Ltd., Mirage TX and Oasis NV were created to enable Dr. Mohamed and the Alibhais to illegally profit through secret kickback arrangements with Gonzaba Ambulatory

Surgery Center ("Gonzaba ASC") and St. Jude's Ambulatory Surgery Center ("St. Jude's ASC") in San Antonio, TX.

78. Specifically, from at least December 2003 through October 2004, Mirage Ltd. paid $2,800 an hour to "use" Gonzaba ASC's operating room facilities. In return, Gonzaba ASC allowed Mirage Ltd. to bill all non-governmental payors, including Travelers, for the facility fees relating to Nerve Blocks and other procedures purportedly performed by Dr. Mohamed. The facility fees billed to Travelers for Nerve Blocks that Dr. Mohamed purportedly performed on each patient at Gonzaba ASC were typically more than $9,500. Therefore, if Dr. Mohamed performed Nerve Blocks on three patients per hour, Mirage Ltd. stood to collect facility fees of at least $28,500. In this scenario, Mirage Ltd. would stand to collect approximately $26,000 an hour more than its cost for each hour that it was allowed to "use" Gonzaba ASC's operating room facilities.

79. The arrangement between Mirage Ltd. and the Gonzaba ASC ended in approximately October 2004. During their relationship, Mirage Ltd. paid at least $195,000 for the "use" of Gonazaba ASC's operating room facilities.

80. To continue to enable Dr. Mohamed and the Alibhais to secretly and illegally profit from surgical procedures performed by Dr. Mohamed in San Antonio after the relationship with Gonzaba ASC terminated, Mirage Ltd. entered into an agreement with St. Jude's ASC which was virtually identical to the arrangement that Mirage Ltd. had with Gonzaba ASC. The primary difference was that Mirage Ltd. was required to pay St. Jude's ASC only $1,500 per hour for the "use" of its operating room facility. In return, St. Jude's ASC allowed Mirage Ltd. to bill all non-governmental payors, including Travelers, for the facility fees relating to Nerve Blocks and other procedures purportedly performed by Dr. Mohamed. The facility fees billed to Travelers for Nerve Blocks that Dr. Mohamed purportedly performed on each patient at St.

Jude's ASC were typically more than $6,000. Therefore, if Dr. Mohamed performed Nerve Blocks on three patients per hour, Mirage Ltd. stood to collect facility fees of at least $18,000. In this scenario, Mirage Ltd. would stand to collect approximately $16,500 an hour more than its cost for each hour that it was allowed to "use" St. Jude's ASC's operating room facilities. The agreement with St. Jude's ASC remained in place until approximately June 2005 which is about when that facility was sold to a new owner who refused to continue with the arrangement.

81.     Since approximately early 2004, Travelers has been fraudulently induced to pay Mirage Ltd. more than $95,000 for facility fees relating to procedures purportedly performed by Dr. Mohamed at Gonzaba ASC and St. Jude's ASC. Mirage Ltd. did not provide any of the items or services upon which the facility fees were based for any procedure purportedly performed by Dr. Mohamed at Gonzaba ASC or St. Jude's ASC. Therefore, Mirage Ltd. had no authority to charge for or receive facility fees from Travelers or any other insurer for any such procedures, regardless of the nature of the item or service or whether they were medically necessary.

82.     To mislead Travelers and other insurers to believe that Mirage Ltd. was collecting facility fees on behalf of Gonzaba ASC or St. Jude's ASC, Dr. Mohamed and the Alibhais typically submitted the bills from "Mirage Medical Group @ Gonzaba Ambulatory Surgery Center," or "Mirage Medical Group @ St. Jude's Ambulatory Surgery Center," used an address of PO Box 4253, Houston, TX 77210-4253 which had no obvious connection to Dr. Mohamed or the Alibhais, and used a fictitious and meaningless "Provider No." of "ASC113" for Gonazaba ASC. A representative bill from Mirage Ltd. is attached hereto as Ex. F.

## 5.     The Orange Grove Shell Companies

83.     Orange Grove Health Services, Ltd. ("Orange Grove Ltd.") was formed as a limited partnership under the laws of Texas on or about April 16, 2003, with its principal place of business at 22 Waugh Drive in Houston, TX.

84.     Orange Grove Health Services—TX, Inc. ("Orange Grove TX") was incorporated under the laws of Texas on or about April 16, 2003, with its principal place of business at 22 Waugh Drive in Houston, TX.  Orange Grove TX was the general partner and 1% stakeholder in Orange Grove Ltd.  Nishat Alibhai purported to be the sole director, as well as the President and Treasurer of Orange Grove TX.

85.     Orange Grove Health Services, Inc. ("Orange Grove NV") was incorporated under the laws of Nevada on or about November 18, 2002, with its principal place of business at 4601 West Sahara Avenue, Suite I, Las Vegas, Nevada 89102.  Orange Grove NV was the sole shareholder of Orange Grove TX, and Reed purported to be the sole officer and director of Orange Grove NV.  In fact, Dr. Mohamed was the undisclosed owner, and he and the Alibhais were the beneficiaries, of Orange Grove NV.  Its corporate status was revoked on December 1, 2005.

86.     Orange Grove Ltd., Orange Grove TX and Orange Grove NV were created to enable Dr. Mohamed and the Alibhais to illegally profit through secret kickback arrangements with the Orange Medical Ambulatory Surgery Center in McAllen, TX ("Orange ASC").

87.     Specifically, from approximately mid 2003 through early 2004, Orange Grove Ltd. or Orange Grove TX paid $300 per patient to "use" Orange ASC's operating room facilities. In return, Orange ASC allowed Orange Ltd. to bill all non-governmental payors, including Travelers, for the facility fees relating to Nerve Blocks and other procedures purportedly performed by Dr. Mohamed.  The facility fees billed to Travelers for Nerve Blocks that Dr.

Mohamed purportedly performed on each patient at Orange ASC were typically more than $8,800.  Therefore, if Dr. Mohamed performed Nerve Blocks on three patients per day, Orange Grove Ltd. stood to collect facility fees of at least $26,400.  In this scenario, Orange Grove Ltd. would stand to collect approximately $25,500 per day more than the amount that it or Orange Grove TX paid for each day that it was allowed to "use" Orange ASC's operating room facilities.

88.     Since approximately the spring of 2003, Travelers has been fraudulently induced to pay Orange Grove Ltd. more than $19,000 for facility fees relating to procedures performed by Dr. Mohamed at Orange ASC.  Orange Grove Ltd. did not provide any of the items or services upon which the facility fees were based for any procedure purportedly performed by Dr. Mohamed at Orange ASC.  Therefore, Orange Grove Ltd. had no authority to charge for or receive facility fees from Travelers or any other insurer for any such procedures, regardless of the nature of the item or service or whether they were medically necessary.

89.     To mislead Travelers and other insurers to believe that Orange Grove Ltd. was collecting facility fees on behalf of the Orange ASC, Dr. Mohamed and the Alibhais typically submitted the bills from "Orange Grove Health Services @ Orange Medical Ambulatory Surgery Center," used an address of PO Box 4253, Houston, TX 77210-4253 which had no obvious connection to Dr. Mohamed or the Alibhais, and used a fictitious and meaningless "Provider No." of "B24963."  A representative bill is attached hereto as Ex. G.

### c.     Shell Companies Created To Conceal Mohamed's Interest in Minu RX

90.     NC Consulting Group, Inc. ("NC Consulting") was incorporated under the laws of Texas on or about March 7, 2002, with its principal place of business at 22 Waugh Dr., Houston, Texas.  At all times relevant, Nishat Alibhai purported to be the President, Treasurer and sole director of NC Consulting.  In fact, Dr. Mohamed was the undisclosed owner, and he and the

Alibhais were the beneficiaries, of NC Consulting. NC Consulting is a defendant in the Sixth and Eighth Claims for Relief.

91. New Frontier Medical Consultants, Inc. ("New Frontier NV") was incorporated under the laws of Nevada on or about October 1, 2002, with its principal place of business at 4816 West Sahara Avenue, Suite 377 in Las Vegas, Nevada. Reed purported to be the sole officer and director of New Frontier NV. In fact, Dr. Mohamed was the undisclosed owner, and he and the Alibhais were the beneficiaries, of New Frontier NV. Its corporate status was revoked on December 1, 2005. New Frontier NV is a defendant in the Sixth and Eighth Claims for Relief.

92. Dr. Mohamed and the Alibhais created and used NC Consulting and New Frontier NV as Shell Companies to secretly funnel kickbacks from Minu RX and Undavia to Dr. Mohamed and the Alibhais based upon money fraudulently collected from Travelers and other insurers from thousands of prescriptions of medically unnecessary Compounds.

93. In September 2003, within 2 months after Dr. Mohamed filed for a divorce from his then-wife Deborah Mohamed, the shares of NC Consulting and New Frontier NV were transferred into the Trusts, the sole beneficiary and second trustee of which were Nishat Alibhai and Nizamudin Alibhai, respectively. In fact, Dr. Mohamed continued to be the major—albeit undisclosed--beneficiary of any income being funneled to NC Consulting or New Frontier NV while they were held in the Trusts. Dr. Mohamed and the Alibhais arranged to transfer these companies into the Trusts, in part, to unlawfully impair and impede the ability of Deborah Mohamed to discover the existence of and Dr. Mohamed's continuing stream of income from them as a result of the secret and illegal financial arrangements with Minu RX and Undavia.

94. Dr. Mohamed, with the help of the Alibhais, continued to affirmatively conceal his ownership interests in and substantial revenue stream from Minu RX, NC Consulting and

New Frontier, NV in October 2005 when he knowingly filed, under penalty of perjury, false statements of financial affairs and schedules of assets and liabilities which did not disclose such interests or income.

95.     Undavia's actions to enable Dr. Mohamed to affirmatively conceal his ownership interest in substantial revenue stream from Minu RX are continuing.  Between March and May 2007, Minu RX and Undavia issued at least three checks to Dr. Mohamed for a total of $25,000, which Dr. Mohamed proceeded to deposit into a bank account that he opened in March 2007 at the Redstone Bank and knowingly failed to disclose to the trustee, Travelers and other creditors in his bankruptcy proceeding.

**3.      The Cerday Defendants**

96.     Eddie Cerday is a citizen of and is licensed to practice medicine in the State of Texas.  Dr. Cerday is a defendant in the First through Fourth Claims for Relief, as well as the Sixth and Eighth Claims for Relief.

97.     In June 2005, after the TWCC barred Dr. Mohamed from collecting workers' compensation benefits, Dr. Mohamed recruited Dr. Cerday to continue the fraud scheme by: (a) inducing Travelers to pre-authorize the same medically unnecessary Nerve Blocks, (b) performing those Nerve Blocks and other procedures at the same ASCs and hospitals with which Dr. Mohamed had the secret and unlawful kickback arrangements, which enabled Dr. Mohamed to continue to substantially profit from the facility fees charged to Travelers and other insurers for each purported Nerve Block and other procedure performed by Dr. Cerday at those facilities, (c) submitting the same fraudulent charges for these procedures which were either medically unnecessary or never performed, (d) prescribing the same medically unnecessary Compounds, pursuant to a secret and illegal kickback arrangement with Minu RX and Khyati Undavia, (e) submitting charges to Travelers for any service rendered after February 1, 2007, despite his

intentional and affirmative concealment of his financial interest in Minu RX, which rendered him ineligible to collect workers' compensation benefits for any service regardless of the nature of the service or whether it was medically necessary, and (f) funneling most of the proceeds collected from his services to Dr. Mohamed through payments to Satex Management Services, Inc. for fictitious "management" and "consulting" services which, in turn, paid Dr. Mohamed ostensibly to assist in those purported services.

98.     Southwest Pain and Injury, P.A. ("Southwest Pain") is a professional association that was organized under the laws of Texas on or about June 13, 2005, with its principal places of business at 6228 Bandera Rd. in San Antonio, TX and 2918 San Jacinto in Houston, TX. These addresses are the same locations where Dr. Mohamed had purportedly provided services to patients until he was removed from the Approved Doctor List in May 2005. At all times relevant, Dr. Cerday was a member, officer, and director of Southwest Pain and is the entity through which Dr. Cerday submitted fraudulent charges to Travelers for services, including Nerve Blocks that he purportedly performed in Houston and San Antonio, Texas. Southwest Pain is a defendant in the First through Fourth Claims for Relief.

99.     Dr. Cerday and Southwest Pain were not entitled to collect from Travelers: (a) any charges for Nerve Blocks that were medically unnecessary or never performed, (b) any duplicative or unbundled charges for Nerve Blocks, regardless of whether they were medically necessary, and (c) any charges for any service performed by Dr. Cerday on or after February 1, 2007 based upon Dr. Cerday's knowing failure to comply with his obligations to disclose his financial interests in Minu RX to which he made referrals for medically unnecessary Compounds.

### 4.    The Boyd Defendants

100.    Johnathon Boyd, ("Boyd") is a citizen of and was licensed to practice chiropractic medicine in the State of Texas.  On March 26, 2004, Boyd was removed from the Approved Doctor List in the State of Texas because his chiropractic license had been cancelled in August 1999, effectively barring him from collecting workers' compensation benefits.  Boyd was the CEO, President and sole shareholder of Satex, as well as two other companies which are described in this section, Inner Houston Medical Management, Inc. and Wildwood Medical Management, Inc., all of which were created together with Dr. Mohamed in June 2005 to further the fraud scheme.  Boyd is a defendant in the First through Fourth Claims for Relief.

101.    Boyd's relationship with Dr. Mohamed and the Alibhais dates back to at least late 2002 when Boyd acted as the intermediary between various ASCs and hospitals and Mohamed, the Alibhais and the Shell Companies in negotiating the secret and illegal "use" agreements described herein.  *See* Ex. H, attached hereto, which is a November 4, 2002 memorandum from attorney John Spicer to Dr. Mohamed and Nizamudin Alibhai regarding Boyd's involvement in negotiations for an illegal "use" agreement with Vista Surgical Center.  Furthermore, from December 2003 through May 2005, Woodward Ltd. issued at least 11 checks to Boyd's wife, Tammy Boyd, totaling $84,000.

102.    Satex Management Services, Inc. ("Satex") was incorporated under the laws of Texas on or about June 8, 2005, with its principal place of business at 6228 Bandera in San Antonio, Texas.  At the time of its incorporation, its name was West Houston Management Services, Inc.  On July 20, 2005, articles of amendment changing the name of the corporation to Satex were filed.  As set forth below, Satex was formed by Boyd solely to enable Dr. Mohamed to continue to secretly profit from workers' compensation claims after he was barred by the TWCC from doing so.  Satex is a defendant in the First through Fourth Claims for Relief.

103.    In June 2005, Mohamed and Boyd created a sham agreement which was nothing more than a ruse to secretly and illegally funnel to Dr. Mohamed most of the workers' compensation benefits received from Travelers and other insurers as a result of Dr. Cerday's purported services.   Specifically, in a "Medical Consultant Agreement" dated June 1, 2005, Satex agreed to pay Dr. Mohamed to serve as a "Medical Consultant" and to "assist Satex in managing various medical practices" which was to include managing and overseeing the operation of medical practices designated by Satex, as well as Satex's own practices.   In that regard, Dr Mohamed was to "formulate, monitor, oversee and approve all policies and activities of the medical staff, as well as review and revise the current operations, procedures, including bylaws, rules and regulations, . . . [and] reasonably assist other licensed medical practitioners in performing and evaluating medical services, to the extent permitted by law."   The Medical Consultant Agreement is attached hereto as Ex. I.

104.    The Medical Consultant Agreement was a sham.   Much, if not most, of the proceeds of Dr. Cerday's fraudulent practices, were paid to Satex, and then passed on to Dr. Mohamed under the auspices of the Medical Consultant Agreement.   Satex did not actually provide any services to Dr. Cerday or Southwest Pain, and Dr. Mohamed did not actually provide any service to Satex.   The arrangement was set up to create an aura of legitimacy for the money flow from Dr. Cerday to Satex to Dr. Mohamed.

105.    In or about May 2005, Dr. Mohamed, working together with the Alibhais, transferred the Shell Companies to Boyd to enable Dr. Mohamed, as well as Boyd, to continue to secretly, unlawfully and substantially profit from the facility fees charged to Travelers and other insurers for procedures, including medically unnecessary Nerve Blocks, that were purportedly performed by Dr. Cerday at ASCs and hospitals.

106.     In June 2005, Boyd and Dr. Mohamed also created two new entities to secretly, unlawfully and substantially profit from the facility fees charged to Travelers and other insurers for procedures, including medically unnecessary Nerve Blocks, that were purportedly performed by Dr. Cerday at ASCs and hospitals.     Specifically, they formed Inner Houston Medical Management, Inc. ("Inner Houston") and Wildwood Medical Management, Inc. ("Wildwood") which both were incorporated under the laws of Texas on or about June 14, 2005, with a principal place of business at 1207 Wildwood Lane in Katy, Texas.     Boyd was the CEO, President and sole shareholder of both companies, but both were formed primarily for the benefit of Dr. Mohamed.     Inner Houston and Wildwood are defendants in the First through Fourth Claims for Relief.

107.     Since approximately June 2005, Travelers has been fraudulently induced to pay Inner Houston and Wildwood more than $16,000 for facility fees and anesthesia services relating to procedures purportedly performed by Dr. Cerday at ASCs and hospitals.     Inner Houston and Wildwood did not provide any of the items or services upon which these fees were based for any procedure purportedly performed by Dr. Cerday.     Therefore, Inner Houston and Wildwood had no authority to charge for or receive these fees from Travelers or any other insurer for any such procedures, regardless of the nature of the item or service or whether they were medically necessary.

108.     To mislead Travelers and other insurers to believe that Inner Houston and Wildwood were collecting facility fees on behalf of ASCs and hospitals, Dr. Mohamed and Boyd typically submitted the bills from "Wildwood Medical, The Renaissance Hospital," with an address of PO Box 437, San Antonio, TX 78292-0437 which had no obvious connection to Dr. Mohamed or Boyd, and used a "Provider No." of 450795 which was the actual Provider Number of the Renaissance Hospital.     A representative bill from Wildwood is attached hereto as Ex. J.

38

### 5.    The Hospital Defendant

109.    Houston Community Hospital, Inc. was incorporated under the laws of Texas on or about December 29, 2000, and operates a licensed hospital, now known as Renaissance Hospital, at 2807 York Road in Houston, TX.  From at least May 2002 through October 2004, pursuant to a secret and illegal kickback arrangement, Houston Community Hospital, Inc. was paid at least $245,000 to facilitate the fraud scheme by allowing Woodward Ltd. to submit and collect charges from Travelers and other insurers for facility fees relating to procedures purportedly performed by Drs. Mohamed and Cerday at the Houston Community Hospital, even though Woodward Ltd. did not provide any of the goods and services upon which those fees were based.  Pursuant to this arrangement, Houston Community Hospital, Inc. facilitated the submission to Travelers of at least 60 fraudulent bills from Woodward Ltd. and Wildwood for facility fees based upon procedures performed by Drs. Mohamed and Cerday at the Houston Community Hospital, and Houston Community Hospital, Inc. is a defendant in the Second and Fourth Claims for Relief.

### 6.    The Undavia Defendants

110.    Khyati Undavia is a citizen of the State of Texas, has been licensed as a pharmacist in the State of Texas in 1996, and is one of Dr. Mohamed's former wives.  Undavia is a defendant in the Fifth through Eighth Claims for Relief.

111.    Minu RX, Ltd. d/b/a Plaza Medical Center Pharmacy and Memorial Compounding Pharmacy was formed as a limited partnership under the laws of Texas on or about March 16, 2005, with its principal place of business at 2918 San Jacinto in Houston, TX.  The building was the location of the Pain Institute and Southwest Pain, and was owned by Woodward Ltd.  The predecessor to Minu RX, Ltd. was Minu RX, Inc. which was incorporated under the laws of Texas on or about April 28, 1998.  Pursuant to a plan of conversion filed on

March 16, 2005, Minu RX, Inc. was converted into Minu RX, Ltd. and all assets and liabilities of Minu RX, Inc. were transferred to Minu RX, Ltd. Minu RX, Ltd. is a defendant in the Seventh and Eighth Claim for Relief.

112. Minu GP, LLC was formed as a limited liability company under the laws of Texas on or about March 16, 2005, and is the general partner for Minu RX, Ltd. As such, it caused, benefited from and is responsible for all activities of Minu, Ltd. Minu GP, LLC is a defendant in the Fifth through Eighth Claims for Relief.

113. On paper, Undavia was and is the sole director, officer and, shareholder of Minu RX, Inc, as well as the sole member of Minu GP, LLC. But, in fact, Dr. Mohamed is and always has been a full fledged partner in both Minu RX, Inc., Minu RX, Ltd and Minu GP, LLC. Pursuant to this interest, Dr. Mohamed has received more than $5,300,000, through payments to the Pain Institute and other entities such as NC Consulting, New Frontier NV and Samsher Flight Management. To conceal the true nature of these payments and Dr. Mohamed's interest in Minu RX, Undavia and Dr. Mohamed agreed to falsely characterize the payments as "royalties." Furthermore, Dr. Mohamed, acting under penalties of perjury, knowingly omitted any disclosure of his interest in Minu RX in an inventory of his alleged assets which was filed under oath in February 2005 in his divorce proceedings from Deborah Mohamed, and in his schedules, statements of financial affairs and testimony under oath in his own bankruptcy proceedings. In addition, Minu RX filed a false claim in the consolidated bankruptcy proceeding of a related entity, Samsher Flight Management, Inc., which was co-owned by Undavia and Dr. Mohamed, claiming that Samsher Flight Management owed a valid debt of $935,000 to Minu RX.

114. From at least 1999 through the present date, Undavia and Dr. Mohamed have caused Minu RX to enter into secret and illegal kickback arrangements with several doctors across the State of Texas, including Drs. Bayles, Cerday, Chowdhury, Moorehead, Shanti and,

on information and belief, McConnell, Pervez, Reyes, Roman and Vidal, in violation of V.T.C.A. Occupations Code § 102.001 and 28 T.A.C. § 180.25. In return for the kickbacks, these doctors have issued thousands of prescriptions to be filled exclusively by Undavia and Minu RX for the medically unnecessary Compounds. Minu RX then has submitted charges to Travelers and other insurers for more than $325 for each prescription of the Compounds, along with a false letter of medical necessity. These fraudulent charges are represented, in part, in the chart attached hereto as Ex. U.

115. As set forth below, (a) the Compounds have never been medically necessary and the letters of medical necessity which Dr. Mohamed and Undavia caused Minu RX to submit in support of every prescription are false in several respects, (b) every prescription for Compounds from Minu RX has been illegal under 21 U.S.C. § 353a because they were not tailored to individual patients and the prescriptions were invalid in that the Compounds were medically unnecessary and often, if not always, they resulted from illegal kickbacks paid by Minu RX and Undavia to the doctors, and (c) Minu RX knowingly maximized its fraudulent charges for the Compounds by including high dosages of unnecessary ingredients in the Compounds, and misrepresenting the source from which Minu RX purchased the generic drugs included in the Compounds to take advantage of a pricing formula based on the average wholesale prices of those sources.

116. Based upon the prescriptions from Drs. Mohamed, Cerday, Bayles, Chowdhury, McConnell, Moorehead, Pervez, Reyes, Roman, Shanti and Vidal, and other doctors, along with the false letters of medical necessity that have been submitted to support the claims of Minu RX for the medically unnecessary Compounds, Travelers has been fraudulently induced to pay Minu RX more than $2,200,000.

117. On paper, Undavia also was and is the sole director, officer and, shareholder of Chartwell Distributors, Inc. ("Chartwell") which provides durable medical equipment based upon prescriptions from Dr. Mohamed and other doctors in TX. But, in fact, Dr. Mohamed is and always has been a full fledged partner in Chartwell. Pursuant to this interest, Dr. Mohamed has received at least hundreds of thousands of dollars, through payments to the Pain Institute and other entities such as New Frontier NV and Samsher Flight Management. To conceal the true nature of these payments and Dr. Mohamed's interest in Chartwell, Undavia and Dr. Mohamed agreed to falsely characterize the payments as "royalties." Furthermore, Dr. Mohamed, acting under penalties of perjury, knowingly omitted any disclosure of his interest in Chartwell in an inventory of his alleged assets filed in his divorce proceeding from Deborah Mohamed and in his schedules, statements of financial affairs and testimony in his own bankruptcy proceedings. Chartwell, Minu RX, the Pain Institute and Southwest Pain and Injury have shared the same address of 2918 San Jacinto in Houston, TX.

### 7. The Prescribing Doctor Defendants

118. Kenneth S. Bayles is a citizen of and is licensed to practice osteopathy in the State of Texas. Since approximately December 2005, pursuant to a secret and illegal kickback arrangement with Minu RX and Khyati Undavia, Dr. Bayles knowingly has issued at least 130 prescriptions for the medically unnecessary Compounds. Dr. Bayles is a defendant in the Sixth and Eighth Claims for Relief.

119. Tim Chowdhury is a citizen of and is licensed to practice medicine in the State of Texas. Since approximately September 2005, pursuant to a secret and illegal kickback arrangement with Minu RX and Khyati Undavia, Dr. Chowdhury knowingly has issued at least 95 prescriptions for the medically unnecessary Compounds. Dr. Chowdhury is a defendant in the Sixth and Eighth Claims for Relief.

120.    John McConnell is a citizen of and is licensed to practice medicine in the State of Texas.  Since approximately January 2006, Dr. McConnell knowingly has issued at least 229 prescriptions for the medically unnecessary Compounds.  On information and belief, these prescriptions were issued pursuant to a secret and illegal kickback arrangement with Minu RX and Khyati Undavia.  Dr. McConnell is a defendant in the Sixth and Eighth Claims for Relief.

121.    Will Moorehead is a citizen of and is licensed to practice medicine in the State of Texas.  Since approximately April 2005, pursuant to a secret and illegal kickback arrangement with Minu RX and Khyati Undavia, Dr. Moorehead knowingly has issued at least 264 prescriptions for the medically unnecessary Compounds.  Dr. Moorehead is a defendant in the Sixth and Eighth Claims for Relief.

122.    Bobby Pervez is a citizen of and is licensed to practice medicine in the State of Texas.  Since approximately October 2001, Dr. Pervez knowingly has issued at least 153 prescriptions for the medically unnecessary Compounds  On information and belief, these prescriptions were issued pursuant to a secret and illegal kickback arrangement with Minu RX and Khyati Undavia.  Dr. Pervez is a defendant in the Sixth and Eighth Claims for Relief.

123.    Ernest Roman is a citizen of and is licensed to practice medicine in the State of Texas.  Since approximately September 2004, Dr. Roman has issued at least 257 prescriptions for the medically unnecessary Compounds.  On information and belief, these prescriptions were issued pursuant to a secret and illegal kickback arrangement with Minu RX and Khyati Undavia.  Dr. Roman is a defendant in the Sixth and Eighth Claims for Relief.

124.    Ihsan Shanti is a citizen of and is licensed to practice medicine in the State of Texas.  Since approximately January 2000, pursuant to a secret and illegal kickback arrangement with Minu RX and Khyati Undavia, Dr. Shanti knowingly has issued at least 289 prescriptions

for the medically unnecessary Compounds. Dr. Shanti is a defendant in the Sixth and Eighth Claims for Relief.

125. Omar Vidal is a citizen of and is licensed to practice medicine in the State of Texas. Since approximately August 2005, pursuant to a secret and illegal kickback arrangement with Minu RX and Khyati Undavia, Dr. Vidal knowingly has issued at least 184 prescriptions for the medically unnecessary Compounds. On information and belief, these prescriptions were issued pursuant to a secret and illegal kickback arrangement with Minu RX and Khyati Undavia. Dr. Vidal is a defendant in the Sixth and Eighth Claims for Relief.

126. The chart attached hereto as Ex. U identifies the prescriptions of the Prescribing Doctor Defendants for the medically unnecessary Compounds which were the basis of the fraudulent claims submitted by Minu RX to Travelers. The Prescribing Doctor Defendants intended and had reason to expect that Travelers and other insurers would rely on these prescriptions in paying Minu RX's fraudulent charges for the medically unnecessary Compounds. In fact, no such charges could have been submitted without such prescriptions.

IV. **THE FRAUD SCHEME**

    A. <u>**The Fraudulent Nerve Blocks**</u>

127. One aspect of the fraud scheme has been premised on the submission of charges to Travelers and other insurers for Nerve Blocks by Drs. Mohamed and Cerday, which were either medically unnecessary or not performed, from 1999 until at least the date of this Second Amended Complaint. The defendants profited through the collection of fraudulent charges for the (a) performance of those procedures, (b) facility fees for the goods and services purportedly provided by the ASCs and hospitals where those procedures were performed, and (c) related anesthesia services.

128.    A Nerve Block is a legitimate procedure for chronic pain patients.  It is generally performed to break-up scarring, numb the affected areas, reduce inflammation, and block pain signals from traveling through the nerves.  The procedure involves the injection of a solution into the joints between bones, or into the epidural space surrounding the spinal cord, spinal fluid, and nerve roots that run along both sides of the spine.  Typically, when solution is injected into these areas directly, it can flow to multiple levels of the spine, and both sides of the spine.  Accordingly, it is often appropriate to treat multiple levels and both sides of the spine with just one injection.

129.    Nerve Blocks should be tailored to the individual patient.  For example, different patients should require injections at different levels or on different sides of the spine, with different types and amounts of solution.  Some patients require only one injection, while others may need multiple injections over time.  The time required between injections can vary, for example, from several weeks to more than a year.  As set forth below and in the chart attached hereto as Ex. K, however, no such variance in treatment occurred among the patients of Drs. Mohamed and Cerday.

130.    Rather, Drs. Mohamed and Cerday have established a pre-determined fraudulent protocol with respect to the Nerve Blocks.  This pre-determined protocol has evolved over time, with each iteration resulting in substantially inflated charges to Travelers by: (a) increasing the number of procedures that were purportedly performed during each Nerve Block; (b) improperly manipulating the billing codes relating to those procedures to maximize profits by including duplicative charges (i.e., the use of two billing codes to describe the same service), unbundled charges (i.e., the use of two billing codes and two charges which are supposed to be bundled together into one code for a lesser charge), and charges for related services that were never performed (i.e., placement of a medicine pump under a patient's skin, or billing for six injections

45

when only one or two were done), and (c) performing the procedures only at ASCs and hospitals through which Dr. Mohamed and the Alibhais or Boyd could substantially profit through the above-described undisclosed ownership interests or secret and illegal "use" agreements.

131.    To support these fraudulent charges, each bill submitted to Travelers for the Nerve Blocks is accompanied by a report (the "Operative Report"), bearing the signature stamp of Dr. Mohamed or Cerday.  These are cloned, verbatim Operative Reports, which indicate that virtually every patient had the same conditions, needed and received the same procedures, and had the same results.  As a result of the pre-determined fraudulent protocol, the charges submitted to Travelers for the Nerve Blocks performed by Drs. Mohamed and Cerday increased from approximately $1,500 to $4,500 per visit in 1999, to often between $10,000 and $20,000 per visit by 2005.

132.    The success of the fraudulent pre-determined protocol has depended upon inducing Travelers into pre-authorizing the Nerve Blocks, thereby discouraging Travelers from later reviewing and/or challenging the compensability of the procedures through the workers' compensation system.  Drs. Mohamed and Cerday have accomplished this by requesting pre-authorization for the Nerve Blocks and providing Travelers with patient records and information to support the purported medical necessity of each such request.  Drs. Mohamed and Cerday know that: (a) Travelers is required to authorize or decline the pre-authorization requests within a matter of days or face administrative penalties, (b) several people at Travelers are responsible for reviewing the requests, (c) each person reviewing the pre-authorization requests for Travelers will view each request in isolation and will have no reason to know that each request is part of a pre-determined fraudulent protocol, and (d) Travelers will be required to provide a clinical basis and principal reason for any denial of pre-authorization requests which could lead to expensive

and time consuming administrative proceedings challenging any such denials on a case-by-case basis.

133.    The defendants have profited from all the fraudulent charges collected in connection with the Nerve Blocks by performing them only in facilities (a) in which Dr. Mohamed had an undisclosed ownership interest, or (b) with which Dr. Mohamed had an unlawful kickback arrangements which permitted the Shell Companies, as well as Inner Houston and Wildwood, to charge and collect the facility fees for the procedures performed in those locations.

### 1.    The Pre-Determined Fraudulent Nerve Block Protocol

134.    Pursuant to a pre-determined fraudulent protocol, Drs. Mohamed and Cerday knowingly performed at least two forms of medically unnecessary Nerve Blocks, and manipulated the billing codes to maximize the profits from these procedures.

135.    A Nerve Block involves an injection into the epidural space at various vertebra levels of the spine, either with an injection through the middle of the spine directly into the epidural space ("Direct Nerve Blocks"), or injection(s) in the opening (the foramina) between the vertebra ("Transforaminal Nerve Blocks").

136.    Both Direct Nerve Blocks and Transforaminal Nerve Blocks are designed to inject solution into the same epidural space.  The only difference between the two procedures is in the path of the injection.  Direct Nerve Blocks are performed by placing a needle in the epidural space and injecting solution, or by placing a needle in the epidural space followed by passing a catheter through that needle, and then withdrawing the needle and injecting solution through the catheter.  For Transforaminal Nerve Blocks, the path of the injection is through the foramina (i.e., opening) between the vertebra.  They are performed by injecting solution through

a needle into the epidural space. There should be no reason to do both Direct and Transforaminal Nerve Blocks to inject solution into the same epidural space.

137. As demonstrated in the chart attached hereto as Exhibit K, between 1999 and May 2005, Dr. Mohamed's practices with respect to Direct and Transforaminal Nerve Blocks fell into three distinct patterns at different periods of time, each of which is described in this section.

138. When Dr. Mohamed became ineligible to collect workers' compensation benefits in May 2005, Dr. Cerday continued the fraud scheme by adopting the same pre-determined fraudulent protocols in place at that time. In almost 20 years of practice as a pain management specialist before May 2005, Dr. Cerday had never performed the more expensive Transforaminal Nerve Blocks. He had always performed the less expensive Direct Nerve Blocks.

139. Essentially, from 1999 through early 2001, on each visit, virtually every patient received one Direct Nerve Block injection to one level of the spine -- either the space between the L5 and S1 level or the space between the C7 and T1 levels. This often resulted in charges to Travelers of about $4,500 per visit. From early 2001 to the spring of 2002, on each visit virtually every patient purportedly received one Direct Nerve Block injection through a catheter. However, during this time-period, Dr. Mohamed reported that he injected two levels of the spine (the L4-5 and L5-S1) bilaterally (i.e., on both the left and right sides of the spine). This often resulted in charges to Travelers of about $7,500 per visit. From 2002 forward, on each visit virtually every patient purportedly received four Transforaminal Nerve Block injections which were performed bilaterally at the same two levels of the spine, L5 and S1, in addition to a Direct Nerve Block through a catheter. This often has resulted in charges of more than $15,000 per visit. During all periods, patients typically returned two or three times for additional Nerve Blocks, with 30 days or less between them.

140. From a medical perspective, these patterns make no sense because it is simply impossible that virtually every patient had the same conditions, needed and received the same procedures, and had the same result every time—no one improved. Furthermore, it makes even less sense that those conditions, procedures and results varied only depending on which period of time the Nerve Blocks were performed. For example, virtually every patient from 1999 through early 2001 purportedly required only one Direct Nerve Block injection, either at the L5-S1 inter-space or the C7-T1 inter-space, but virtually every patient from early 2002 forward purportedly has required four Transforaminal Nerve Block injections at the L5 and S1 levels of the spine, in addition to a Direct Nerve Block injection to break-up purported scarring.

## 2. The Pre-Determined Protocol From 1999 Through Early 2001

141. As demonstrated in the chart attached hereto as Ex. K, the first pre-determined protocol occurred from 1999 through early 2001. During this period, virtually all patients, during each visit, received one Direct Nerve Block injection into either the lumbar (i.e., lower) spine at the space between the L5 and S1 vertebra or the cervical (i.e., upper) spine at the space between the C7 and T1 vertebra. The patients typically received two to three of the same procedures with 30 days or less between each one. For each such procedure, Dr. Mohamed submitted a cloned, verbatim Operative Report bearing his signature stamp. Examples of his Operative Reports for this period are attached as Ex. L.

142. From a medical perspective, it makes no sense that: (a) virtually every patient over this two-year period required a Direct Nerve Block at one of the same two levels of the spine as opposed to at one level or any other levels, (b) virtually every patient required an injection on more than one occasion, with each such injection becoming necessary within 30 days or less of the last one, and (c) according to the Operative Reports, every patient had exactly the same conditions, needed and received exactly the same procedure, and had exactly the same

results—no one improved.  Accordingly, based upon the pattern of Nerve Blocks during this period, they were not performed because they were medically necessary or appropriate.  Rather, they were performed solely to facilitate fraudulent charges relating to each such procedure.

143.    During this time-period, the bills submitted to Travelers for each injection to the lumbar and cervical areas of the spine included one unit of billing code 62289 or 62298, respectively.  The corresponding charges typically ranged from approximately $1,500 to $4,500 per patient visit for the single Direct Nerve Block injection.

### 3.    The Pre-Determined Protocol From Early 2001 Through Early 2002

144.    As demonstrated in the chart attached hereto as Ex. K, Dr. Mohamed changed the pre-determined protocol in early 2001 to significantly increase his fraudulent charges to Travelers.  Specifically, from early 2001 to early 2002, virtually every patient during each visit received one Direct Nerve Block injection into the lumbar (i.e., lower) spine through a catheter with two levels - L4-5 and L5-S1 – reported as being injected bilaterally (i.e., on both the right and left sides of the spine).  The patients typically received two to three of the same sets of procedures, with 30 days or less between each set.  For each such set of procedures, Dr. Mohamed submitted cloned, verbatim Operative Reports bearing his signature stamp. According to the Operative Reports generated during this time-period, each patient purportedly had scarring around the nerve roots on both the right and left sides (i.e., bilaterally) of the L5 and S1 vertebra levels.  Examples of Dr. Mohamed's Operative Reports for this period of time are attached hereto as Ex. M.

145.    From a medical perspective, it makes no sense that:  (a) virtually every patient over this one-year period required two Direct Nerve Block injections into the same two levels of the spine, as opposed to into one level or any other levels, (b) virtually every patient required injections on more than one occasion, with each such injection becoming necessary within 30

days or less of the last one, (c) according to the Operative Reports, every patient had exactly the same conditions, needed and received exactly the same procedures, and had exactly the same results—no one improved, and (d) two levels were injected, because during a routine Direct Nerve Block, solution which is injected in the epidural space flows to several levels above and below the injection site. Accordingly, based upon the pattern of Nerve Blocks during this period, they were either not medically necessary or not performed. Rather, they were performed, if at all, solely to facilitate fraudulent charges for the procedures.

146. From early 2001 to early 2002, the bills submitted to Travelers typically included four units under billing code 62289 for the Nerve Blocks. The corresponding charges were often $7,000 to $8,000 per patient visit for the procedures. These charges were fraudulent because the procedures were either not medically necessary or not performed. Furthermore, in light of the fact that just one Nerve Block injection can reach multiple levels of the spine on both sides of the spine, only one unit under billing code 62289 should have been charged. The bills submitted to Travelers were improperly inflated by billing four units under billing code 62289, which multiplied the charges by four. Moreover, the bills also were inflated by including another $2,113 charge under billing code 63780. Billing code 63780 represents the placement under the patient's skin of a pump filled with medicine (e.g., morphine for cancer patients). However, no such procedure was performed, and there was no basis for the use of this code or the corresponding $2,113 charge.

### 4. The Pre-Determined Protocol From Early 2002 Forward

147. Dr. Mohamed changed the pre-determined protocol again in early 2002. Specifically, from early 2002 forward, virtually every patient, during each visit, reportedly received: (a) four Transforaminal Nerve Block injections which were performed bilaterally into either the lumbar (i.e., lower) spine at both the L4 and L5 levels, or at both the L5 and S1 levels;

and (b) a Direct Epidural Injection through a catheter. According to Dr. Mohamed's boilerplate, verbatim Operative Reports, the Direct Nerve Block injection was done bilaterally (i.e., on both the left and right sides of the spine) to break-up scarring around the nerve roots (i.e., lysis of adhesions) on two levels of the spine -- either the L4 and L5 levels, or the L5 and S1 levels. In addition, the patients also received Transforaminal Nerve Block injections at the same two levels of the spine -- either the L4 ands L5 levels, or the L5 and S1 levels. The patients typically received these procedures, if they received them at all, two to three times with 30 days or less between each set. Dr. Mohamed then submitted cloned, verbatim Operative Reports bearing his signature stamp. According to the Operative Reports, every patient had scarring around the nerve roots on both the right and left sides (i.e., bilaterally) of either the L4 and L5 or the L5 and S1 vertebra levels. Examples of his Operative Reports during this period are attached hereto as Ex. N.

148. From a medical perspective, it makes no sense that: (a) virtually every patient over this three-year period required Direct Nerve Block injections through a catheter to break-up scarring that occurred bilaterally at two levels of the spine (e.g., the nerve roots on both the right and left sides of L4 and L5, or of L5 and S1); (b) before early 2001 no scarring occurred in any of his patients at these or any other levels of the spine; (c) in addition to the Direct Nerve Block injection performed to break-up the scarring, virtually every patient purportedly needed and received Transforaminal Nerve Block injections at the same levels of the spine; (d) before 2002, no patient purportedly needed or received a Transforaminal Nerve Block; (e) virtually every patient required injections on more than one occasion, with each such injection becoming necessary within 30 days or less of the last one; and (f) according to the Operative Reports, every patient had exactly the same condition, needed and received exactly the same procedures, and had exactly the same results—no one improved. Accordingly, based upon the pattern of Nerve

Blocks during this period, they were either not medically necessary or not performed. Instead, they were performed solely to facilitate fraudulent charges for these procedures.

149. The billing codes submitted to Travelers during this period of time were improperly manipulated in several respects to substantially inflate the charges relating to the Nerve Blocks. As a result, the charges submitted to Travelers increased, in many instances, to more than $15,000 per patient visit for these procedures. These charges were fraudulent because the procedures were either not medically necessary or not performed.

150. During this period, if Drs. Mohamed and Cerday actually performed the Direct Nerve Blocks via a catheter to break-up scarring, the charges should have included only one unit under billing code 62264 which represents a Direct Nerve Block to break-up scarring around the epidural space. If a such a Direct Nerve Block were performed, there would have been no need to also perform and charge for any of the Transforaminal Nerve Blocks.

151. During this period, if Drs. Mohamed and Cerday did not actually perform the Direct Nerve Blocks but did do the Transforaminal Nerve Blocks at two levels of the spine, the charges should have included only one unit under billing code 64483 and one unit under billing code 64484.

152. From early 2002 through about the fall of 2003, the improper billing codes typically included up to two to four units under billing code 64999 for the Transforaminal Nerve Blocks that Drs. Mohamed and Cerday allegedly performed on each of the bilateral nerve roots at L4 and L5 or L5 and S1. These charges were fraudulent for at least two reasons. First, if these procedures were performed, they were not medically necessary. Second, the appropriate billing codes for these procedures (even if they were performed and were necessary) would have been one unit of 64483 and one unit of 64484, which are the codes for Transforaminal Nerve Blocks and which would have resulted in substantially lower charges.

153.    From about the fall of 2003 through the present, the improper billing codes typically included:

(a)    one unit under billing code 62263 which represents that Drs. Mohamed and Cerday used a solution injection or mechanical means to break-up scarring in the epidural space around the spine over *two or more days*.    The use of billing code 62263 was fraudulent because Drs. Mohamed and Cerday *never* used a solution injection or mechanical means to break-up adhesions in the epidural space over *more than one day*, if they did it all.

(b)    Even if Drs. Mohamed and Cerday used a solution injection or mechanical means to break-up adhesions in the epidural space and this procedure was medically necessary (which it was not), the appropriate billing code would have been 62264, which would have resulted in a lesser charge than the one presented under billing code 62263, and there would not have been any basis to use any of the other routinely used billing codes that are described in paragraphs (c) – (f).

(c)    one unit under billing code 62311, which represents a Direct Nerve Block into the lumbar or sacral area of the spine.    Even if Drs. Mohamed and Cerday performed Direct Nerve Blocks and they were medically necessary (which they were not), the charge for this procedure was already bundled into and included in the charge for billing code 62263.    Drs. Mohamed and Cerday fraudulently billed twice for the same procedure by using billing codes 62311 and 62263 together.

(d)    two units under billing code 64483, which represents a Transforaminal Nerve Block into the lumbar or sacral area of any level of the spine, bilaterally.    This code was fraudulent for at least two reasons.    First, if Drs. Mohamed and Cerday actually performed Direct Nerve Blocks, there likely would have been no medical reason to perform any Transforaminal Nerve Blocks at the same levels of the spine.    Both procedures are designed to deliver solution to the same epidural space, and would have been duplicative.    Therefore, there was no basis to charge under billing code 64483 when a charge under billing code 62263 was already included.    Second, it was improper to bill two units under billing code 64483 for the Transforaminal Nerve Blocks which were made bilaterally at one level of the spine because it is permissible to bill only one unit of 64483 for the bilateral injections made at any vertebra level.

(e)    two units under billing code 64484, which represents a Transforaminal Nerve Block into the bilateral epidural space at additional vertebra levels of the spine after one vertebra level

already had been done. The use of billing code 64484 was fraudulent for at least two reasons. First, if Drs. Mohamed and Cerday actually performed Direct Nerve Blocks, there would have been no medical reason to perform any Transforaminal Nerve Block at the same levels of the spine. Both procedures are designed to deliver solution to the same epidural space, and would have been duplicative. Therefore, there was no basis to charge under billing code 64484 when a charge under billing code 62263 was already included. Second, it was improper to bill two units under billing code 64484 for the Transforaminal Nerve Blocks which were made bilaterally at one level of the spine because it is permissible to bill only one unit of 64484 for the bilateral injections made for both the left and right sides at any vertebra level.

(f) charges under billing codes 72275 and 76005, which represent epidurograms and fluoroscopy, respectively. Epidurography involves the injection of contrast material that can be seen by x-ray in the epidural space. Fluoroscopy is a radiological procedure used to guide the path of the needle and catheter during Direct and Transforaminal Nerve Blocks. The use of both of these codes was fraudulent because the charge for these procedures was already bundled into and included in the charge for billing code 62263 which expressly includes the "radiologic localization" for the injections contemplated by that code. The use of billing codes 72275 and 76005, together with billing code 62263, amounted to fraudulently billing three times for the radiologic localization and interpretation necessary to do the Direct and Transforaminal Nerve Blocks.

## 5. The Secret And Illegal Kickback Arrangements With The Facilities Where Nerve Block Injections Were Purportedly Performed

154. Between at least 1999 and May 2005, Dr. Mohamed performed Nerve Block Injections only at the ASCs and hospitals with which he, the Alibhais and Boyd had the secret and illegal arrangements described in paragraphs 37-89 and 105-108 above. These arrangements created precisely the kinds of improper financial incentives for Dr. Mohamed to patronize and refer patients to the ASCs and hospitals that Texas' licensure, anti-kickback and workers' compensation laws were specifically designed to prohibit. All parties to these arrangements benefited. The ASCs and hospitals guaranteed themselves income from the "use" fees that they collected for hours during which their operating rooms might otherwise have sat idle, and

secured the patronage of Drs. Mohamed and Cerday who brought the facilities a steady, if not exclusive, referral stream for Nerve Blocks and other procedures. At the same time, Dr. Mohamed, the Alibhais and Boyd profited substantially from the facility fees that they collected from these arrangements.

155. Dr. Mohamed, the Alibhais and Boyd, as well as the hospitals and ASCs, agreed not to disclose their kickback arrangements because they knew full well that they were illegal and that neither Dr. Mohamed, the Alibhais, Boyd, or the companies that they created, had any right to charge for or collect the facility fees relating to any Nerve Blocks or other procedures that Dr. Mohamed or Cerday performed. Indeed, they knew that only health care providers, such as the hospitals and ASCs, which were licensed to and did provide the relevant goods or services were entitled to charge for or collect workers' compensation benefits, pursuant to 28 T.A.C. §§ 133.20(d) (post-May 2, 2006) and 134.801(e) (from July 15, 2000 through May 1, 2006). In fact, when these regulations were adopted, the TWCC explained that the purpose was to prohibit "the practice whereby one entity pays a reduced fee to the health care provider that provided the treatment(s) and/or service(s), then bills the workers' compensation insurance carrier a higher fee. This practice increases cost to the system without adding value to the system. . ." 25 Tex. Reg. 2140 (Mar. 10, 2000).

156. To mislead Travelers into believing that payments for facility fees were being made to licensed ASCs and hospitals, defendants engaged in affirmative acts of fraud including: (1) identifying the provider of the facility goods and services as the Shell Company *at* the facility – for example, "Woodward @ Houston Community Hospital" – causing it to appear that the Shell Corporation was legitimately associated with the facility, when it was not, (2) either using the six digit Medicare "provider number" assigned to the facility in Box 51 of the bill or using a fictitious and meaningless ambulatory surgery identification number. For example, when billing

for procedures performed at Gonzaba – a registered ambulatory surgery center in Texas with an assigned Medicare number of 007221 – Mirage listed "ASC113" in Box 51. This purported identification number is meaningless and was used to mislead Travelers into believing that payments for facility fees were being made to a licensed ASC.

### B. The Fraudulent Compounds

157. Another aspect of the fraud scheme has been premised on Minu RX's submission of charges to Travelers and other insurers for medically unnecessary Compounds that were prescribed by Drs. Mohamed, Cerday, Bayles, Chowdhury, McConnell, Moorehead, Pervez, Reyes, Roman, Shanti and Vidal, as well as several other doctors, often, if not always, pursuant to secret and illegal kickbacks disguised as payments for "royalties," for "research studies" or for acting as a "Medical Consultant" or "Medical Director" to Minu RX.

158. As set forth above, Dr. Mohamed and Undavia formed Minu RX, to operate from the location of the Pain Institute at 2918 San Jacinto in Houston, TX. To conceal Dr. Mohamed's interest in Minu RX, Undavia is identified as the sole director, officer, shareholder and member of Minu RX. In fact, Dr. Mohamed has always been a full fledged partner in the company and, until May 25, 2005 when he was barred by the TWCC from participating in the workers' compensation system, Dr. Mohamed's prescriptions were responsible for most of Minu RX's income.

159. From at least 1999 through the present date, Undavia and Dr. Mohamed have caused Minu RX to enter into secret and illegal financial kickback arrangements with several doctors, including Drs. Bayles, Cerday Chowdhury, Moorehead, Shanti, and, on information and belief, Drs McConnell, Pervez, Reyes, Rodriguez, Roman and Vidal. The kickbacks are disguised as payments by Minu RX to the doctors for "royalties," for "research studies" or for acting as a "Medical Consultant" or "Medical Director" to Minu RX. In fact, these payments are

pure kickbacks, in violation of V.T.C.A. Occupations Code § 102.001 and 28 T.A.C. § 180.25. In return for these kickbacks, these doctors knowingly prescribed the medically unnecessary Compounds thousands of times, to be filled exclusively by Undavia and Minu RX. Minu RX then submitted charges to Travelers and other insurers for more than $325 for each prescription of the Compounds, along with a letter of medical necessity falsely stating, among other things, that the Compounds are medically necessary. The letters of medical necessity also are intentionally misleading in that they accurately state that the individual medicines in the Compounds are FDA approved, but intentionally omit that the Compounds themselves *are not FDA approved for any use* and many medicines in the Compounds are not FDA approved *for topical use*.

160.    The kickbacks from Minu RX and Undavia to Dr. Mohamed amounted to more than $5,300,000 from 2002 through 2004 alone, and have taken various forms over time. For example, in 2001 Dr. Mohamed and the Alibhais formed NC Consulting, as a Shell Company, to funnel kickbacks from Minu RX to Dr. Mohamed. Although Dr. Mohamed's name is not associated with NC Consulting on any corporate filings, the company is identified as one of his assets in a consolidated financial statement prepared for him for the calendar year 2002. That financial statement states that "in 2001 NC Consulting was formed to collect fees received from clinically prescribed pain gels developed by Dr. Mohamed." The financial statement represents that NC Consulting had receipts of $1,335,000 for 2002, which resulted in cash flow of $1,174,000 for the year after expenses. Representative pages from Dr. Mohamed's financial statement regarding NC Consulting are attached hereto as Ex. O. Furthermore, in 2003, Minu RX and Undavia funneled kickbacks amounting to more than $2,700,000 to Dr. Mohamed and Nizamudin Alibhai. See the document attached hereto as Ex. P which was produced by the trustee for Dr. Mohamed and his entities, referencing more than $7,000,000 in receipts to Minu

RX (apparently for 2003) with $2,400,000 being allocated to "Niz" (a reference to Nizamudin Alibhai) and another $300,000 being allocated to "Prov" (a reference to a Providian entity owned by Dr. Mohamed). Furthermore, in an agreement dated October 2, 2003, Minu RX agreed to pay to the Pain Institute a "royalty" of $175 for every prescription for the Compounds that was issued by Dr. Mohamed or any other doctor at the Pain Institute. The October 2, 2003 agreement is attached hereto as Ex. Q. The purported purpose of the $175 "royalty" was to compensate the Pain Institute for its expertise in the development of formulas for compounded pharmaceuticals including gel-based medicines and evaluating other products. In 2004, Minu RX paid the Pain Institute at least $1,790,000 in such "royalties." The characterization of Minu RX's payments as "royalties" was false. These payments were kickbacks to Dr. Mohamed, pursuant to his interest as a full fledged partner in Minu RX.

161.    Furthermore, personal financial statements prepared for Dr. Mohamed for the year 2004 projected that he would receive "royalty" income from the Compounds of approximately $2,400,000 per year for each of the next five years. Representative pages from a 2004 personal financial statement for Dr. Mohamed are attached hereto as Ex. R.

162.    After Dr. Mohamed recruited Dr. Cerday in June 2005 to continue the fraud scheme, Dr. Cerday knowingly prescribed hundreds of medically unnecessary Compounds for patients whose benefits were paid by Travelers. Dr. Cerday, in approximately 20 years of practicing as a pain medicine specialist before his association with Dr. Mohamed, had never prescribed a Compound for a single patient.

163.    On or about February 1, 2007, Minu RX and Undavia entered into two agreements with Dr. Cerday and Southwest Pain which were kickback arrangements disguised as "Medical Consultant," "Medical Director" and "Recruiting Assistance" contracts. Pursuant to the former, Minu RX has paid Dr. Cerday $5,000 a month to act as a "Medical Consultant" to

Minu RX. Pursuant to the latter, Minu RX has "loaned" Southwest Pain at least $60,000 to assist Dr. Cerday in "relocating" and starting a full-time medical practice in San Antonio, even though he already had been in full-time practice in San Antonio for almost 2 years and Southwest Pain did not need the money to recruit Dr. Cerday given that he owned Southwest Pain. In reality, these payments to Dr. Cerday were illegal kickbacks. These kickback agreements are attached hereto as Ex. S.

164.    Minu RX has had similarly disguised kickback arrangements with Drs. Bayles, Chowdhury, Moorehead, Shanti and, on information and belief, McConnell, Pervez, Reyes, Roman and Vidal, as well as other doctors, who have knowingly prescribed its medically unnecessary Compounds over the years.

165.    The Compounds were not and are not medically necessary for at least five reasons. First, some formulations of the Compounds purportedly include active drug ingredients that are salt-based which makes it highly unlikely that they would be absorbed through the skin. Second, some formulations of the Compounds purportedly include active drug ingredients that would react with each other and negate their potential effectiveness. Third, all formulations of the Compounds purportedly include combinations of active ingredients that are either duplicative or for which there is no peer-reviewed, scientific evidence of efficacy for individual or combination therapies. Fourth, even for those formulations of the Compounds with active drug ingredients that could be absorbed through the skin, at best they would provide little, if any, pain relief and certainly no more pain relief than if the standard, universally accepted, FDA approved, oral medications including the same active ingredients, were taken by the patients. Fifth, in addition to a lack of efficacy, the Compounds pose greater risks of side effects to the patients than the standard, universally accepted, oral medications, namely in the form of rashes and irritations.

166.     Furthermore, the letters of medical necessity submitted by Minu RX and Undavia are intentionally misleading in that they accurately state that the individual medicines in the Compounds are FDA approved, but intentionally omit that the Compounds themselves *are not FDA approved* for any use and any of the medicines in the Compounds are not approved *for topical use*.  Moreover, every prescription for Compounds from Minu RX has been illegal under federal law, particularly 21 U.S.C. § 353a, which prohibits compounding unless the compound is for an *identified individual patient* based upon the unsolicited receipt of a *valid prescription*. The Compounds prescribed from Minu RX were not tailored to individual patients and the prescriptions were invalid in that they were for medically unnecessary Compounds and resulted often, if not always, from illegal kickbacks paid by Minu RX and Undavia to the doctors.

167.     Moreover, as set forth below, Dr. Mohamed and Undavia knowingly maximized Minu RX's fraudulent charges for the Compounds in at least two ways.  First, they designed them to include high dosages of unnecessary drugs and other substances.  In fact, Dr. Mohamed and Undavia knew that many of these drugs and other substances were wholly duplicative of each other, directly conflicted with and negated any potential benefit of the others, had no apparent purpose, and were in inexplicably high dosages.  They did so to take maximum advantage of the applicable fee schedule.  Specifically, 28 T.A.C. § 134.502(d)(2) provides that compound drugs shall be billed by listing each drug included in the compound and calculating the charge for each drug separately.  By intentionally maximizing the ingredients and dosages purportedly in the Compounds, Dr. Mohamed and Undavia thereby maximized the fraudulent charges for each.

168.     The second way that Dr. Mohamed and Undavia knowingly maximized the fraudulent charges for the Compounds was designed to take advantage of another aspect of the applicable fee schedule.  Specifically, 28 T.A.C. § 134.503(a)(2) provides that the maximum

allowable reimbursement ("MAR") for prescription drugs shall be no more than "the fees established by the following formulas based on the average wholesale price ("AWP") determined by utilizing a nationally recognized pharmaceutical reimbursement system (e.g., Redbook, First Data Bank Services) in effect on the day the prescription drug is dispensed." For generic drugs like those included in the Compounds, the specified formula is "((AWP per unit) x (number of units) x 1.25) + $4.00 dispensing fee = MAR." In addition, a "compounding fee of $15 shall be added for compound drugs. . . ."

169.    To fraudulently maximize charges for the Compounds under the above-described formula, the Minu RX bills to Travelers and other insurers misrepresented the source from which Minu RX purchased the generic drugs included in the Compounds because the AWPs of those sources were substantially higher than the AWPs of the sources from which Minu RX actually purchased the generic drugs. By way of example, a common generic drug in the Compounds was 12 grams of Ketoprofen. In bills submitted to Travelers, Minu RX routinely represented that it purchased the Ketoprofen from the Professional Compounding Centers of America ("PCCA"). According to the 2006 Redbook, the PCCA's AWP for Ketoprofen is $3.12 per gram. Therefore, under the fee schedule formula, Minu RX could and did charge a maximum of $50.80 for the 12 grams of Ketoprofen, based upon $3.12 (AWP) x 12 (number of units) x $1.25. See a representative bill from Minu RX attached hereto as Ex. T.

170.    The above-described charge of $50.80 for the 12 grams of Ketoprofen included in the Compound was fraudulent because Minu RX did not buy Ketoprofen from the PCCA. In fact, Minu RX purchased Ketoprofen from other suppliers such as Medisca, Inc. According to the 2007 Redbook, Medisca's AWP for Ketoprofen is $1.15 per gram (based upon the purchase of 1000 grams). Therefore, under the fee schedule formula, Minu RX could and should have charged a maximum of $17.25 for the 12 grams of Ketoprofen, based upon $1.15 (AWP) x 12

(number of units) x $1.25. In other words, by misrepresenting to Travelers and other insurers the identity of the supplier for the Ketroprofen that it used in its Compounds, Minu RX charged almost three times the amount of the maximum charge to which it would have been entitled, even if the Compounds were medically necessary, which they were not.

171. Moreover, Minu RX purchased the drugs that it used in the Compounds in substantial quantities at prices that were much lower than any of the AWPs listed in the Redbook. This increased Minu RX's actual profit margins even more, and provided added incentive to bill for as many of the medically unnecessary Compounds as possible.

172. Based upon the prescriptions from Drs. Mohamed, Bayles, Chowdhury, Cerday, McConnell, Moorehead, Pervez, Reyes, Roman, Shanti and Vidal, as well as other doctors, along with the false letters of medical necessity that have been submitted to support the claims of Minu RX for the medically unnecessary Compounds, Travelers has been fraudulently induced to pay Minu RX more than $2,200,000.

**C.     The Fraudulent Concealment Of The "Financial Interests" In Providers To Which Drs. Mohamed and Cerday Made Referrals, After September 1, 2003**

173. Dr. Mohamed had direct or indirect ownership interests and/or compensation arrangements with health care providers to which he made referrals after September 1, 2003, namely: (a) the Shell Companies which are described at paragraphs 37-89 and 105-108 above, (b) the hospitals and ASCs at which he and Dr. Cerday performed Nerve Blocks and other procedures, including HCH, Renaissance ASC, Gonzaba ASC, St. Jude's ASC, North Point ASC and Orange ASC, (c) Minu RX, (d) Chartwell Distributors, Inc., and (e) at least five other entities, Fountainview Rehab, LLC, Elite MRI, Inc., Medical Spine Care Clinics of America, Inc., Medical Spine Care Clinic of Houston, Inc. and Medical Spine Care Clinic of San Antonio, Inc., which he and the Alibhais created in 2003 to conceal his interest in and revenue stream

from physical therapy services, magnetic resonance imaging studies, and Vax-D treatments purportedly performed on his patients based upon his referrals. Accordingly, Dr. Mohamed had a "financial interest" in these health care providers, within the meaning of 28 T.A.C. §§ 180.24(a)(2)(a) and/or (a)(2)(b). In fact, from January 2003 though April 2005, Dr. Mohamed received substantially more than $9 million from his undisclosed "financial interest" in these entities.

174.    Dr. Mohamed knowingly failed to disclose his "financial interests" in the above-described entities, despite his requirement to do so pursuant to V.T.C.A. Labor Code §§ 413.041(a)-(c) and 418.001(2), as well as 28 T.A.C. §§ 180.24(b)(1) and (b)(2).

175.    Dr. Mohamed was well aware of the disclosure obligations under V.T.C.A. Labor Code §§ 413.041(a)-(c) and 418.001(2) as well as 28 T.A.C. §§ 180.24(b)(1) and (b)(2) because, on December 10, 2003, he disclosed on the relevant form that the Pain Institute "receives compensation in the form of royalties" from Plaza Medical Center Pharmacy (i.e., Minu RX). Although he made this disclosure, it was false in that he falsely described the nature of his "financial interests" in Minu RX as "compensation in the form of royalties" when, in fact, the true nature of his "financial interest" in Minu RX was that as a full fledged partner and the payments were illegal kickbacks, in violation of 28 T.A.C. § 180.25 and V.T.C.A. § 102.001, not "royalties."

176.    Based upon Dr. Mohamed's knowing failure to comply with the above described disclosure requirements, pursuant to V.T.C.A. Labor Code §§ 413.041(a)-(c) and 418.001(2), as well as 28 T.A.C. §§ 180.24(c)(1) and (c)(2), Dr. Mohamed had no right to present a claim and collect workers' compensation benefits from Travelers or any other payor for any services that he rendered on or after September 1, 2003, regardless whether the particular services were subject to the disclosure requirement or whether the services were medically necessary. Yet, he

knowingly did so and, as a result, Travelers was fraudulently induced to pay more than $490,000 to Dr. Mohamed, Advanced Rehab, Ortho Pain and the Pain Institute for such services.

177.    Similarly, as of February 1, 2007, Dr. Cerday had a compensation arrangement with Minu RX to which he made referrals for Compounds.  Accordingly, Dr. Cerday had a "financial interest" in Minu RX, within the meaning of 28 T.A.C. §§ 180.24(a)(2)(a) and/or (a)(2)(b).

178.    Dr. Cerday knowingly failed to disclose his "financial interests" in Minu RX, despite his requirement to do so pursuant to V.T.C.A. Labor Code §§ 413.041(a)-(c) and 418.001(2), as well as 28 T.A.C. §§ 180.24(b)(1) and (b)(2).

179.    Dr. Cerday was well aware of the disclosure obligations under V.T.C.A. Labor Code §§ 413.041(a)-(c) and 418.001(2), as well as 28 T.A.C. §§ 180.24(b)(1) and (b)(2) because, on February 21, 2003, he disclosed on the relevant form that had an employment relationship with Medical Associates.

180.    Based upon Dr. Cerday's knowing failure to comply with the above described disclosure requirements, pursuant to V.T.C.A. Labor Code §§ 413.041(a)-(c) and 418.001(2), as well as 28 T.A.C. §§ 180.24(b)(1) and (b)(2), Dr. Cerday had no right to present a claim and collect workers' compensation benefits from Travelers or any other payor for any services rendered on or after February 1, 2007, regardless whether the particular services were subject to the disclosure requirement or whether the services were medically necessary.  Yet, he knowingly did so and, as a result, Travelers was fraudulently induced to pay more than $7,000 to Dr. Cerday and Southwest Pain for such services.

## V.      **TRAVELERS' JUSTIFIABLE RELIANCE**

181.    In each and every claim submitted to Travelers, the defendants knowingly have made some or all of the following misrepresentations: (a) that the Nerve Blocks were medically

necessary, (b) that the Nerve Blocks were performed, (c) that the billing codes and charges for the Nerve Blocks were proper, (c) that the Shell Companies, as well as Inner Houston and Wildwood, provided and were entitled to payment for any of the goods and services upon which the facility fees were based for Nerve Blocks and other procedures performed by Drs. Mohamed and Cerday, (d) that any of the Compounds were medically necessary and their medicines are FDA approved for topical use, (e) that the charges for the Compounds were proper, (f) that Dr. Mohamed had truthfully complied with his disclosure obligations pursuant to V.T.C.A. Labor Code §§ 413.041(a)-(c) and 418.001(2), as well as 28 T.A.C. §§ 180.24(b)(1) and (b)(2), and was therefore entitled to payment for any services after September 1, 2003, regardless of the nature of the service or whether it was medically necessary, and (g) that Dr. Cerday had truthfully complied with his disclosure obligations pursuant to V.T.C.A. Labor Code §§ 413.041(a)-(c) and 418.001(2), as well as 28 T.A.C. §§ 180.24(b)(1) and (b)(2), and was therefore entitled to payment for any services rendered on or after February 1, 2007, regardless of the nature of the service or whether it was medically necessary.

182.    As licensed professionals, Drs. Mohamed, Bayles, Cerday, Chowdhury, McConnell, Moorehead, Pervez, Reyes, Roman, Shanti and Vidal, as well as Undavia, who attested to the indication and necessity of the Nerve Blocks and/or Compounds, as well as the accuracy and appropriateness of the charges, are obligated legally and ethically to act honestly, with integrity, and in the best medical interest of their patients.

183.    Travelers is under statutory and contractual obligations to promptly and fairly process workers' compensation claims within very tight deadlines.  The facially valid documents submitted to Travelers in support of the fraudulent charges at issue, including in the requests for pre-authorization sent by Drs. Mohamed and Cerday, combined with the material misrepresentations and affirmative acts of concealment described above, were designed to and

did cause Travelers to justifiably rely on them. As a result, Travelers has incurred actual damages of more than $4,200,000 million based upon the fraudulent charges.

184. Based upon the material misrepresentations and affirmative acts of concealment described above, Travelers did not discover and should not have reasonably discovered that its damages were attributable to fraud until shortly before it filed this Second Amended Complaint.

## V. CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
**(Substantive Racketeering – 18 U.S.C. §§ 1962(c) and 1964)**

185. Travelers incorporates, as if fully set forth herein, each and every allegation in paragraphs 1 through 184 above.

186. Drs. Mohamed and Cerday, Stein Pain, Advanced Rehab, the Pain Institute, Orthopedic Pain, the Alibhias, Mirage Ltd., Mirage TX, Oasis NV, Orange Grove Ltd., Orange Grove TX, Orange Grove NV, Renaissance Ltd., Renaissance TX, Renaissance NV, Woodward, Ltd., Woodward TX, Woodward NV, Boyd, Southwest Pain, Satex, Inner Houston and Wildwood, are an association-in-fact "enterprise" (the "Fraudulent Claims Enterprise"), as that term is defined in 18 U.S.C. § 1961(4), that engages in, and the activities of which affect, interstate commerce.

187. The members of the Fraudulent Claims Enterprise are and have been associated through time, joined in purpose and organized in a manner amenable to hierarchical and consensual decision-making, with each member fulfilling a specific and necessary role to carry out and facilitate common purposes, namely to fraudulently induce Travelers and other insurers to pay: (a) for Nerve Blocks that were either medically unnecessary or never performed, (b) charges relating to the Nerve Blocks that were improper because they were either duplicative, unbundled or for related services that were never performed, regardless of whether the Nerve

Blocks were medically necessary, (c) facility fees relating to all procedures performed by Drs. Mohamed and Cerday in ASCs and hospitals, including Nerve Blocks, to the Shell Companies, as well as Inner Houston and Wildwood, which had secret and illegal kickback arrangements with ASCs and hospitals and did not provide the goods and services upon which the facility fees were based, (d) charges for any services purportedly rendered by Dr. Mohamed on or after September 1, 2003, despite his knowing failure to disclose his financial interests in health care providers to which he made referrals, and (e) charges for any services purportedly rendered by Dr. Cerday on or after February 1, 2007, despite his knowing failure to disclose his financial interests in Minu RX to which he made referrals.

188. The planning and carrying out of the scheme would be beyond the capacity of each member of the Fraudulent Claims Enterprise acting singly or without the aid of each other. Together, the members of the enterprise comprised the structure, necessary to achieve their common purposes. Specifically, Dr. Mohamed induced Travelers and other insurers to pre-authorize medically unnecessary Nerve Block Injections and caused the submission of all of the fraudulent charges at issue. The Alibhais, together with Dr. Mohamed, formed Mirage Ltd., Mirage TX, Oasis NV, Orange Grove Ltd., Orange Grove TX, Orange Grove NV, Renaissance Ltd., Renaissance TX, Renaissance NV, Woodward, Ltd., Woodward TX, and Woodward, NV, to enter into secret and illegal kickback arrangements with ASCs and hospitals. The purpose of these arrangements was to enable Dr. Mohamed and the Alibhais to unlawfully profit from facility fees for procedures purportedly performed by Drs. Mohamed at ASCs and hospitals, including Nerve Blocks. Jonathan Boyd acted as the intermediary between the hospitals and ASCs, and Dr. Mohamed, the Alibhais and the Shell Companies in negotiating the secret and illegal kickback arrangements. Stein Pain, Advanced Rehab, Orthopedic Pain and the Pain Institute were formed by Dr. Mohamed to submit the fraudulent procedure fees relating to the

Nerve Blocks purportedly performed by Dr. Mohamed, as well as the fraudulent charges for all other services that he purportedly rendered after September 1, 2003 despite his knowing failure to disclose his financial interests in health care providers to which he made referrals. After Dr. Mohamed was barred by the TWCC from participating in the workers' compensation system, he recruited Dr. Cerday to form Southwest Pain and to continue with exactly the same fraudulent treatment and billing practices. Dr. Mohamed also recruited Boyd to form Satex to funnel the proceeds of Dr. Cerday's practices to Dr. Mohamed disguised as "consulting fees," and to form Inner Houston and Wildwood to continue through the secret and illegal kickback arrangements with ASCs and hospitals to unlawfully profit from the fraudulent facility fees for procedures purportedly performed by Dr. Cerday at those facilities.

189. The Fraudulent Claims Enterprise is distinct from and has an existence beyond the pattern of racketeering activity described herein, namely by recruiting, employing, overseeing and coordinating many professionals and non-professionals who have been responsible for facilitating and performing a wide variety of administrative and professional functions in several cities and states, beyond the acts of mail fraud (i.e. the submission of the fraudulent bills to Travelers and other insurers), including the formation of numerous entities, the purchase and lease of buildings and equipment necessary to provide a range of pain management medical services, the recruitment and supervision of personnel to provide such services, the acquisition and sale of undisclosed ownership interests in hospitals and ASCs, the negotiation and execution of secret "use" agreements with hospitals and ASCs, the bookkeeping and accounting functions necessary to manage the receipts and disbursements relating to the overall operations, and arrangements with lawyers, accountants and others whose services were necessary to support all of these functions.

190.     Drs. Mohamed and Cerday, Stein Pain, Advanced Rehab, the Pain Institute, Orthopedic Pain, the Alibhias, Mirage Ltd., Mirage TX, Oasis NV, Orange Grove Ltd., Orange Grove TX, Orange Grove NV, Renaissance Ltd., Renaissance TX, Renaissance NV, Woodward, Ltd., Woodward TX, Woodward NV, Boyd, Southwest Pain, Satex, Inner Houston and Wildwood are or have been employed by and/or associated with the Fraudulent Claims Enterprise. Furthermore, they have knowingly conducted and/or participated, directly or indirectly, in the conduct of the Fraudulent Claims Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted to Travelers and other insurers the fraudulent charges described, in part, in the chart attached hereto as Ex. K. Each such mailing was made in furtherance of the mail fraud scheme.

191.     Travelers has been injured in its business and property by reason of this conduct in that it has paid more than $2,000,000, consisting of payments made by Travelers: (a) to Drs. Mohamed or Cerday, or Stein Pain, Advanced Rehab, Orthopedic Pain, the Pain Institute or Southwest Pain for Nerve Blocks that were either medically unnecessary or never performed, and/or improper charges relating to the Nerve Blocks, (b) to the Shell Companies, as well as Inner Houston and Wildwood, for all facility fees relating to procedures performed by Drs. Mohamed and Cerday in ASCs and hospitals, including Nerve Blocks, (c) to Dr. Mohamed, Advanced Rehab, Orthopedic Pain, or the Pain Institute for any services purportedly rendered by Dr. Mohamed on or after September 1, 2003, despite his knowing failure to disclose his financial interests in health care providers to which he made referrals, and (d) to Dr. Cerday or Southwest Pain for any services purportedly rendered by Dr. Cerday on or after February 1, 2007, despite his knowing failure to disclose his financial interests in Minu RX to which he made referrals.

192.     Based upon the above-described material misrepresentations and affirmative acts of concealment, Travelers did not discover and should not have reasonably discovered that its damages were attributable to fraud until shortly before it filed this complaint.

193.     Travelers is entitled to treble damages, pre-judgment and post-judgment interest, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## SECOND CLAIM FOR RELIEF
### (Violation of 18 U.S.C. 1962(d))

194.     Travelers incorporates, as if fully set forth herein, each and every allegation in paragraphs 1 through 184 and 186-190 above.

195.     All members of the Fraudulent Claims Enterprise, as well as Houston Community Hospital Inc., have knowingly agreed and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Fraudulent Claims Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit to Travelers and other insurers hundreds of fraudulent claims as set forth in paragraph 190 above. The fraudulent bills and corresponding mailings which comprise the pattern of racketeering activity identified through the date of this Second Amended Complaint are described, in part, in Ex. K attached hereto.

196.     Each member of the Fraudulent Claims Enterprise, as well as Houston Community Hospital Inc., knew of, agreed to and acted in furtherance of the common and overall objectives of the conspiracy by facilitating the submission to Travelers and other insurance companies of the fraudulent charges at issue.  Houston Community Hospital, Inc. furthered the common and overall objective by agreeing, pursuant to the secret and illegal kickback agreements described above, to allow Woodward Ltd. and Wildwood to unlawfully bill

all non-governmental payors, including Travelers, for the facility fees relating to Nerve Blocks and other procedures purportedly performed by Drs. Mohamed and Cerday. The roles of the other defendants in furthering the common and overall objectives of the conspiracy are described in paragraph 188 above.

197. Travelers has been injured in its business and property by reason of defendants' above-described conduct in that it has paid more than $2,000,000 consisting of payments made by Travelers: (a) to Drs. Mohamed or Cerday, or Stein Pain, Advanced Rehab, Orthopedic Pain, the Pain Institute or Southwest Pain for Nerve Blocks that were either medically unnecessary or never performed, and/or improper charges relating to the Nerve Blocks, (b) to the Shell Companies, as well as Inner Houston and Wildwood, for all facility fees relating to procedures performed by Drs. Mohamed and Cerday in ASCs and hospitals, including Nerve Blocks, (c) to Dr. Mohamed, Advanced Rehab, Orthopedic Pain, or the Pain Institute for any services purportedly rendered by Dr. Mohamed on or after September 1, 2003, despite his knowing failure to disclose his financial interests in health care providers to which he made referrals, and (d) to Dr. Cerday or Southwest Pain for any services purportedly rendered by Dr. Cerday on or after February 1, 2007, despite his knowing failure to disclose his financial interests in Minu RX to which he made referrals.

198. By reason of this injury, Travelers is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### THIRD CLAIM FOR RELIEF
### (Common Law Fraud)

199. Travelers incorporates, as if fully set forth herein, each and every allegation in paragraphs 1 through 184 above.

200.    In the claims set forth, in part, in the chart attached hereto as Ex. K, Drs. Mohamed and Cerday, Stein Pain, Advanced Rehab, the Pain Institute, Orthopedic Pain, the Alibhias, Mirage Ltd., Mirage TX, Oasis NV, Orange Grove Ltd., Orange Grove TX, Orange Grove NV, Renaissance Ltd., Renaissance TX, Renaissance NV, Woodward, Ltd., Woodward TX, Woodward, NV, Boyd, Southwest Pain, Satex, Inner Houston, and Wildwood, intentionally and knowingly made or caused to be made false and fraudulent statements of material fact to Travelers, namely that: (a) the Nerve Blocks were performed and medically unnecessary, (b) the charges relating to the Nerve Blocks were proper and were not duplicative, unbundled or for related services that were never performed, (c) Mirage Ltd., Orange Grove Ltd., Renaissance Ltd., Woodward Ltd., Satex, Inner Houston and Wildwood provided the goods and services upon which the facility fees were based for procedures purportedly performed by Drs. Mohamed and Cerday in ASCs and hospitals, including Nerve Blocks, and were entitled to payment of such fees, (d) Dr. Mohamed, Advanced Rehab, the Pain Institute or Orthopedic Pain were entitled to charge and collect for any services that Dr. Mohamed purportedly rendered on or after September 1, 2003, despite his knowing failure to disclose his financial interests in health care providers to which he made referrals, and (e) Dr. Cerday and Southwest Pain were entitled to charge and collect for any services that Dr. Cerday purportedly rendered on after February 1, 2007, despite his knowing failure to disclose his financial interests in Minu RX to which he made referrals.

201.    Drs. Mohamed and Cerday, Stein Pain, Advanced Rehab, the Pain Institute, Orthopedic Pain, the Alibhias, Mirage Ltd., Mirage TX, Oasis NV, Orange Grove Ltd., Orange Grove TX, Orange Grove NV, Renaissance Ltd., Renaissance TX, Renaissance NV, Woodward, Ltd., Woodward TX, Woodward, NV, Boyd, Southwest Pain, Satex, Inner Houston, and

Wildwood made or caused to be made these material, false, and fraudulent statements to induce Travelers to pay the charges which were not, in fact, owed.

202.    Travelers justifiably relied on the material, false, and fraudulent representations, and as a direct and proximate result incurred damages of more than $2,000,000, consisting of payments made by Travelers: (a) to Drs. Mohamed or Cerday, or Stein Pain, Advanced Rehab, Orthopedic Pain, the Pain Institute or Southwest Pain for Nerve Blocks that were either medically unnecessary or never performed, and/or improper charges relating to the Nerve Blocks, (b) to the Shell Companies, as well as Inner Houston and Wildwood, for all facility fees relating to procedures performed by Drs. Mohamed and Cerday in ASCs and hospitals, including Nerve Blocks, (c) to Dr. Mohamed, Advanced Rehab, Orthopedic Pain, or the Pain Institute for any services purportedly rendered by Dr. Mohamed on or after September 1, 2003, despite his knowing failure to disclose his financial interests in health care providers to which he made referrals, and (d) to Dr. Cerday or Southwest Pain for any services purportedly rendered by Dr. Cerday on or after February 1, 2007, despite his knowing failure to disclose his financial interests in Minu RX to which he made referrals.

203.    Based upon Defendants' material misrepresentations and affirmative acts to conceal the fraud, Travelers did not discover and should not have reasonably discovered that its damages were attributable to fraud until shortly before this complaint was filed.

204.    Defendants' extensive fraudulent conduct constitutes a high degree of moral turpitude and wanton dishonesty, thus entitling Travelers to punitive damages.

205.    Travelers is entitled to compensatory and punitive damages, pre-judgment and post-judgment interest, and any other relief the Court deems just and proper.

## FOURTH CLAIM FOR RELIEF
### (Common Law Fraud Conspiracy)

206. Travelers incorporates, as if fully set forth herein, each and every allegation in paragraphs 1 through 184 above.

207. In the claims set forth, in part, in the chart attached hereto as Ex. K, Drs. Mohamed and Cerday, Stein Pain, Advanced Rehab, the Pain Institute, Orthopedic Pain, the Alibhias, Mirage Ltd., Mirage TX, Oasis NV, Orange Grove Ltd., Orange Grove TX, Orange Grove NV, Woodward, Ltd., Woodward TX, Woodward, NV, Boyd, Southwest Pain, Satex, Inner Houston, Wildwood, and Houston Community Hospital, Inc. conspired and agreed to intentionally and knowingly make or cause to be made false and fraudulent statements of material fact to Travelers, namely that: (a) the Nerve Blocks were performed and medically unnecessary, (b) the charges relating to the Nerve Blocks were proper and were not duplicative, unbundled or for related services that were never performed, (c) Mirage Ltd., Orange Grove Ltd., Renaissance Ltd., Woodward Ltd., Satex, Inner Houston and Wildwood provided the goods and services upon which the facility fees were based for procedures purportedly performed by Drs. Mohamed and Cerday in ASCs and hospitals, including Nerve Block Injections, and were entitled to payment of such fees, (d) Dr. Mohamed, Advanced Rehab, the Pain Institute or Orthopedic Pain were entitled to charge and collect for any services that Dr. Mohamed purportedly rendered after September 1, 2003, despite his knowing failure to disclose his financial interests in health care providers to which he made referrals, and (e) Dr. Cerday and Southwest Pain were entitled to charge and collect for any services that Dr. Cerday purportedly rendered after February 1, 2007, despite his knowing failure to disclose his financial interests in health care providers to which he made referrals.

208.     Defendants conspired, agreed and had a meeting of the minds on a common object and course of action, namely to induce Travelers and other insurers to pay charges for the performance of and facility fees relating to Nerve Blocks and other procedures purportedly performed by Drs. Mohamed and Cerday, as well as other services purportedly rendered by Drs. Mohamed and Cerday during their non-compliance with the financial interest reporting requirements, which were not owed, by making, and causing to be made, the above-described material, false, and fraudulent statements.  Defendants intended and had reason to expect that Travelers and other insurers would rely on the above-described fraudulent statements by paying such charges which were not owed.

209.     Travelers justifiably relied on the material, false, and fraudulent representations, and as a direct and proximate result incurred damages of more than $2,000,000, consisting of payments made by Travelers: (a) to Drs. Mohamed or Cerday, or Stein Pain, Advanced Rehab, Orthopedic Pain, the Pain Institute or Southwest Pain for Nerve Blocks that were either medically unnecessary or never performed, and/or improper charges relating to the Nerve Blocks, (b) to the Shell Companies, as well as Inner Houston and Wildwood, for all facility fees relating to procedures performed by Drs. Mohamed and Cerday in ASCs and hospitals, including Nerve Blocks, (c) to Dr. Mohamed, Advanced Rehab, Orthopedic Pain, or the Pain Institute for any services purportedly rendered by Dr. Mohamed on or after September 1, 2003, despite his knowing failure to disclose his financial interests in health care providers to which he made referrals, and (d) to Dr. Cerday or Southwest Pain for any services purportedly rendered by Dr. Cerday on or after February 1, 2007, despite his knowing failure to disclose his financial interests in Minu RX to which he made referrals.

210.     Based upon Defendants' material misrepresentations and affirmative acts to conceal the fraud, Travelers did not discover and should not have reasonably discovered that its damages were attributable to fraud until shortly before this complaint was filed.

211.     Defendants' extensive fraudulent conduct constitutes a high degree of moral turpitude and wanton dishonesty, thus entitling Travelers to punitive damages.

212.     Travelers is entitled to compensatory and punitive damages, pre-judgment and post-judgment interest, and any other relief the Court deems just and proper.

### FIFTH CLAIM FOR RELIEF
### (Substantive Racketeering – 18 U.S.C. §§ 1962(c) and 1964)

213.     Travelers incorporates, as if fully set forth herein, each and every allegation in paragraphs 1 through 184 above.

214.     Minu RX, Ltd and its predecessor Minu RX, Inc. are and always have been an "enterprise" (the "Minu RX Enterprise"), as that term is defined in 18 U.S.C. § 1961(4), that engages in, and the activities of which affect, interstate commerce.  Although the form of the entity was converted from a corporation to a limited partnership, the Minu RX Enterprise has always been a legal entity in one form or the other.

215.     Dr. Mohamed, Undavia and Minu GP, LLC are or have been employed by and/or associated with the Minu RX Enterprise. Specifically, Dr. Mohamed has issued thousands of prescriptions for medically unnecessary Compounds to facilitate fraudulent charges from the Minu RX Enterprise to Travelers and other insurers.  Furthermore, Dr. Mohamed and Undavia are and have been full fledged partners in the Minu RX Enterprise, disguising millions of dollars in kickbacks to Dr. Mohamed and other doctors as "royalties," "Medical Consultant," "Medical Director," or "Recruiting Assistance" payments to induce prescriptions for medically unnecessary Compounds.  As the general partner of Minu RX, Minu GP LLC has caused,

benefited from and is responsible for the entire pattern of racketeering activity that has been committed through the Minu RX Enterprise.

216. The Minu RX Enterprise is distinct from and has an existence beyond the pattern of racketeering activity described herein, namely it is a formal legal entity with a structure in place to coordinate and oversee a full-service pharmacy, including recruiting, employing, and coordinating pharmacists and non-pharmacists who have been responsible for facilitating and performing a wide variety of administrative and professional functions beyond the acts of mail fraud (i.e. the submission of the fraudulent bills and letter of medical necessity to Travelers and other insurers for medically unnecessary Compounds), including the lease of buildings and equipment necessary to provide a range of pharmaceutical services and products other than Compounds, the recruitment and supervision of personnel to provide such services, bookkeeping and accounting functions necessary to manage the receipts and disbursements relating to the overall operations, and arrangements with lawyers, accountants and others whose services were necessary to support all of these functions.

217. Dr. Mohamed, Undavia and Minu GP, LLC are or have been employed by and/or associated with the Minu RX Enterprise, and have knowingly conducted and/or participated, directly or indirectly, in the conduct of the Minu RX Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted to Travelers and other insurers thousands of fraudulent charges for medically unnecessary Compounds which were supported by letters of medically necessary, falsely representing that the Compounds were medically necessary and that their medicines were FDA approved, when, in fact, the Compounds were not medically necessary or FDA approved for any use, and many of their medicines have never been FDA approved for topical use, among other things, as set forth,

in part, in the chart attached hereto as Ex. U.  Each such mailing was made in furtherance of the mail fraud scheme.

218.    Travelers has been injured in its business and property by reason of this conduct in that it has paid Minu RX more than $2,200,000 for medically unnecessary Compounds.

219.    Based upon the above-described material misrepresentations and affirmative acts of concealment, Travelers did not discover and should not have reasonably discovered that its damages were attributable to fraud until shortly before it filed this complaint.

220.    Travelers is entitled to treble damages, pre-judgment and post-judgment interest, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### SIXTH CLAIM FOR RELIEF
**(Violation of 18 U.S.C. 1962(d))**

221.    Travelers incorporates, as if fully set forth herein, each and every allegation in paragraphs 1 through 184 and 214 through 216 above.

222.    Dr. Mohamed, Undavia, Minu GP, LLC, the Alibhais, NC Consulting, New Frontier NV, the Pain Institute, and Drs. Cerday, Bayles, Chowdhury, McConnell, Moorehead, Pervez, Reyes, Roman, Shanti and Vidal, have knowingly agreed and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Minu RX Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit to Travelers and other insurers thousands of fraudulent claims as set forth in paragraph 217 above. The fraudulent bills and corresponding mailings which comprise the pattern of racketeering activity identified through the date of this Second Amended Complaint are described, in part, in Ex. U attached hereto.

223. Dr. Mohamed, Undavia, Minu GP, LLC, the Alibhais, NC Consulting, Frontier NV, the Pain Institute, and Drs. Cerday, Bayles, Chowdhury, McConnell, Moorehead, Pervez, Reyes, Roman, Shanti and Vidal, knew of, agreed to and acted in furtherance of the common and overall objectives of the conspiracy by facilitating the submission to Travelers and other insurance companies of the fraudulent charges at issue. Specifically, Drs. Mohamed, Cerday, Bayles, Chowdhury, McConnell, Moorehead, Pervez, Reyes, Roman, Shanti and Vidal have issued thousands of prescriptions for medically unnecessary Compounds to facilitate fraudulent charges from the Minu RX Enterprise to Travelers and other insurers. Dr. Mohamed and Undavia are and have been full fledged partners in the Minu RX Enterprise, and working together with the Alibhais, they have disguised millions of dollars in kickbacks to Dr. Mohamed as "royalties." Dr. Mohamed and Undavia also have induced Drs. Cerday, Bayles, Chowdhury, Moorehead, Shanti and, on information and belief, McConnell, Pervez, Reyes, Roman and Vidal, as well as other doctors, to issue prescriptions for thousands of medically unnecessary Compounds through secret and illegal kickbacks which have been often disguised as "royalties," or "Medical Consultant," "Medical Director," and "Recruiting Assistance" payments. As the general partner of Minu RX, Minu GP LLC has caused, benefited from and is responsible for the entire pattern of racketeering activity that has been committed through the Minu RX Enterprise. NC Consulting, New Frontiers NV and the Pain Institute actively served as the "fronts" and conduits through which Dr. Mohamed, Undavia and the Alibhais funneled millions of dollars in kickbacks from the Minu RX Enterprise to Dr. Mohamed under the guise of "royalties."

224. Travelers has been injured in its business and property by reason of defendants' above-described conduct in that it has paid Minu RX more than $ 2,200,000 for medically unnecessary Compounds.

225. By reason of this injury, Travelers is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## SEVENTH CLAIM FOR RELIEF
### (Common Law Fraud)

226. Travelers incorporates, as if fully set forth herein, each and every allegation in paragraphs 1 through 184 above.

227. In the claims set forth in the chart attached hereto as Ex. U, Dr. Mohamed, Undavia, Minu RX, Ltd. and Minu GP, LLC, intentionally and knowingly made or caused to be made false and fraudulent statements of material fact to Travelers, namely that the Compounds were medically necessary and that their medicines were FDA approved, when, in fact, the Compounds were not medically necessary or FDA approved for any use, and many of their medicines have never been FDA approved for topical use, among other things. Furthermore, the defendants intentionally omitted to inform Travelers regarding Dr. Mohamed's secret interest in Minu RX, that millions of dollars in kickbacks disguised as "royalties" were being funneled through NC Consulting, New Frontiers NV and possibly other entities to Dr. Mohamed, and that doctors, were being induced to issue prescriptions for thousands of medically unnecessary Compounds through secret and illegal kickbacks often disguised as "royalties," "Medical Consultant," "Medical Director," or "Recruiting Assistance" payments.

228. Dr. Mohamed, Undavia, Minu RX, Ltd. and Minu GP, LLC made or caused to be made these material, false, and fraudulent statements and omissions to induce Travelers to pay the charges which were not, in fact, owed.

229. Travelers justifiably relied on the material, false, and fraudulent representations, and as a direct and proximate result incurred damages of more than $2,200,000 through payments to Minu RX for medically unnecessary Compounds.

230. Based upon Defendants' material misrepresentations and affirmative acts to conceal the fraud, Travelers did not discover and should not have reasonably discovered that its damages were attributable to fraud until shortly before this complaint was filed.

231. Defendants' extensive fraudulent conduct constitutes a high degree of moral turpitude and wanton dishonesty, thus entitling Travelers to punitive damages.

232. Travelers is entitled to compensatory and punitive damages, pre-judgment and post-judgment interest, and any other relief the Court deems just and proper.

## EIGHTH CLAIM FOR RELIEF
### (Common Law Fraud Conspiracy)

233. Travelers incorporates, as if fully set forth herein, each and every allegation in paragraphs 1 through 184.

234. In the claims set forth in the chart attached hereto as Ex. U, Dr. Mohamed, Undavia, Minu RX, Ltd., Minu GP, LLC, Drs. Cerday, Bayles, Chowdhury, McConnell, Moorehead, Pervez, Reyes, Roman, Shanti and Vidal, the Alibhais, NC Consulting, New Frontier NV, and the Pain Institute conspired and agreed to intentionally and knowingly make or cause to be made false and fraudulent statements of material fact to Travelers, namely that the Compounds were medically necessary and that their medicines were FDA approved, when, in fact, the Compounds were not medically necessary or FDA approved for any use, and many of their medicines have never been FDA approved for topical use, among other things. Furthermore, the defendants intentionally omitted to inform Travelers regarding Dr. Mohamed's secret interest in Minu RX and that millions of dollars in kickbacks disguised as "royalties" were

being funneled through NC Consulting, New Frontiers NV, the Pain Institute and possibly other entities to Dr. Mohamed, and that Drs. Cerday, Bayles, Chowdhury, Moorehead, Shanti and, on information and belief, McConnell, Pervez, Reyes, Roman and Vidal, as well as other doctors, were being induced to issue prescriptions for thousands of medically unnecessary Compounds through secret and illegal kickbacks often disguised as "royalties," or "Medical Consultant," "Medical Director," and "Recruiting Assistance" payments.

235.     Dr. Mohamed, Undavia, Minu RX, Ltd., Minu GP, LLC, Drs. Cerday, Bayles, Chowdhury, McConnell, Moorehead, Pervez, Reyes, Roman, Shanti and Vidal, the Alibhais, NC Consulting, New Frontier NV, and the Pain Institute conspired, agreed and had a meeting of the minds on a common object and course of action, namely to induce Travelers and other insurers to pay for Compounds which were not owed, by making, and causing to be made, the above-described material, false, and fraudulent statements.  Defendants intended and had reason to expect that Travelers and other insurers would rely on the above-described fraudulent statements by paying  charges for Compounds which were not owed.

236.     Travelers justifiably relied on the material, false, and fraudulent representations, and as a direct and proximate result incurred damages of more than $2,200,000 through payments to Minu RX for medically unnecessary Compounds.

237.     Based upon Defendants' material misrepresentations and affirmative acts to conceal the fraud, Travelers did not discover and should not have reasonably discovered that its damages were attributable to fraud until shortly before this complaint was filed.

238.     Defendants' extensive fraudulent conduct constitutes a high degree of moral turpitude and wanton dishonesty, thus entitling Travelers to punitive damages.

239.     Travelers is entitled to compensatory and punitive damages, pre-judgment and post-judgment interest, and any other relief the Court deems just and proper

**WHEREFORE**, Travelers prays for judgment in its favor and respectfully requests that this Court:

A.      enter a judgment in favor of Travelers on its First Claim for Relief against Defendants Drs. Mohamed and Cerday, Stein Pain, Advanced Rehab, the Pain Institute, Orthopedic Pain, the Alibhias, Mirage Ltd., Mirage TX, Oasis NV, Orange Grove Ltd., Orange Grove TX, Orange Grove NV, Renaissance Ltd., Renaissance TX, Renaissance NV, Woodward, Ltd., Woodward TX, Woodward, NV, Boyd, Southwest Pain, Satex, Inner Houston and Wildwood for compensatory damages in amount of more than $2,000,000, together with treble damages, costs and reasonable attorneys fees pursuant to 18 U.S.C. §§ 1962(c) and 1964(c) plus interest;

B.      enter a judgment in favor of Travelers on its Second Claim for Relief against Defendants Drs. Mohamed and Cerday, Stein Pain, Advanced Rehab, the Pain Institute, Orthopedic Pain, the Alibhias, Mirage Ltd., Mirage TX, Oasis NV, Orange Grove Ltd., Orange Grove TX, Orange Grove NV, Renaissance Ltd., Renaissance TX, Renaissance NV, Woodward, Ltd., Woodward TX, Woodward, NV, Boyd, Southwest Pain, Satex, Inner Houston, Wildwood, and Houston Community Hospital, Inc., for compensatory damages in amount of more than $2,000,000, together with treble damages, costs and reasonable attorneys fees pursuant to 18 U.S.C. §§ 1962(d) and 1964(c) plus interest;

C.      enter a judgment in favor of Travelers on its on its Third Claim for Relief against Defendants Drs. Mohamed and Cerday, Stein Pain, Advanced Rehab, the Pain Institute, Orthopedic Pain, the Alibhias, Mirage Ltd., Mirage TX, Oasis NV, Orange Grove Ltd., Orange Grove TX, Orange Grove NV, Renaissance Ltd., Renaissance TX, Renaissance NV, Woodward, Ltd., Woodward TX, Woodward, NV, Boyd, Southwest Pain, Satex, Inner Houston and

Wildwood, for compensatory damages in an amount of more than $2,000,000, together with punitive damages and interest pursuant to Texas common law;

D.      enter a judgment in favor of Travelers on its on its Fourth Claim for Relief against Defendants Drs. Mohamed and Cerday, Stein Pain, Advanced Rehab, the Pain Institute, Orthopedic Pain, the Alibhias, Mirage Ltd., Mirage TX, Oasis NV, Orange Grove Ltd., Orange Grove TX, Orange Grove NV, Renaissance Ltd., Renaissance TX, Renaissance NV, Woodward, Ltd., Woodward TX, Woodward, NV, Boyd, Southwest Pain, Satex, Inner Houston, Wildwood, and Houston Community Hospital, Inc. for compensatory damages in an amount of more than $2,000,000, together with punitive damages and interest pursuant to Texas common law;

E.      enter a judgment in favor of Travelers on its Fifth Claim for Relief against Defendants Dr. Mohamed, Undavia, and Minu GP, LLC, for compensatory damages in amount of more than $2,200,000, together with treble damages, costs and reasonable attorneys fees pursuant to 18 U.S.C. §§ 1962(c) and 1964(c) plus interest;

F.      enter a judgment in favor of Travelers on its Sixth Claim for Relief against Defendants Dr. Mohamed, Undavia, Minu GP, LLC, Drs. Cerday, Bayles, Chowdhury, McConnell, Moorehead, Pervez, Reyes, Roman, Shanti and Vidal, the Alibhais, NC Consulting, New Frontiers NV, and the Pain Institute for compensatory damages in amount of more than $2,200,000, together with treble damages, costs and reasonable attorneys fees pursuant to 18 U.S.C. §§ 1962(d) and 1964(c) plus interest;

G.      enter a judgment in favor of Travelers on its on its Seventh Claim for Relief against Defendants Dr. Mohamed, Undavia, Minu RX, Ltd. and Minu GP, LLC for compensatory damages in an amount of more than $2,200,000, together with punitive damages and interest pursuant to Texas common law;

H.    enter a judgment in favor of Travelers on its on its Eighth Claim for Relief against Defendants Dr. Mohamed, Undavia, Minu RX, Ltd., Minu GP, LLC, Drs. Cerday, Bayles, Chowdhury, McConnell, Moorehead, Pervez, Reyes, Roman, Shanti and Vidal, the Alibhais, NC Consulting, New Frontiers NV and the Pain Institute for compensatory damages in an amount of more than $2,200,000, together with punitive damages and interest pursuant to Texas common law;

I.    grant Travelers such other and further relief to which it may be entitled.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated:  November 30, 2007                    Respectfully submitted,


By: ____/s/ Ross O. Silverman_____
       Ross O. Silverman
       Illinois Bar No. 6226560
       KATTEN MUCHIN ROSENMAN LLP
       525 West Monroe Street
       Chicago, Illinois  60661
       (312) 902-5200 telephone
       (312) 902-1061 facsimile
       **Attorney-in-Charge for Plaintiff**

**Of Counsel:**

Charles Chejfec                        Joseph F. Nistico, Jr.
Illinois Bar No. 6230825               Fed ID 1024
Patrick C. Harrigan                    Texas Bar No. 15035300
Illinois Bar No. 6289678               M. Micah Kessler
KATTEN MUCHIN ROSENMAN LLP             Fed ID 21206
525 West Monroe Street                 Texas Bar No. 00796878
Chicago, Illinois  60661               NISTICO & CROUCH, P.C.
(312) 902-5200 telephone               5151 San Felipe, Suite 900
(312) 902-1061 facsimile               Houston, Texas 77056
                                       (713) 781-2889 telephone
                                       (713) 781-7222 facsimile

50452747_1.DOC 11/30/2007