# EXHIBIT S

# MEDICAL CONSULTANT CONTRACT

## MEMORIAL COMPOUNDING PHARMACY

Memorial Compounding Pharmacy (hereafter referred to as "Contracting Party" or "MCP"), and Dr Eddie Cerday (hereafter referred to as "Dr. " or "Independent Contractor"), agrees to a contractual relationship whereby Dr. will perform duties as Medical Consultant for Pharmaceutical Services for Memorial Compounding Pharmacy.

Services to be performed: Independent Contractor shall perform, at a minimum, the following services for the Contracting Party:

1. Serve as Medical Consultant for professional activities for the Memorial Compounding Pharmacy.

2. Formulate, propose, monitor, and supervise the enforcement of the Medical Staff by laws, rules and regulations and all current applicable center and governing body policies as it relates to Memorial Compounding Pharmacy.

3. Collaborate with the professional staff regarding pharmaceutical services, establish a systematic process of monitoring the quality of patient care with at least quarterly performance reports.

4. Perform services in conjunction with all applicable state and federal laws, and within the guidelines of licensure.

## TERMS OF AGREEMENT

Memorial Compounding Pharmacy agrees to compensate the Independent Contractor as a Medical Consultant for Pharmaceutical Services and performance of above stated services at the rate of $ 5000 per month. Any increase in compensation must be agreed to in advance by MCP and Independent Contactor in writing.

This agreement shall begin on 1 Feb 07 and shall terminate on Feb 1, 2009, or within thirty (30) days advance written notice from either party.

01KUMRX000574

## HOLD HARMLESS AGREEMENT

Memorial Compounding Pharmacy and Dr Ed Cordoy shall hold each other harmless of any certification, licensure, reimbursement, or regulatory decision made by any regulatory, reimbursement, or licensing agency.

This is an agreement for independent contracting services. The Contracting Party provides no benefits such as unemployment insurance, health insurance, or worker's compensation insurance to the Independent Contractor.

Independent Contractor is responsible for payment of all federal, state and local income taxes.

## INSURANCE

Independent Contractor agrees to maintain professional liability in an amount to be determined by Memorial Compounding Pharmacy. MCP agrees to maintain its insurance in the current amounts in effect at the time of this Agreement.

This contract constitutes the entire agreement between MCP and                No
change shall be valid unless made by supplemental written agreement.

IN WITNESS WHEREOF, the parties hereto have executed this agreement on the date first above written.

_____                Memorial Compounding Pharmacy
Ed Cordoy M.D.
        M.D.                                   By: _____
                                                   Khyati Undavia, Administrator

# RECRUITING ASSISTANCE AGREEMENT

THIS RECRUITING ASSISTANCE AGREEMENT ("AGREEMENT") is made and entered into this __1__ day of __Feb 2007__, ~~2006~~, between Memorial Compounding Pharmacy ("**Pharmacy**") and Southwest Pain, ("**Group**") _(ku)_

## WITNESSETH:

WHEREAS, the geographic area served by the Pharmacy ("**Service Area**"), as described in Exhibit A hereto, is underserved in, the specialty of ~~Anesthesiology surgery and the Service~~ _(ku)_ Area's residents have a documented objective need for such services;   _Pain Mangement_

WHEREAS, Pharmacy, Group and Physician have determined that it is in the best interest of the Service Area's residents for Physician to join Group, which has agreed to assist Physician in commencing a full-time private practice of medicine in the Service Area, and Group and Physician have entered into that certain Physician Services Agreement dated Febuary 1, 2007, as amended;

WHEREAS, in consideration of the recruitment assistance offered by Pharmacy pursuant to the terms of this Agreement and Group's willingness to assist Physician, Physician has agreed to relocate to the Service Area in order to become a member of the Pharmacy's medical staff and to establish a full-time private practice of medicine to serve the needs of the Service Area's residents;

WHEREAS, the recruitment assistance offered pursuant to this Agreement is necessary to induce Physician to relocate to the Service Area, and the amount of such assistance is reasonable and not determined based on the volume or value of any actual or anticipated referrals by Group or Physician or other business generated between the parties;

NOW, THEREFORE, Group and Pharmacy hereby agree as follows:

1. **STRUCTURE AND TERM OF THE AGREEMENT**

    Group and Pharmacy acknowledge and agree that although Physician is not a party to this Agreement, Physician is expected to undertake certain actions in connection with this Recruiting Assistance Agreement as set forth herein. Group and Pharmacy further acknowledge and agree that Group shall cause Physician to undertake those actions described in this Agreement, and Group shall be responsible for Physician's undertaking those actions, and any and all remuneration paid to Group hereunder shall be passed through directly to, or shall remain with, Physician.

The term of this Agreement shall commence on _____February 1st_____, 2007 ("**Start Date**"), by which date Physician is to obtain medical staff privileges at Pharmacy and commence the Full-Time Private Practice of Medicine in the Service Area in the specialty for which Physician was recruited, unless the parties agree in writing to a different Start Date. Physician shall continue a Full-Time Private Practice of Medicine in the Service Area thereafter for ~~at least~~ ____12 (twelve)____ months (the "**Term of this Agreement**"). The term "**Full-Time Private Practice of Medicine**" means Physician's availability to see patients residing in the Service Area, and in the specialty for which Physician was recruited, ~~at least thirty-five (35) hours per week~~, during at least ~~forty-eight (48)~~ 30 weeks per ~~calendar year~~.

## 2. PHARMACY'S OBLIGATIONS

A. **Support Loan.** In recognition of Physician's initiating a start-up practice, Pharmacy hereby agrees to advance certain amounts of money to Group to advance to Physician in the form of a loan (the "**Support Loan**"), to cover the actual additional incremental costs attributable to Physician's joining Group, as set forth in <u>Exhibit B</u> hereto, that Group projects it will allocate during the Support Loan Period. Such Support Loan shall be advanced to Group on behalf of Physician in the following manner:

1. In the event that in any of the first ____4 (Re)____ months after the Start Date (the "**Support Loan Period**"), the Net Cash Receipts attributable to Physician's Full-Time Private Practice of Medicine shall be ~~less than~~ $ ~~20,000~~ 15,000 ("**Monthly Support Loan Amount**"), ~~Pharmacy shall~~ advance such deficit to Group to advance to Physician. The term "**Net Cash Receipts**" means all ~~cash~~ receivables collected less any refunds paid, for all services provided by, or under the supervision of, Physician from any and all sources whatsoever, including without limitation, office visits, Pharmacy practice, emergency room treatments, and coverage for other physicians in Group. The total amount of the Net Cash Receipts attributable to Physician's practice during the Support Loan Period shall be referred to herein as the "**Total Net Cash Receipts Amount.**"

2. On or before the fifteenth (15th) day of each month of the Support Loan Period, Group shall submit to Pharmacy, on the form attached hereto as <u>Exhibit C</u>, a statement of the Net Cash Receipts attributable to Physician's practice from the preceding month ("**Monthly Statement**"). On or before the fifteenth (15th) day following receipt of the Monthly Statement, Pharmacy shall advance to Group to advance to Physician the amount by which, if any, the Monthly Support Loan Amount exceeds the Net Cash Receipts for the preceding month ("**Support Advance**"). If, however, the Net Cash Receipts is equal to or greater than the Monthly Support Loan Amount, Pharmacy shall have no obligation hereunder to advance any amount for such month, and the amount, if any, by which the Net Cash Receipts exceeds the Monthly Support Loan Amount shall be subtracted from any amounts Pharmacy is obligated to advance hereunder for subsequent months during the Support Loan Period until such excess amount has been fully offset. If the first and/or last months of the term of this Agreement is/are less than full calendar months, the Support Loan shall be prorated by the number of days Physician has engaged in the Full-Time Private Practice of Medicine in the respective month. The total amount

of the Support Loan paid by Pharmacy during the Support Loan Period shall be referred to herein as the "**Total Support Advances Amount.**"

B. If at any time during the Support Loan Period, the Total Support Advances Amount exceeds $ ~~20,000.00~~ /60,000, Pharmacy shall have no further obligation to advance any further amounts hereunder. (KW) EPL

C. No later than the thirtieth (30th) day following the end of the Support Loan Period or the date of termination of this Agreement, whichever is sooner, Group shall submit to Pharmacy, on the form attached hereto as <u>Exhibit D</u>, an accounting of the Total Net Cash Receipts Amount attributable to Physician's practice during the Support Loan Period and of the additional Actual Incremental Expenses attributable to Physician's practice that Group allocated to Physician during the Support Loan Period ("**Total Actual Incremental Expenses Amount**"). ~~In the event the Total Support Advances Amount plus Total Net Cash Receipts Amount exceeds the Total Actual Incremental Expenses Amount, Physician shall immediately reimburse to Pharmacy an amount equal to such excess, not to exceed an amount equal to the Total Support Advances Amount.~~ In the event the Total Support Advances Amount is less than the Total Actual Incremental Expenses Amount, Pharmacy shall immediately advance to Group to advance to Physician an amount equal to such deficit. The term "**Actual Incremental Expenses**" shall mean the actual additional incremental costs, if any, attributable to Physician that Group allocated to Physician and actually incurred and paid for the preceding month. Such costs shall not exceed the actual additional incremental increase in Group's costs that are the direct result of Physician's practice in the Service Area. The parties agree that additional incremental costs do not include Physician's *pro rata* share of Group's existing expenses, but rather reflect new expenses that are incurred due to the recruitment of Physician. The parties also agree that the additional incremental costs actually must be incurred to be included in the calculation of the Support Loan. The allowable expenses that may be allocated by Group as Actual Incremental Expenses are set forth in <u>Exhibit B</u> hereto. 

D. At the end of the Support Loan Period, the Total Support Advances Amount shall be due and payable by Physician and shall be evidenced by a Promissory Note in the form attached hereto as <u>Exhibit E</u> ("**Note**"). Interest on the Note will begin to accrue at the end of the Support Loan Period. The rate of said interest shall be the prime interest rate plus one percentage point (1%) as reported in the Wall Street Journal on the first business day following the end of the Support Loan Period and shall remain said rate for the Term of this Agreement. No later than thirty (30) days following the end of the Support Loan Period, Group shall execute the Note.

6. Beginning with the first month following the end of the Support Loan Period, for each month that Physician maintains a Full-Time Private Practice of Medicine in the Service Area and Group and Physician continue to fulfill their respective obligations, Pharmacy shall forgive and cancel one- 4th the (1/ 4 th) of the debt to Pharmacy resulting from the Support Loan ("**Loan Forgiveness**"). The amount, if any, of such loan forgiveness shall be reported on Form 1099 or such other appropriate form

as may be prescribed by the Internal Revenue Service. If at any time, Physician fails to conduct a Full-Time Private Practice of Medicine in the Service Area during the Term of this Agreement, or Group otherwise breaches this Agreement, Group shall be liable to repay to Pharmacy any amount that has not been forgiven pursuant to this Section 2 and that remains unpaid.

7. Group agrees that Pharmacy may inspect Group's financial books and records at any reasonable time during normal business hours upon no less than 48 hours written notice as a condition to receipt of any Support Loan.

F. Tax Reporting. Pharmacy shall report to the Internal Revenue Service and to such state and local taxing authorities as may be applicable, any income realized by Group or Physician pursuant to this Agreement as required by law, pursuant to IRS Form 1099 or similar forms used for such purposes. Pharmacy shall not have responsibility for calculating, paying, or withholding any taxes or benefits on behalf of Physician or Group.

J. Actual Costs. Except for actual additional incremental costs incurred by Group in recruiting Physician, the remuneration paid pursuant to this Agreement shall remain with, Physician. The remuneration from Pharmacy is not determined in a manner that takes into account (directly or indirectly) the volume or value of any actual or anticipated referrals by Physician or Group (or any physician affiliated with Group).

K. No Requirement To Refer. Nothing in this Agreement shall be construed to require Physician to admit patients to Pharmacy or to utilize Pharmacy to provide inpatient, outpatient or any other services to patients or otherwise to generate business for Pharmacy, and no part of any payment made pursuant to this Agreement is intended to be, either explicitly or implicitly, a payment for referrals or other business generated. Physician may establish medical staff privileges at any other Pharmacy, and may refer business to any other entity, as Physician may desire. Notwithstanding any unanticipated effect of any provision of this Agreement, no party will knowingly or intentionally conduct himself in such a manner as to violate any applicable federal or state law, including the prohibition against fraud and abuse in connection with the Medicare and Medicaid programs (set forth at 42 USC Section 1320a-7b).

3. CONDITIONS PRECEDENT TO PHARMACY'S OBLIGATIONS

This Agreement is executed subject to the following conditions precedent to Pharmacy's obligations to fund the Support Loan pursuant to this Agreement, which shall be satisfied by Physician prior to the Start Date:

A. Obtaining and maintaining valid licensure in the state of Texas;

B. Obtaining successful and satisfactory results from Pharmacy's customary background checks, which include a sanction check and may include a credit check;

C. Submission of all necessary applications and enrollment forms to obtain provider numbers from the Medicare and Medicaid programs and all third party insurance providers; and

RECRUITING ASSISTANCE AGREEMENT
Page 4

D. Commencement of the Full-Time Private Practice of Medicine in the Service Area.

In the event Physician fails to fulfill any one of the foregoing conditions, then Pharmacy's obligations to fund the Support Loan pursuant to this Agreement shall be null and void. Pharmacy's waiver of any condition precedent must be in writing and shall not constitute a waiver of any other condition precedent to this Agreement.

**4. PHYSICIAN'S REPRESENTATIONS AND WARRANTIES**

Group makes the following representations and warranties concerning Physician:

A. Physician holds, or is eligible to obtain, a currently valid, unrestricted license to practice medicine in Texas;

B. Physician has not previously been appointed to Pharmacy's medical staff, and, unless Physician is a resident or has been in practice one year or less, either (i) has moved her medical practice at least 25 miles, or (ii) expects to derive at least 75 percent of revenues from professional services rendered to new patients not previously seen or treated by Physician in her prior medical practice site during the preceding three years ("**Practice Revenue Test**"). The Practice Revenue Test shall be measured on an annual basis.

C. Group has not imposed, by agreement or otherwise, any additional practice restrictions on Physician other than conditions related to quality of care;

D. Physician is not now and has never been excluded, debarred, or otherwise made ineligible from participation in any government program, including any federal or state health care program;

E. Physician is not under investigation or otherwise aware of any circumstances that may result in Physician's being excluded, debarred, or otherwise made ineligible from participation in any government program;

F. Physician has never been convicted of a felony offense, other than a minor traffic offense;

G. Except as previously disclosed to Pharmacy in writing, Physician is not currently, nor has in the past been, subject to any formal investigation or discipline by any state board of medicine, Pharmacy, medical staff peer review committee, or third party reimbursement program;

H. Physician has provided true and correct information to Pharmacy during the application process and authorizes Pharmacy to perform a credit check;

**RECRUITING ASSISTANCE AGREEMENT**
Page 5

I. Except as previously disclosed to Pharmacy in writing, Physician has never vacated a service area while a party to a Recruiting Assistance Agreement and is neither delinquent on any outstanding debt arising from a past recruitment arrangement with another Pharmacy, nor presently a party to any litigation regarding a physician recruitment agreement;

J. There are no contractual or legal restrictions that would prevent Physician from fulfilling any obligations under this Agreement;

K. The recruitment assistance offered pursuant to the terms of this Agreement does not exceed that which is reasonably necessary to induce Physician to relocate to the Service Area;

L. Physician is not required to refer to, or otherwise generate business for, Pharmacy, and there are no verbal or private understandings between Physician and Pharmacy or Physician and Group that require Physician to refer to, or otherwise generate business for, Pharmacy;

M. Physician may establish staff privileges at any other Pharmacy(s), and may refer business to any other entities;

N. There have been no express or implied representations or warranties by Pharmacy or any of its employees and/or agents regarding the expected success of Physician's practice or the expectation that Physician will continue to receive income at a level that is the same or greater than the Monthly Support Loan Amount; and

O. Except as previously disclosed to Pharmacy in writing, Physician has never declared bankruptcy.

Group acknowledges and understands that Pharmacy has entered into this Agreement in reliance on the representations and warranties set forth herein and that such representations and warranties are a material inducement to Pharmacy's entering into this Agreement.

5. PHYSICIAN'S UNDERTAKINGS

In furtherance of the purpose of this Agreement to provide needed medical services to the Service Area's residents, Physician shall:

A. Provide all information reasonably required by Pharmacy to conduct its customary background checks;

B. Maintain Active Staff privileges at the Pharmacy in the specialty for which Physician was recruited;

C. Maintain a Full-Time Private Practice of Medicine in the Service Area and be available to see patients residing in the Service Area and in the specialty for which Physician was recruited;

01KUMRX000583

D.  Unless Physician is a resident, has been in practice for one year or less, or has moved his or her residence at least 25 miles, continue to meet the Practice Revenue Test during the Term of this Agreement by deriving at least 75 percent of revenues from professional services rendered to new patients not previously seen or treated by Physician in her prior medical practice site during the preceding three years;

E.  Maintain professional liability insurance in accordance with Pharmacy's medical staff bylaws, rules, regulations, or policies;

F.  Provide, at no additional cost to Pharmacy, emergency and service call coverage in accordance with Pharmacy's medical staff bylaws, rules, regulations, or policies;

G.  Maintain enrollment as a participating provider in Medicare and Medicaid and in such other third party reimbursement programs, including any health maintenance or preferred provider organization, as Pharmacy may reasonably require;

H.  Treat patients receiving medical benefits or assistance under any federal health care program in a non-discriminatory manner;

I.  Use reasonable efforts to facilitate Group's timely and accurate billing and reporting to Pharmacy as provided in Section 2.

J.  Inform Pharmacy within 24 hours of Physician's departure from Group;

K.  Immediately provide written notice to Pharmacy if Physician expresses a clear intent to leave the Service Area or otherwise to cease conducting the Full-Time Private Practice of Medicine in the Service Area in the specialty for which Physician was recruited;

L.  Refrain from entering into or negotiating during the Term of this Agreement any contractual agreement or relationship that could impair Physician's ability to engage in the Full-Time Private Practice of Medicine in the Service Area;

M.  Repay to Pharmacy any amounts advanced in accordance with the terms of this Agreement if at any time during the Term of this Agreement Physician ceases to conduct the Full-Time Private Practice of Medicine in the Service Area; and

N.  Abide by Pharmacy's medical staff bylaws, rules, regulations, and policies.

6.  **GROUP'S REPRESENTATIONS AND WARRANTIES**

Group makes the following representations and warranties:

A.  Neither Group nor any of its physicians, employees, or independent contractors is now or has ever been excluded, debarred, or otherwise made ineligible from participation in, any government program, including any federal or state health care program;

B.      Neither Group nor any of its physicians, employees, or independent contractors has been convicted of a criminal offense related to the provision of health care items or services;

C.      Neither Group nor any of its physicians, employees or independent contractors is under investigation or otherwise aware of any circumstances that may result in any of its physicians, employees, or independent contractors being excluded, debarred, or otherwise made ineligible from participation in any government program;

D.      Group shall allocate to Physician for purposes of the Support Loan only those actual additional incremental costs attributable to Physician. Group acknowledges that such information is being relied upon by Pharmacy in determining the appropriate amount of financial assistance to provide to Pharmacy and Physician pursuant to the terms of this Agreement;

E.      The recruitment assistance offered pursuant to the terms of this Agreement does not exceed that which is reasonably necessary to induce Physician to relocate to the Service Area;

F.      Neither Group or any of its physician members is required to refer to, or otherwise generate business for, Pharmacy;

G.      There are no verbal or private understandings between Physician and Group that require Physician to refer to, or otherwise generate business for, Pharmacy;

H.      There are no verbal or private understandings between Group and Pharmacy that require Physician, Group, or Group's physicians, employees, or independent contractors to refer to, or otherwise generate business for, Pharmacy;

I.      Physician may establish staff privileges at any other Pharmacy(s), and may refer business to any other entities;

J.      Group shall not impose, by agreement or otherwise, any practice restrictions on Physician other than conditions related to quality of care;

K.      There have been no express or implied representations or warranties to Group by Pharmacy or any of its employees and/or agents regarding the expected success of Physician's practice or the expectation that Physician will continue to receive income at a level that is the same or greater than the Monthly Support Loan Amount; and

L.      This Agreement incorporates fully Pharmacy's obligations to Physician and Group, and all of the compensation, inducements and benefits offered by Pharmacy to Physician and Group. All prior communications, oral or written, between the parties or with anyone on behalf of the parties, are merged into this Agreement.

Group acknowledges and understands that Pharmacy has entered into this Agreement in reliance on the representations and warranties set forth herein and that such representations and warranties are a material inducement to Pharmacy's entering into this Agreement.

RECRUITING ASSISTANCE AGREEMENT
Page 8

## 7. GROUP'S OBLIGATIONS

During the Term of this Agreement, and without limiting any other obligation of Group herein, Group shall:

A. Enter into an employment or other service agreement with Physician which is effective on or about the Start Date;

B. Except for the actual additional incremental costs incurred by Group in recruiting Physician, allow to remain with Physician any remuneration paid by Pharmacy pursuant to this Agreement;

C. Maintain, and make available to Pharmacy and the Secretary of U.S. Department of Health and Human Services upon request, for a period of at least five years after the end of the Support Loan Period, records of (i) any amounts paid by Pharmacy to Group and passed through to Physician and (ii) the actual costs attributable to Physician that were incurred by Group during the Support Loan Period, (iii) records that evidence amounts that have been paid by Pharmacy pursuant to the terms of this Agreement, and (iv) records that evidence the manner in which Group has used such amounts.

D. Use reasonable efforts to establish an appropriate patient load for Physician;

E. Use reasonable efforts to bill all patients promptly within ten (10) days following service, and use reasonable efforts to collect accounts receivable diligently and in a timely manner;

F. Refrain from imposing practice restrictions on Physician other than conditions related to quality of care;

G. Notify Pharmacy at least 24 hours prior to terminating Physician's employment or professional service arrangement;

H. Immediately provide written notice to Pharmacy if Physician expresses a clear intent to leave the Service Area or otherwise fails to conduct the Full-Time Private Practice of Medicine in the specialty for which Physician was recruited in the Service Area;

I. Inform Pharmacy within at least 24 hours of obtaining knowledge that Physician has failed, or will fail, to meet the Practice Revenue Test;

J. Provide, at no additional cost to Pharmacy, emergency and service call coverage in accordance with Pharmacy's medical staff bylaws, rules, regulations or policies; and

K. Treat patients receiving medical benefits or assistance under any federal health care program in a non-discriminatory manner.

RECRUITING ASSISTANCE AGREEMENT
Page 9

8. **TERMINATION FOR CAUSE**

Immediately and without notice to Group, Pharmacy may, in its sole discretion, terminate this Agreement if:

A. Group breaches this Agreement, including without limitation, the breach of any representation or warranty;

B. Group or Physician is adjudicated bankrupt or judicially determined to be insolvent, or makes a disposition of all or a substantial part of Group's or Physician's assets to or for the benefit of creditors; or if a final judgment against Group or Physician remains unsatisfied or of record for 30 days or longer (unless a bond sufficient to stay execution of such judgment pending appeal is filed); or if Group is dissolved;

C. Physician fails to satisfy the Practice Revenue Test for any year during the Term of this Agreement;

D. Physician and Group enter into an agreement that imposes practice restrictions on Physician, other than conditions related to quality of care;

E. Group and/or Physician knowingly maintains false books or records, or knowingly submits any false reports or claims;

F. Any information submitted by Physician in the application process is discovered to have been false, misleading, or incomplete in any respect;

G. Pharmacy ceases to operate as a Pharmacy;

H. Physician leaves the Service Area or otherwise ceases to conduct the Full-Time Private Practice of Medicine in the Service Area in the specialty for which Physician was recruited; or

To the extent that Group and/or Physician have any repayment obligations pursuant to Section 2 and the Note attached hereto, such repayment obligation shall survive the termination of this Agreement.

9. **REMEDIES**

Upon termination of this Agreement by Pharmacy, Pharmacy shall have the right, in its sole discretion, immediately and without notice to Group, to:

A. Cease payment of Support Advances;

B.  Recover all amounts due and owing at the time of termination pursuant to this Agreement, and all costs, expenses, and attorneys' fees incurred in collecting such amounts, or in enforcing this Agreement, Physician's Note; and

C.  Recover all damages and avail itself of all other remedies available to Pharmacy at law or in equity, resulting from or arising out of or in connection with Group's breach of this Agreement;

Forbearance to exercise any of these remedies with respect to any such breach or non-fulfillment shall not be considered a waiver of the right as to any subsequent or continuing breach.

## 10. GENERAL PROVISIONS

10.1  **Physician and Group's Independent Contractor Status.** At all times during the Term of this Agreement, Physician and Group are and shall be independent contractors and not servants, agents, or employees of Pharmacy. The parties further agree that nothing contained herein shall be deemed to create any type of employment, agency, servant, partner, or joint venture relationship between Physician and Pharmacy or Group and Pharmacy. Physician and Group shall employ their own means and methods and exercise their own independent medical judgment in their practice of medicine and in the performance of all professional services for their patients, including Physician's or Group's selection of Pharmacys for admission of, or services for, their patients. Physician and Group shall not be subject to the control or direction of Pharmacy with respect to such means, methods or judgment, or with respect to such selection. The objective of Pharmacy in this Agreement is to encourage Physician to practice medicine and provide professional services to patients in the Service Area.

10.2  **Mediation and Arbitration.** The parties desire to resolve all disputes arising hereunder without resort to litigation in order to protect their respective business reputations and the confidential nature of certain aspects of their relationship. Accordingly, in the event of a dispute, controversy, or claim arising out of or relating to this Agreement, either party may require that the parties submit the dispute to mediation, pursuant to the mediation procedures of a neutral mediation agency selected by the parties. This mediation shall consist of two mediation sessions of at least four hours each, or until the mediator declares that the parties have reached an impasse, whichever occurs sooner. The parties are not required to exercise their right to mediation prior to providing notice of termination. Any dispute, controversy, or claim arising out of or relating to this Agreement that is not resolved by mediation, shall be settled by arbitration administered by the American Arbitration Association office located in Dallas, Texas in accordance with its Commercial Arbitration Rules, and judgment on the award rendered by the arbitrator or arbitrators shall be binding and conclusive on the parties, and shall be kept confidential by the parties to the greatest extent possible. The parties shall make no disclosure of the award except as required by law or as necessary or appropriate to effectuate the terms thereof. Further, Dallas, Texas is the exclusive venue of any action related to any disputes, claims, or controversies arising from this Agreement.

10.3 Notices. Any notice required or desired to be given in respect to this Agreement shall be deemed to be given upon the earlier of (i) actual delivery to the intended recipient or its agent, or (ii) upon the third business day following deposit in the United States mail, postage prepaid, certified or registered mail, return receipt requested. Any such notice shall be delivered to the respective addresses set out below, or to such other address as a party shall specify in the manner required by this Section 15. The respective addresses are:

If to Pharmacy:   _Memorial Compounding Pharmacy_

If to Group: _[signature]_

10.4 Assignment. Group shall not have the right to assign this Agreement to any other party or parties without the prior written consent of Pharmacy which shall not be unreasonably withheld, delayed or conditioned. This Agreement may be assigned to any affiliate of Pharmacy or to any entity acquiring Pharmacy or all or substantially all the assets of Pharmacy with the consent of Group. This Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective successors and permitted assigns.

10.5 Partial Invalidity. In the event any provision of this Agreement is found to be legally invalid or unenforceable for any reason, the remaining provisions of the Agreement shall remain in full force and effect provided the fundamental rights and obligations remain reasonably unaffected.

10.6 Confidential. Physician and Group acknowledge and agree that this Agreement is confidential. Physician and Group shall not disclose this Agreement or any of its terms hereof to any third parties, except as may be necessary to obtain advice and counsel from Physician's or Group's attorneys, accountants, or financial advisors or as may otherwise be required through legal process.

10.7 Governing Law. The laws of the state of Texas shall govern this Agreement.

10.8 Entire Agreement. This Agreement incorporates completely all of the compensation, inducements and benefits offered by Pharmacy and there are no others in addition to those stated herein. As to the subject matter hereof, all prior communications, oral or written, between the parties or with anyone on behalf of the parties, are merged into this Agreement.

IN WITNESS WHEREOF, the parties hereto have signed this Agreement on the day and year first above written.

| "GROUP" | "PHARMACY" |
|---|---|
| Southwest Pain | MEMORIAL PHARMACY |
| By: _____, M.D. President | By: _Khyati Undavia_ Pharmacy Chief Executive Officer  2.1.12007 |

I:\5700s\5713\03\D\Recruiting Assistance Agreement - Recruitment into Existing Group - draft 1.doc