**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| Shaffin Ali Mohamed; aka Ali Mohamed, et al., | § | |
| Debtor(s) | § | |
| | § | Lead Case No. H-07-1122 |
| Travelers Indemnity Company, et al., | § | Judge Sim Lake |
| Plaintiff(s) | § | Magistrate Judge Nancy K. Johnson |
| v. | § | (Adversary No. 06-3393) |
| Mohamed Shaffin Ali, et al., | § | |
| Defendant(s). | § | |

| | | |
|---|---|---|
| In re: | § | |
| Shaffin Ali Mohamed, et al., | § | Member Case No. H-07-995 |
| Debtors. | § | Judge Sim Lake |
| | § | Magistrate Judge Nancy K. Johnson |
| | § | (Formerly Case No. 05-42695-H2-11) |

| | | |
|---|---|---|
| The Travelers Indemnity Company, | § | |
| Plaintiff, | § | |
| v. | § | Member Case No. 4:07-cv-00638 |
| | § | Judge Sim Lake |
| | § | Magistrate Judge Nancy K. Johnson |
| Shaffin Ali Mohamed, M.D.,  et al, | § | |
| Defendant(s) | | |

**TRAVELERS' MOTION FOR CASE TERMINATING
SANCTIONS AGAINST THE MOHAMED AND UNDAVIA DEFENDANTS
AND REQUEST FOR EVIDENTIARY HEARING IN SUPPORT THEREOF**

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION ................................................................................................1

II.   SUMMARY .......................................................................................................2

III.  THE LONG AND SORDID HISTORY OF MINU RX.......................................10

    A.   Minu RX's Formation And The Symbiotic Relationship Between
        Mohamed and Undavia Which Has Produced More Than $20 Million In
        Profits For Them To Share ..........................................................................10

        1.   From At Least July 2001 Through August 2003 Minu RX Funnels
            More Than $4.6 Million To Mohamed Through Three Shell
            Companies And Falsely Deducts These Amounts As "Costs of
            Goods Sold" .....................................................................................12

        2.   Events In The Summer Of 2003 Force Mohamed To Disclose A
            Financial Relationship With Minu RX, But He And Undavia Still
            Lie About the Scope And Nature Of That Relationship To Hide
            Mohamed's Ownership Interest In Minu RX .............................................14

        3.   Mohamed Denies An Ownership Interest And Falsely
            Characterizes His Financial Interest In Minu RX As A Royalty
            Relationship ......................................................................................16

        4.   From October 2003 Through May 2005, Minu RX Funnels More
            Than $2.7 Million To Mohamed Under The Pretext Of "Royalties"
            To His Clinic.....................................................................................18

        5.   After Mohamed Is Thrown Out Of The Worker's Compensation
            System For A Pattern of Medically Unnecessary Treatment And
            Billing, Mohamed And Undavia Recruit Dr. Eddie Cerday And
            Other Prescribing Doctors To Carry On The Scheme ..............................18

        6.   Minu RX Continues To Funnel Money To Mohamed From July
            2005 Through 2007...........................................................................23

        7.   Other Minu RX Transactions For Mohamed's Benefit .............................24

    B.   Shell Companies Used To Funnel Money From Minu RX ...................................28

        1.   Cita, NC, Inc and New Frontier.................................................................28

        2.   Satex Management Services, Inc. ..............................................................30

        3.   Breezy, AlfaTeck USA And Dean Ferguson..............................................34

        4.   Newbury Personnel Services, Inc. .............................................................37

        5.   SHR Invests Corp. And Fataneh Ramji .....................................................38

C.    The Shell Companies That Mohamed Formed To Secretly Bill And Collect Facility Fees For Nerve Block Injections....................................................39

D.    Five More Shell Companies That Mohamed Formed To Secretly Bill And Collect Fees For Physical Rehabilitation, MRIs and Vax-D Treatments..............42

E.    Mohamed's and Undavia's Violations of Court Orders And Other Discovery Abuses ................................................................................43

  1.    Mohamed Has Engaged In a Pervasive Pattern of Bankruptcy Fraud, Perjury, Obstruction Of Justice, Tax Fraud, Violations Of This Court's Orders And Continues To Persist In His Refusal To Engage in Discovery And Lies About the Existence of Documents .........43

  2.    The Undavia Defendants Have Engaged In a Pervasive Pattern of Bankruptcy Fraud, Perjury, Obstruction Of Justice, Tax Fraud, Violations Of This Court's Orders And Continue To Persist In Discovery Abuses and Violations of Court Orders. ..................................48

IV.    LEGAL STANDARDS AND ANALYSIS ....................................................56

V.    CONCLUSION ............................................................................62

## TABLE OF AUTHORITIES

**C**ASES

*Bonaventure v. Butler*,
    593 F.2d 625 (5th Cir. 1979) ..................................................................................57

*Chambers v. Nasco Inc.*,
    501 U.S. 32 (1991)...................................................................................................57

*Connecticut Gen. Life Ins. v. New Images of Beverly Hills*,
    482 F.3d 1091 (9th Cir. 2007) .......................................................................... 58-59

*Emerick v. Fenick Industrs., Inc.*,
    539 F.2d 1379 (5th Cir. 1976) ................................................................................57

*In re Matter of United Markets Intern., Inc.*,
    24 F.3d 650 (5th Cir. 1994) ....................................................................................58

*Link v. Wabash R. Co.*,
    370 U.S. 626 (1962).................................................................................................57

*Little Creek Dev. Co. v. Commonwealth Mortgage Corp.*,
    779 F.2d 1068 (5th Cir. 1986) ................................................................................58

*McCleod, Alexander, Powell & Apffel v. Quarles*,
    894 F.2d 1482 (5th Cir. 1990) ................................................................................57

*Nat'l Hockey League v. Metro. Hockey Club, Inc.*,
    427 U.S. 639 (1976).................................................................................................57

*Romano Castro v. Pain Institute of Texas, P.A. et al*,
    Cause No. 2000-28574, in the 133rd Judicial District of Harris County, Texas. ............... 13-14

*Smith v. Smith*,
    145 F.3d 335 (5th Cir. 1989) ............................................................................ 56-57

*Universal Oil Prods. Co. v. Root Refining Co.*,
    328 U.S. 575 (1946)...................................................................................................57

*Woodson v. Surgitek, Inc.*,
    57 F.3d 1406 (5th Cir. 1995) ..................................................................................58

**TRAVELERS' MOTION FOR CASE-TERMINATING
SANCTIONS AGAINST THE MOHAMED AND UNDAVIA DEFENDANTS
AND REQUEST FOR EVIDENTIARY HEARING IN SUPPORT THEREOF**

Pursuant to Federal Rule of Civil Procedure 37(b)(2)(A) and this Court's inherent authority, Plaintiff Travelers Indemnity Company ("Travelers") seeks an Order entering the sanction of judgment on all of Travelers claims against Defendants Shaffin Ali Mohamed ("Mohamed"), Stein Pain Management Associates, P.A., Advanced Rehabilitation & Pain Management, P.A., Pain Institute of Texas, P.A., and Orthopedic Management, P.A. (collectively the "Mohamed Defendants"), as well as Khyati Undavia ("Undavia"), Minu RX, Ltd. (formerly Minu RX, Inc.) ("Minu RX"), and Minu GP, LLC (collectively the "Undavia Defendants"). To the extent that the Court deems it necessary to determine appropriate sanctions, Travelers requests an evidentiary hearing at which Mohamed, Undavia and others are compelled to testify under oath regarding the extremely serious matters set forth below. In support, Travelers states the following:

**I.       INTRODUCTION**

This motion seeks the most severe sanctions against the Mohamed Defendants and Undavia Defendants -- judgment. This is the only appropriate sanction based upon the duration, scope and pervasiveness of the pattern of contemptuous conduct in which these parties have engaged since the Mohamed Defendants commenced their bankruptcy proceedings in the summer of 2005. That pattern includes bankruptcy fraud, perjury, obstruction of justice, tax fraud, repeated violations of Court orders, and gamesmanship with the Courts as well as with anyone whose interests differ from those of the Mohamed Defendants and Undavia Defendants. As set forth below, their pattern of contemptuous conduct began well before the Mohamed Defendants commenced their bankruptcy proceedings and has simply continued in what can only be described as a "business-as-usual" manner since that time.

Although litigation is adversarial and zealous advocacy is appropriate, it is also a search for the truth which requires the participants to tell the truth.  Based upon what the Court is about to read below, it is obvious that the Mohamed Defendants and Undavia Defendants are incapable of bieng truthful.  Now the time has come for them to suffer the consequences of their reprehensible conduct.

The length of this motion is a function of the sweeping scope, duration and complexity  of the relevant misconduct of the Mohamed Defendants and Undavia Defendants.  Suffice it to say, they have weaved a tangled web to deceive and cheat the courts, the Internal Revenue Service ("IRS"), Travelers and other insurers, an ex-spouse of Mohamed (Deborah Mohamed), and at least one judgment creditor who obtained a large malpractice verdict against Mohamed.  In this motion, Travelers untangles that web and, to eliminate any questions or doubts, provides hard, supporting documentation to support its statements.

## II.    SUMMARY

The relevant facts begin in 1998.  At that time, Undavia was a pharmacist working at a pharmacy in a supermarket.  Mohamed was a pain management doctor with a significant workers' compensation patient base.  In April 1998, they formed Minu RX to capitalize upon their  respective professional licenses.  Specifically, Mohamed could and did prescribe thousands of trans-dermal compound gels ("Compounds") for his workers' compensation patients, and steered all of those prescriptions to Undavia who, in turn, caused Minu RX to submit to Travelers and other insurers fraudulent charges for the medically unnecessary Compounds.  The fraudulent nature of the Compounds and Minu RX's charges for them is described at length in Travelers' Second Amended Complaint ("SAC").

When Minu RX was formed, Mohamed and Undavia agreed to conceal that Mohamed was a full-fledged partner in it.  On corporate papers, federal income tax returns, and in several judicial

proceedings, including the divorce proceedings that Mohamed commenced in 2003 against his ex-wife Deborah Mohamed, the Mohamed Defendants' bankruptcy proceedings and these racketeering proceedings, the Undavia Defendants and Mohamed Defendants have repeatedly and steadfastly represented falsely that Mohamed had no ownership interest in Minu RX.  They have done so primarily to evade laws that prohibit self-referrals by physicians (i.e., to avoid the appearance that Mohamed was arranging for his own pharmacy to provide prescriptions to his patients) as well as financial disclosure requirements established by the Texas Legislature and Division of Workers' Compensation ("the DWC"), to keep Mohamed's interest in Minu RX beyond the reach of creditors including an individual who obtained a $1.8 million malpractice judgment against Mohamed, Mohamed's ex-wife Deborah Mohamed, as well as Travelers and other creditors in the Mohamed Defendants' bankruptcies and Travelers' RICO case.

After almost nine years of fierce denials, perjury, obstruction of justice, and false income tax returns, the overwhelming evidence of Mohamed's ownership interest in Minu RX has finally surfaced.  Unfortunately, it has taken significant expense, extensive motion practice and repeated orders from this Court to overcome the many obstacles that the Mohamed Defendants, the Undavia Defendants and their attorneys have erected to avoid the truth.  The depths to which they have gone to avoid this day are attributable to the financial stakes for all involved and the various prices that Undavia and Mohamed now may have to pay for their deliberate actions.

The financial stakes for the Mohamed Defendants and the Undavia Defendants are high. During the six years from 2001 through 2006, Minu RX's gross receipts, which were derived largely from Mohamed's prescriptions from Compounds, exceeded $40 million dollars.  During that same period, Undavia received compensation and distributions from Minu RX exceeding $12 million while, at the same time, funneling more than $9 million to Mohamed through various subterfuges,

including payments to shell companies that he formed to conceal that he was the true beneficiary of those proceeds.  In fact, during the Mohamed Defendants' bankruptcy proceedings and to this very day, Undavia and Mohamed have continued to use Minu RX to funnel more than a million dollars to Mohamed which has enabled him to secretly: (1) acquire at least one residential property in San Antonio, (2) acquire a franchise from an Israeli company which gives him the right to market and sell a non-invasive medical device that purportedly eliminates cellulite ("the Bellacontour") in the United States, India, and the United Arab Emirates, and (3) to pay his former bankruptcy counsel Dean Ferguson more than $77,000, without disclosure to or approval from this Court in Mohamed's bankruptcy proceedings.

This explains the motivations behind the consistent denials from the Mohamed Defendants and the fierce opposition of the Undavia Defendants in this Court and over time to avoid having to comply with Court orders to produce the basic documentation that would reveal these simple truths regarding Minu RX.  That basic documentation includes Minu RX's general ledgers which the Undavia Defendants initially refused to produce at all, then attempted to induce this Court to permit them to produce with substantial redactions, and finally produced after months of haggling and multiple Court orders that very explicitly required them to do so. More troubling, though, is that perhaps the most basic document which revealed Mohamed's ownership in Minu RX was not produced by either the Mohamed Defendants or the Undavia Defendants.  The document in question is a two-page Declaration signed by Undavia on May 6, 1998 ("the Undavia Declaration"), a few weeks after Minu RX was formed, secretly transferring half her shares of Minu RX to Mohamed's mother, Shirin Mohamed (as discussed below, a nominee for Mohamed).

As of November 21, 2007, the Undavia Defendants had produced approximately 20,000 documents to Travelers pursuant to this Court's orders.  The Undavia Declaration was not among

those documents.  The Undavia Declaration was produced later, by attorney Aaron Keiter in response to a subpoena that Travelers had served upon him in his personal capacity.  Keiter is the one who finally came clean, and produced the two-page Undavia Declaration which completely belied the denials of the Undavia Defendants and Mohamed Defendants regarding whether Mohamed had an ownership interest in Minu RX.  Shamelessly, after moving to quash the Keiter subpoena, counsel for the Undavia Defendants are now attempting to take credit for producing the Undavia Declaration because they insisted on requiring Keiter to filter his production through them so that they could "produce" his documents to Travelers with a Minu RX bates-label on the documents.

The Undavia Defendants, the Mohamed Defendants and their counsel cannot with a straight face deny the critical importance of the Undavia Declaration in establishing Mohamed's true interest in Minu RX.  Nor can they seriously argue that such interest belonged to Mohamed's mother, Shirin Mohamed, who has never received one cent from Minu RX.  The fact is that Mohamed and Undavia have used Mohamed's own mother to facilitate their fraud and enable Mohamed to receive millions of dollars pursuant to his undisclosed interest in Minu RX both before and during his bankruptcy proceedings.  In an evidentiary hearing, perhaps they and their counsel will explain why it took nine years and a personal subpoena to attorney Keiter, which the Undavia Defendants attempted to quash, to produce the two-page Undavia Declaration.

Beyond Minu RX, as set forth below, Mohamed also has engaged in a pattern of perjury, fraud and deceit to conceal his ownership interest in more than 30 other shell companies, many of which he created to facilitate his illegal kickback scheme with hospitals and ambulatory surgical centers.  The circumstances surrounding the formation of these shell companies through William Reed and the Asst Protection Group in Las Vegas, and their illegal purposes are described at length

in the SAC.  To eliminate the need for any further serious discussion regarding those circumstances and illegal purposes, Travelers in this motion has expanded on the details of the SAC and provided even more supporting documentation.  Throughout his divorce proceeding, bankruptcy proceedings and this RICO case, Mohamed has steadfastly, and falsely, refused to disclose and affirmatively denied his ownership of these shell companies.  During the same periods, he secretly obtained millions of dollars of income through these companies, which he has methodically concealed from and attempted to put beyond the reach of the IRS, his ex-wife Deborah Mohamed, this Court and other courts, and his creditors, including Travelers and the individual who obtained the $1.8 million malpractice judgment against him.

One shell company discussed herein is Breezy Medical Services, Inc. ("Breezy"), which Mohamed and his former bankruptcy counsel Dean Ferguson created in September 2006 for two illegal purposes that were designed to facilitate bankruptcy and tax fraud.  Dean Ferguson was the sole director of Breezy when it was formed, and its principal place of business was Dean Ferguson's home address on Breezy Point Lane.  One illegal purpose for Breezy was to enable Mohamed to use Breezy to secretly make an investment of about $100,000 to acquire the franchise rights to market and sell the Bellacontour anti-cellulite device in the United States, India and the United Arab Emirates, without disclosure to or approval from the Court in Mohamed's bankruptcy proceedings. The other illegal purpose for which Breezy was formed was to enable Mohamed to funnel about $77,000 in attorneys' fees to Dean Ferguson without disclosure to or approval from the Court in Mohamed's bankruptcy proceedings.[1]

Not surprisingly, the Undavia Defendants were the sole source of the funds used by Breezy to accomplish these illegal purposes.  Specifically, between September 2006 and December 2006,

Minu RX issued checks in the aggregate amount of $180,000 to Breezy and falsely characterized these payments as part of their "cost of goods sold" so that Minu RX could illegally evade approximately $60,000 in taxes based upon these purported expenses.  In fact, Breezy never provided any goods or services to Minu RX, these expenses were not deductible, and Minu RX's federal income tax return for 2006 was false; they were payments made by Undavia to enable Mohamed and Dean Ferguson to commit bankruptcy fraud.

The most recent indignity heaped upon this Court occurred approximately two weeks ago.  In a February 15, 2008 telephonic hearing with the Court, counsel for the Mohamed Defendants contended that Mohamed had made complete and truthful disclosures to comply with this Court's many orders and that Mohamed is so destitute that he is living with his father in India.  These representations to the Court were, of course, completely false.  The truth is that, shortly after commencing his bankruptcy proceedings, Mohamed secretly paid approximately $250,000 to acquire the right to sponsor anti-aging conferences in India and the United Arab Emirates.  True to form, this was done without disclosure to or authorization from the Court in Mohamed's bankruptcy proceedings.

Mohamed has been falsely pleading poverty for years, throughout his divorce from Deborah Mohamed, his bankruptcy proceedings, and Travelers' RICO case.  For a quick peek into his true current circumstances the Court need look no further than the website home page for the American Academy of Anti-Aging ("A4M") at www.worldhealth.net.  If the Court clicks on the box for "Conferences," it will link to a page with icons for international A4M conferences scheduled in 2008.  This page includes icons for two conferences that Mohamed is sponsoring later this year, one in Mumbai, India and another in Dubai.  Indeed, if the Court clicks on the icon for the "AM India"

---

1.      In fact, in 2006 Mohamed funneled an additional $65,000 in attorneys fees to Dean Ferguson which

conference scheduled in Mumbai, India on September 27-28, 2008, it will link to a page describing the upcoming conference in Mumbai.  If the Court clicks on the "About Us" box at the top of that page, a pull down menu will appear.  Click "The Chairman" option from the pull down menu, and meet The Chairman who is none other than Mohamed.  *See* the website's The Chairman page attached as Exhibit 1.  As discussed below, Mohamed has secretly paid approximately $250,000 to be the Chairman of the India and Dubai conferences.

The Chairman's page begins with the modest claims that Mohamed "can only be described as a Renaissance man" and proceeds to tout his educational and professional backgrounds, including his pioneering approach to nerve block injections and the development of trans-dermal gels that can be applied to a painful site with remarkable results.  *Id*.  The page notes that Mohamed has been "[i]nspired by another educator in the field, Suzanne Somers . . . [and] is working on a comprehensive book on Age Management, titled: *It's Not In Your Head, Dear*."  *Id.*

While Mohamed's counsel is asking this Court to excuse Dr. Mohamed from having to travel to Houston to testify regarding the matters raised in this motion, the truth is that Mohamed is busy running around the world promoting and attempting to profit from hormone treatments which purportedly can reverse the aging process.  In fact, within the past few days, the A4M has begun to produce documentation of Mohamed's busy speaking schedule at A4M conferences around the world and his sponsorship of conferences which are scheduled for later this year in Mumbai and Dubai.  Of course, Travelers has had to incur significant expense to learn of Mohamed's relationship with the A4M and to obtain information in that regard pursuant to a subpoena to the A4M.

The judicial process and search for the truth depends on the integrity of the participants.  As demonstrated in this motion, the Mohamed Defendants and Undavia Defendants have none and the

---

was never disclosed to or approved by the Court in Mohamed's bankruptcy proceedings.

time finally has come for them to be held fully accountable for it.  Therefore, Travelers requests an Order entering judgment against the Mohamed Defendants and Undavia Defendants on all of Travelers' claims.  In the alternative, Travelers requests an Order requiring the Mohamed Defendants, the Undavia Defendants and others with relevant evidence, including attorneys Aaron Keiter and Dean Ferguson, to appear in person before this Court to testify under oath, subject to cross-examination regarding the conduct described herein.  Then, at last, their connivances and games will end.

The remainder of this memorandum is organized into six sections.  The first section describes the circumstances surrounding the formation and operation of Minu RX.  This section explains how Mohamed and Undavia have concealed Mohamed's ownership interest in Minu RX for the past nine years and the subterfuges that they have used to funnel much more than $9 million to Mohamed from Minu RX during that time.  The second section describes shell companies that Mohamed has formed in the names of nominees for various purposes including funneling money to himself from Minu RX, to himself through his former employee Fataneh Ramji, and to his bankruptcy counsel Dean Ferguson without disclosure to or approval from the bankruptcy court.  The third section addresses shell companies that Mohamed has formed in the names of nominees for other purposes including to enable him to secretly bill and collect millions of dollars for facility fees relating to nerve block injections that he purportedly performed but which were either medically unnecessary or never performed at all.  The fourth section discusses five more shell companies that Mohamed formed in the names of nominees to secretly bill and collect charges for medical services, including MRIs, physical rehabilitation and Vax-D therapy.  The fifth section sets forth the various Court Orders which Mohamed, Undavia, and Minu RX have violated to date and continue to violate.  The final section discusses the governing law for this contempt and sanctions motion.

III.     THE LONG AND SORDID HISTORY OF MINU RX

    A.     **Minu RX's Formation And The Symbiotic Relationship Between Mohamed and Undavia Which Has Produced More Than $20 Million In Profits For Them To Share**

As discussed below, Minu RX was formed in April 1998 and operated to this very day with Undavia falsely identified as the sole owner, director and officer.[2]  Throughout Mohamed's divorce proceedings, his bankruptcy proceedings, and Traveler's RICO case, both Mohamed and Undavia have falsely denied that Mohamed had an ownership interest in Minu RX.  In fact, Mohamed and Undavia have been full fledged partners in Minu RX from its inception, and together they have taken more than $20,000,000 from the business.

Mohamed and Undavia have had a completely symbiotic relationship.  Mohamed provided much, if not all, of the initial funding for Minu RX, and for the first seven years of its operation, he prescribed most of the medicines which were dispensed by Minu RX.  His role as a doctor, specifically one specializing in pain management, was critical, because Minu RX had virtually no ability to bill or generate revenue without thousands of prescriptions from him.  Undavia's role also was critical to the success of their scheme.  As a pharmacist, she could own a pharmacy, dispense medicine, and submit bills to insurance companies for those drugs.

Although Minu RX has dispensed various medicines over time, the Compounds have been primarily responsible for generating Minu RX's revenues which, in the aggregate, exceeded more than $40 million from 2001 through 2006.  Prior to May 2005, when Mohamed was thrown out of the worker's compensation system, he prescribed thousands of the Compounds from Minu RX.

---

2.     In 2005, Minu RX, Inc. was converted from a Texas corporation to a Texas limited partnership known as Minu RX, Ltd.  At that time, Minu GP, LLC was formed as a Texas limited liability company to act as the general partner of Minu RX, Ltd.  Undavia is identified as the President and sole member of Minu GP, LLC, and her shares of Minu RX, Inc. purportedly also were converted to limited partnership units of Minu RX, Ltd.

Since May 2005, Minu RX has paid kickbacks of more than $900,000 to Dr. Eddie Cerday and other doctors to induce them to prescribe the Compounds.  In 2006 and 2007, Minu RX has continued to funnel more than $1 million to Mohamed through various subterfuges.  All of this is described next.

On April 28, 1998, Minu RX, Inc. was incorporated in Texas, with Undavia identified as the registered agent and sole director.  *See* Minu RX's articles of incorporation attached as Exhibit 2.  Notwithstanding the denials by Mohamed and Undavia that Mohamed had an ownership interest in Minu RX, on May 6, 1998 Undavia signed the Undavia Declaration, stating her intention to transfer half her shares of Minu RX to Shirin Mohamed (Mohamed's mother who is referenced herein as "Shirin").  *See* Declaration attached as Exhibit 3.

Placing the shares in Shirin's name was a sham.  Shirin was simply a nominee for Mohamed.  In fact, Minu RX has not produced and Travelers has never seen a single document other than the Undavia Declaration that indicates any relationship between Minu RX and Shirin.  Conversely, as discussed below, Minu RX's tax returns, general ledgers, bank records and other documents show that more than $9 million was funneled to Mohamed from 2001 through 2007.  Therefore, it is obvious that Mohamed and Undavia deliberately parked half the shares of Minu RX in the name of Mohamed's mother, Shirin, to conceal Mohamed's ownership interest in Minu RX.  The statements of Mohamed and Undavia to the contrary are just plain false.

Prior to the formation of Minu RX, Undavia worked as a pharmacist in a pharmacy at a supermarket.  Her fortunes changed dramatically once she and Mohamed formed Minu RX.  Indeed, Minu RX's general ledgers and tax returns for the years 2001 through 2006 reflect that she received more than $12 million in income and distributions for that period.  Of course, she has had to secretly funnel similar amounts to Mohamed during that period.  Here is how they did it.

    1.      From At Least July 2001 Through August 2003 Minu RX Funnels More Than $4.6 Million To Mohamed Through Three Shell Companies And Falsely Deducts These Amounts As "Costs of Goods Sold"

Minu RX's general ledgers reflect that from July 2001 through March 2002, Minu RX paid more than $1,670,000 to a Mohamed shell company, Cita Pharmaceuticals of North America, Inc. ("Cita").  On December 12, 2000, Mohamed caused Cita to be incorporated in Nevada.  *See* a printout from the Nevada Secretary of State website, attached as Exhibit 4.  Cita's initial Secretary was Aaron Keiter who was very involved in Mohamed's activities at the time, and its initial President and Treasurer was Irfah Abji, who also worked for Mohamed at the time.  *Id.*  By 2002, defendant Nishat Alibhai became the President of Cita and its address became 22 Waugh Dr. in Houston which was the address for most of Mohamed's companies.

Minu RX deducted more than $1,670,000 that it paid to Cita on its tax returns as "costs of goods sold."  *See* pp.7, 18, 21 and 1, 3, 4, and 25 of the Minu RX general ledgers from 2001-02 attached as Exhibit 5.  This characterization was false.  These payments were not for any "goods" that Minu RX purchased or sold.  Indeed, Minu RX has not produced a single document reflecting any "goods" that it purchased from Cita.   Rather, these were payments to Mohamed based upon his interest in Minu RX and in return for his vital role in prescribing the medicines that generated virtually all, if not all, of Minu RX's revenues at the time.

In March 2002, the payments from Minu RX to Cita stopped.  At that time, Mohamed formed another shell company, NC Consulting, Inc. ("NC Inc."), to serve the same purpose that Cita had served.  *See* NC Inc's articles of incorporation, attached as Exhibit 6, showing NC Inc.'s sole director as Nizam Alibhai.  Minu RX's general ledgers reflect that, from April 2002 through September 2002, it paid more than $1,185,000 to NC Inc. and deducted those expenses as "cost of goods sold."  This characterization was false.  These payments were not for any "goods" that Minu

RX purchased or sold.  Indeed, Minu RX has not produced a single document reflecting any "goods" that it purchased from NC Inc.  They were payments to Mohamed based upon his interest in Minu RX and in return for his vital role in prescribing the medicines that generated virtually all, if not all, of Minu RX's revenues at the time.

The timing of the April 2002 switch from Cita to NC Inc. was not coincidental.  On or about December 31, 2001, a malpractice judgment of approximately $1.8 million was rendered against Mohamed in *Romano Castro v. Pain Institute of Texas, P.A. et al*, Cause No. 2000-28574, in the 133rd Judicial District of Harris County, Texas.  On March 5, 2002, Mohamed's motion for new trial was denied.  This meant that the judgment became final and subject to execution on April 4, 2002.  *See* Judgment and Order denying motion for new trial, attached as Exhibit 7.  NC Inc. was formed on March 6, 2002, which was exactly when Mohamed was clearly motivated to hide his assets and income from the individual who had obtained the $1.8 million malpractice judgment against him.

In September 2002, the payments from Minu RX to NC Inc. stopped.  On October 1, 2002, Mohamed formed another shell company, New Frontier Medical Consultants, Inc. ("New Frontier") to serve the same purpose as NC Inc.  *See* printout from the Nevada Secretary of State website regarding New Frontier, attached as Exhibit 8.  As explained in the next paragraph, New Frontier was one of several shell companies that Mohamed created in Nevada in the fall of 2002 through William Reed, the disbarred attorney and President of Asset Protection Group whose checkered past is described at length in paragraphs 31-36 of the SAC.  Minu RX's general ledgers reflect that, from October 2002 through August 2003, it paid more than $1,810,000 to New Frontier and deducted those expenses as "cost of goods sold."  This characterization was false.  These payments were not for any "goods" that Minu RX purchased or sold.  Indeed, Minu RX has not produced a single document reflecting any "goods" that it purchased from New Frontier.  Rather, these payments to

Mohamed based upon his interest in Minu RX and in return for his vital role in prescribing the medicines that generated virtually all, if not all, of Minu RX's revenues at the time.

The timing of the September/October 2002 switch from NC Inc. to New Frontier was not coincidental. By the fall of 2002, Mohamed had discovered William Reed and fully bought into his *Bulletproof Asset Protection* program which is described at paragraphs 31-36 of the SAC.  Indeed, at about the same time that he formed New Frontier, Mohamed also used Reed and his asset concealment strategies to form several other Nevada shell companies which were integral components of his mail fraud scheme to collect for nerve block injections that were either never performed nor medically necessary.  *See* ¶¶ 31-95 of the SAC.

> 2.     Events In The Summer Of 2003 Force Mohamed To Disclose A Financial Relationship With Minu RX, But He And Undavia Still Lie About the Scope And Nature Of That Relationship To Hide Mohamed's Ownership Interest In Minu RX

In the summer of 2003, two events led Mohamed and Undavia to again change their method of funneling income from Minu RX to Mohamed.  Those two pivotal events were: (1) a divorce proceeding that Mohamed commenced on July 15, 2003 against his then-wife Deborah Mohamed, and (2) the DWC's adoption of a regulation that required all health care practitioners to disclose by September 1, 2003 any financial interest they held in any health care provider to which they made referrals.  *See* 28 T.A.C. § 180.24.  The penalties for failing to make the financial disclosures are justly draconian - practitioners lose their right to present a claim for worker's compensation benefits for any service and are subject to forfeiture of any benefits obtained during any period of non-compliance with the disclosure requirements.  *Id.*

The convergence of these two events was a major problem for Mohamed and Undavia.  As demonstrated in the August 27, 2003 e-mail which is described next, Mohamed knew that his then-wife Deborah Mohamed was aware of his otherwise secret interest in Minu RX and might try to use

it for leverage in the divorce proceeding by alleging that it was illegal for Mohamed to simultaneously own and make referrals to Minu RX.

Specifically, in an August 27, 2003 e-mail, Carla Longhofer, Mohamed's in-house attorney, informed Mohamed as well as Nishat and Nizam Alibhai, that they needed to discuss what, if any, disclosure Mohamed might be forced to make regarding his interest in Minu RX.  *See* Longhofer's August 27, 2003 e-mail attached as Exhibit 9.  Longhofer's e-mail makes clear that they were concerned that Deborah Mohamed would reveal in the divorce proceeding that Mohamed owned half of Minu RX because he had "***been taking a 50/50 split [of Minu RX's income] which is de facto ownership***."  (Emphasis added.)  Given that Minu RX had secretly funneled more than $4,600,000 to Mohamed from July 2001 through August 2003 through payments to shell companies Cita, NC Inc. and New Frontiers, Longhofer's concerns were entirely understandable.

Based upon Deborah Mohamed's knowledge of Mohamed's interest in Minu RX, Longhofer and Mohamed realized that Mohamed had to disclose some form of financial interest in Minu RX. Their dilemma, and the subject of Longhofer's August 27, 2003 e-mail, was how they should characterize that financial interest.  Longhofer had researched whether Mohamed's medical license would be jeopardized if he acknowledged his ownership interest in Minu RX.  Her e-mail recounts her analysis of whether physicians could legally own pharmacies under Texas law and her phone call to the Texas Pharmacy Board "***using a non-traceable phone card/number***" to discuss that very issue.  (Emphasis added).  Based upon the thousands of prescriptions that Mohamed had made from Minu RX, they also were concerned whether Mohamed and Undavia would be deemed to have violated any federal or state anti-kickback or self-referral prohibitions if Mohamed disclosed that he owned half of Minu RX.

In Longhofer's August 27, 2003 e-mail, she concluded that Texas law probably allowed physicians to own pharmacies and that Mohamed's prescriptions to Minu RX would not violate any federal laws because they had been careful not to submit claims to any federal program. Furthermore, Longhofer concluded that the DWC rules would not prohibit the self-referrals between Mohamed and Minu RX if he made the required disclosures of his ownership interest in the pharmacy. In light of the stakes, Longhofer was consulting with an attorney at Thompson & Knight whom she described as a "medical heavy hitter." In fact, it appears that Longhofer did consult with Thompson & Knight because Minu RX produced a 1099 to Thompson & Knight from 2003, indicating that Minu RX (not Mohamed) paid that firm for its advice.

The importance of the disclosure issue for Mohamed and Undavia is reflected in the language of Longhofer's e-mail. Specifcally, she states that:

> ***The biggest issue right now for the divorce is their intended attack on your medical license***. This is separate from the Approved Doctor's List. If a doctor can own a pharmacy, then that takes it away as an issue. ***Even if you have an agreement, they will try to make the argument that because you have been taking a 50-50 split it is de facto ownership. That is why it is important to resolve whether or not a doctor can own a pharmacy or not***. If you can, even if they win the argument (and that's not a slam dunk for several reasons), there's no attack on your license. . . ***This has been a priority because it takes a nuclear weapon out of Debbie's arsenal if ownership isn't an issue with your license, we need to know the position we're taking as production shapes up, and the drop-dead date for ADL reporting is 9/1/03***. We need to discuss this.

*See* Exhibit 9 (emphasis added).

3.      Mohamed Denies An Ownership Interest And Falsely Characterizes His Financial Interest In Minu RX As A Royalty Relationship

The discussions that followed Longhofer's August 27, 2003 e-mail are not known, but the results are. Mohamed disclosed a financial interest, which he had to do to take "a nuclear weapon out of Debbie [Mohamed's] arsenal." True to form, though, the disclosure he made falsely characterized the nature of his financial interest in Minu RX. Specifically, his disclosure stated that

one of his clinics, defendant The Pain Institute of Texas, PA ("Pain Institute"), "receives compensation in the form of royalties."  *See* Mohamed's 12/10/03 DWC disclosure of financial interest attached as Exhibit 10.  In contrast, he did not indicate any "ownership" interest in or "investment" arrangement with Minu RX.

Simultaneously, Mohamed and Undavia manufactured a document to support the lie in his DWC disclosure that his financial interest in Minu RX was comprised of royalties that the pharmacy owed to the Pain Institute.  That document is an agreement dated October 2, 2003 between the Pain Institute and Minu RX.  *See* the 10/2/03 agreement attached as Exhibit 11.  This agreement is a sham.  It provides that Minu RX will pay the Pain Institute "royalties" of $175 for every prescription for the Compounds that it fills.  The purported basis for these royalties was that they allegedly represented the fair market value of the Pain Institute's "expertise in developing the formulas used in the development" of the Compounds.

The October 2, 2003 "royalty" agreement is complete nonsense.  These "royalty" payments actually represented amounts compensating Mohamed for his half interest in Minu RX. Furthermore, one has to wonder how the "fair market" really would have valued the "expertise" used to develop formulas for the Compounds given that: (1) those formulas make no sense from a medical perspective, and (2) only a few varieties of the Compounds were mass produced and repeatedly prescribed.  Obviously, with Undavia's full support, Mohamed decided not to acknowledge his ownership interest in Minu RX because that would have given Deborah Mohamed an opportunity to take that interest or its value in the divorce proceeding.  Furthermore, it eliminated, or at least minimized, the possibility that he would be accused of having made prohibited self-referrals by prescribing medicines from Minu RX, a pharmacy in which he held an ownership interest.

4.     From October 2003 Through May 2005, Minu RX Funnels More Than $2.7 Million
       To Mohamed Under The Pretext Of "Royalties" To His Clinic

Minu RX's general ledgers reflect that, from October 2003 through May 2005, it paid more than $2,715,000 in royalties to the Pain Institute.  *See* excerpts of the Minu RX general ledgers from 2003-05 attached as Exhibit 12.  For the reasons described above, this characterization was false.  These payments were not for "royalties."  Rather, they were payments to Mohamed based upon his interest in Minu RX and in return for his vital role in prescribing the Compounds and other medicines that generated virtually all, if not all, of Minu RX's revenues at the time.

In May 2005 the payments from Minu RX to the Pain Institute stopped.  The reason was that Mohamed's application for renewal to the Approved Doctor List was denied by the DWC based upon its finding that Mohamed had performed medically unnecessary nerve block injections on at least four patients.  *See* the DWC's May 25, 2005 Notice attached as Exhibit 13.   As a practical matter, this precluded Mohamed from collecting worker's compensation benefits for any services rendered to injured employees.  Therefore, he could no longer prescribe the Compounds from Minu RX for his patients, virtually all whom received their benefits through workers' compensation.  Unfortunately, this did not stop Mohamed and Undavia from continuing with their fraudulent Minu RX enterprise.

5.     After Mohamed Is Thrown Out Of The Worker's Compensation System For A
       Pattern of Medically Unnecessary Treatment And Billing, Mohamed And Undavia
       Recruit Dr. Eddie Cerday And Other Prescribing Doctors To Carry On The Scheme

By late 2004, Mohamed knew that he was in trouble with the DWC and that his eligibility to participate in worker's compensation claims might be short-lived.  Therefore, in late 2004, he and Undavia recruited other doctors ("the Prescribing Doctors") who were on the Approved Doctor List to prescribe the Compounds and other medicines from Minu RX.  Without the Prescribing Doctors,

Mohamed and Undavia would have had no ability to profit from the fraudulent Compounds and other medicines. The challenge for Mohamed and Undavia would be to find a way to convince the Prescribing Doctors to prescribe the Compounds, something that none of them had done before. As discussed next, the only way in which Mohamed and Undavia were able to induce the Prescribing Doctors to do so was by paying illegal kickbacks under the guise of "Medical Director" payments.

Minu RX's general ledgers and 1099s reflect that, from late 2004 through the end of 2007, Minu RX paid more than $900,000 to at least 16 Prescribing Doctors who were responsible for all, or virtually all, Compound prescriptions filled by Minu RX during that period. Based upon their volume of prescriptions for the Compounds, 10 of the Prescribing Doctors are defendants in the SAC.

The initial Prescribing Doctors were Ihsan Shanti and Ernest Roman, who first appear in Minu RX's general ledgers in the fall of 2004. *See* pp. 22, and 24-26 of the general ledger which are attached as Exhibit 14. Per the general ledger, Drs. Shanti and Roman each received $14,000 from Minu RX in 2004. These payments were deducted by Minu RX as "consulting" expenses. This was false. Neither Minu RX, these doctors, nor anyone else for that matter, has produced a single document reflecting any services that Drs. Shanti or Roman ever provided to Minu RX. These were illegal kickbacks which, not surprisingly, coincide with the first Compound prescriptions from Drs. Shanti and Roman.

From 2005 through 2007, several more Prescribing Doctors joined the kickback scheme. Specifically, Minu RX's general ledgers, form 1099s, and checks reflect that the following Prescribing Doctors received at least the following amounts: (1) Neil Atlin received $10,000; (2) Kenneth Bayles received $25,000, (3) Tim Chowdhury received $74,500, (4) Peter Fooks received $18,000, (5) Manuel Griego received $32,000, (6) John McConnell received $70,000, (7) Ricky

McShane received $12,000, (8) David Metzger received $3,000, (9) Will Moorehead received $144,000, (10) Joseph Osei received $36,000, (11) Bobby Pervez received $4,000, (12) Gregory Podleski received $4,000, (13) Ishan Shanti received $331,000, and (14) Douglas Won received $2,500.  On its general ledgers, Minu RX falsely characterized these payments as "consulting" fees and deducted them as business expenses on its tax returns.  As explained above, these actually were non-deductible, illegal kickbacks.[3]  Additionally, none of these Prescribing Doctors has ever disclosed these financial arrangements to the DWC, despite their legal obligation to do so.  *See* 28 TAC 180.24.

In addition to the above-described payments to Prescribing Doctors, in June 2005, Mohamed recruited defendant Dr. Eddie Cerday (who was on the Approved Doctor List) to carry on the fraudulent practices at Mohamed's clinics in Houston and San Antonio.  The circumstances surrounding Cerday's recruitment in June 2005 and his involvement in the scheme are described at length in the SAC.  *See* ¶¶ 96-108 of the SAC.  Essentially, Cerday continued to bill for nerve block injections that were medically unnecessary or never performed, and to prescribe the Compounds from Minu RX.  As alleged in the SAC and discussed at pp. 31-34 below, the revenues generated through the bills for Cerday's purported services were ultimately funneled to Mohamed through yet another company that he created for that purpose, Satex Management Services, Inc. ("Satex").

Cerday had been a pain management doctor in Texas for approximately 20 years when he met Mohamed, and had never prescribed a Compound.  Yet, he immediately and routinely began to do so upon becoming involved with Mohamed in June 2005.  Cerday did not receive any payments

---

3.    In 2005, at least two of the Prescribing Doctors - Ishan Shanti and Joseph Osei - were indicted by Travis County Grand Juries for worker's compensation billing fraud, although not related to their relationships with Mohamed, the Undavia Defendants, or prescriptions for the Compounds.  *See* the respective Indictments attached as Exhibit 15.  MedAlert Healthcare System, Inc., of which Osei was the President, plead guilty on October 30, 2006.

directly from Minu RX from June 2005 through approximately early 2007 which is when he separated from Mohamed.  Instead, during this period, Mohamed allowed Cerday to take a salary of approximately a few thousand dollars per month directly from the Houston and San Antonio clinics.

In approximately early 2007, the Mohamed clinics closed and Cerday started his own clinic in a new location.  At that point, Minu RX paid Cerday directly to induce him to continue prescribing the Compounds.  In fact, in 2007, Minu RX paid Cerday and his clinic, Southwest Pain & Injury, PA ("Southwest Pain") at least $108,000.  *See* Minu RX's report of payments to Cerday and Southwest Pain, attached as Exhibit 16.

Minu RX's payments to Cerday and Southwest Pain were illegal kickbacks.  In an attempt to create a facade of legitimacy for the kickbacks, Minu RX paid them pursuant to three agreements dated February 1, 2007.  One is a Recruiting Assistance Agreement and provides that Minu RX would provide Southwest Pain a forgivable loan of up to $60,000 to recruit Cerday and help him relocate his practice to San Antonio.  *See* Recruiting Assistance Agreement attached as Exhibit 17. This is absurd.  Cerday was the sole owner of Southwest Pain, so that clinic hardly needed to borrow $60,000 to recruit Cerday when he already worked for it.  Furthermore, Cerday had been working in San Antonio since at least June 2005.  Therefore, Cerday's clinic, Southwest Pain, hardly needed to borrow $60,000 to help him re-locate to San Antonio when he already lived there.  In addition, in two other agreements dated February 1, 2007, Minu RX agreed to pay Cerday $5,000 a month purportedly to provide Medical Director services to Minu RX and to do research studies regarding the Compounds.  *See* The Medical Director and Research Study agreements attached as Exhibits 18 and 19.  These two agreements were further attempts to disguise the illegal kickbacks paid to Cerday to induce his continued Compound prescriptions.

In addition to the above-described agreements with Cerday, Minu RX has produced a grand total of four other Medical Director contracts.  These agreements purport to be between Minu RX and Prescribing Doctors Bayles, Chowdhury, Moorehead and Shanti.  *See* representative agreement produced by Bayles, attached hereto as Ex. 20. The dates for two of these agreements are highly suspect.  Specifically, the Medical Director agreement relating to Shanti is dated January 2007 which was two and a half years after Minu RX began making monthly payments to him.  Similarly, the Medical Director agreement relating to Moorehead is dated December 2006 which was two years after Minu RX began making monthly payments to him.  Indeed, prior to the dates of these so-called Medical Director agreements, Minu RX had already paid $295,000 to Shanti and $94,000 to Moorehead.

As discussed below in the section relating to the Undavia Defendants' discovery abuses and violations of Court orders, Travelers recently has obtained additional Medical Director agreements between Minu RX and two other Prescribing Doctors, Peter Foox and Jerry McShane.  *See* the Medical Director agreements attached hereto as Exs. 21-22.  These agreements were produced by these Prescribing Doctors pursuant to subpoenas that Travelers served directly upon them.  Minu RX did not disclose either agreement.

Accordingly, at this point, Travelers is aware of Medical Director agreements between Minu RX and at least seven Prescribing Doctors, in addition to hundreds of thousands of dollars paid by Minu RX to them and many other Prescribing Doctors.  In attempting to resist discovery, counsel for the Undavia Defendants has portrayed Minu RX as "a small pharmacy. . . . This is a small operation with just a few people who work there.  I want to be clear about that."  *See* 1/22/08 transcript at 24, a copy of which is attached as Exhibit 23.  One has to question why such a small pharmacy would need so many overlapping Medical Directors, and why the pharmacy and all of these purported

Medical Directors, together, have been able to produce literally only one piece of paper reflecting any services that any of these Medical Directors have ever purportedly provided to Minu RX.[4]   No other documentation has been produced to date which would support the notion that any of these Prescribing Doctors provided any service to Minu RX other than prescribing the Compounds.

6.    Minu RX Continues To Funnel Money To Mohamed From July 2005 Through 2007

As a practical matter, Mohamed could no longer prescribe Compounds and other medicines from Minu RX after May 2005.  That did not stop Undavia from secretly funneling money to Mohamed through Minu RX, despite the fact that he was in bankruptcy during virtually that entire period.

From July 2005 through 2007, Undavia funneled more than a million dollars from Minu RX to Mohamed.  Specifically, (1) between July 2005 and August 2006, many Minu RX checks totaling more than $450,000 were issued payable to "Johnathan Boyd" and were deposited into a Satex account and was used purely for Mohamed's benefit.  Boyd was not aware of and did not benefit from any of these checks; (2) from September 2005 through January 2006, for Mohamed's benefit and at his direction, Minu RX loaned $230,000 to Fataneh Ramji, a former employee of Mohamed, (3) between September 2006 and December 2006, six Minu RX checks totaling $180,000 were issued payable to Breezy, a shell company created by Mohamed and his bankruptcy counsel Dean Ferguson to: (a) enable Mohamed to secretly invest in and own 100,000 shares of AlfaTeck USA, a company with the exclusive right to market and sell the Bellacontour anti-cellulite device in the United States, and (b) enable Mohamed to pay Dean Ferguson more than $77,000 of attorney's fees without disclosure to or approval by the Court in the Mohamed Defendants' bankruptcy proceedings; and (4) beginning in January 2007, less than two months after the consolidated plan of

---

4.      The one piece of paper is a Timesheet from July 2006, purporting to reflect a few hours of purported

liquidation was approved by the bankruptcy court in this case, and continuing through late 2007, several Minu RX checks totaling more than $100,000 were issued payable to Mohamed.  These activities are described below at pp 36-39 of this memorandum.

      7.    <u>Other Minu RX Transactions For Mohamed's Benefit</u>

To date, Travelers has uncovered at least three other transactions by Undavia and Minu RX to secretly benefit Mohamed.

      a.    <u>Mohamed And Undavia Conspired To Buy A Home In Undavia's Name Which Actually Is Owned By Mohamed</u>

The first transaction occurred in September 2003 when Undavia purchased and held title to a home in San Antonio as a nominee for Mohamed.  She has done so to protect the home from Mohamed's ex-wife Deborah Mohamed and his creditors, including Travelers.  Indeed, Mohamed has never disclosed his ownership of this home, despite his obligation to do so in his divorce, bankruptcy proceedings, and Travelers' RICO case.

The background for this transaction began in mid-2003 when Mohamed established Orthopedic Pain Management, P.A. to operate a clinic at 6228 Bandera in San Antonio.  Mohamed lived in Houston and needed a place to stay in San Antonio when he visited the San Antonio clinic.  Accordingly, in September 2003, Undavia paid $429,000 to purchase a home at 135 Westcourt in San Antonio.  *See* mortgage records relating to the purchase attached as Exhibit 24. In connection with the purchase, Undavia borrowed $322,000 from Wells Fargo.  *Id.*  She signed the mortgage documents "Khyati Undavia Mohamed" and represented that the home would be her "primary residence."  *Id.*  This was false, as Undavia never lived in this home.  In fact, Mohamed lived at the residence.  Furthermore, Nizam Alibhai made the $10,000 escrow payment for the property and notarized "Undavia Mohamed's" signature on the mortgage documents.  *Id.*

---

services that one Prescribing Doctor supposedly provided to Minu RX.

Moreover, on October 27, 2003 Undavia opened an account at Compass Bank under the name Khyati Undavia d/b/a Dominion Realty.  *See* opening account documents attached as Exhibit 25.  The statement address for the account was 311 Pinehaven which was Mohamed's home address in Houston.  Furthermore, from the opening of this account through June 2005 virtually all deposits into this account came from two shell companies secretly owned by Mohamed to bill and collect facility fees for nerve block injections, defendants Woodward Health Services, Ltd. ("Woodward") and Mirage Medical Group, Ltd. ("Mirage") and purportedly were for "rent" at 6228 Bandera Road in San Antonio and 2918 San Jacinto.  There was absolutely no reason for Woodward and Mirage to pay rent to Undavia for either of these locations given that Woodward owned 6228 Bandera and another Mohamed entity, Providian Holdings Inc., owned 2918 San Jacinto.

The true reason that shell companies Woodward and Mirage paid tens of thousands of dollars to "Dominion Realty," which was simply a "front" for Undavia, was to enable Undavia to use these funds to pay the mortgage on the 135 Westcourt property in San Antonio.  In other words, two shell companies owned by Mohamed — Woodward and Mirage — were paying for a San Antonio home purchased and held by Undavia as a nominee for Mohamed.

> b.    Minu RX Paid More than $1 Million In Lease Payments Owed By Samsher Flight Management, A Company Jointly Owned By Undavia And Mohamed

Another series of transactions involving Minu RX, Undavia and Mohamed relates to Samsher Flight Management, Inc. ("Samsher Flight").  On December 13, 2000, Samsher Flight was incorporated in Nevada.  *See*  printout from the Nevada Secretary of State website regarding Samsher Flight, attached as Exhibit 26.  Mohamed owned 80 shares, Undavia owned 20 shares, and Aaron Keiter was the initial Secretary.  *Id*.  Samsher Flight bought a Lear jet which it leased for commercial use.

On May 10, 2002, Oscar Trevino, who was an in-house attorney for Mohamed at the time, wrote a letter to Undavia regarding Samsher Flight. *See* Trevino's 5/10/02 letter attached as Exhibit 27. In the letter, Trevino informed Undavia that Mohamed was having "severe cash flow problems resulting from a medical malpractice judgment of approximately $1,800,000 and the loss of his partnership interest in the Memorial Surgical Center. This is impacting his ability to make payments on the Samsher plane." *Id.* Therefore, Mohamed offered Undavia the right to take over the payments on the plane and to purchase Mohamed's interest in Samsher. *Id.* If Undavia accepted the proposal, Mohamed would pay for the plane on a "per use" basis. *Id.*

There are two versions of a response from Undavia, both dated May 11, 2002. One states that Undavia accepts Mohamed's offer, but it is not signed. *See* 5/11/02 Undavia letter attached as Exhibit 28. This version bears a handwritten note, likely written by Undavia, stating "Shove it up your ass. I am not responsible and don't want to." *Id.* In the other version of this letter, Undavia accepts Mohamed's offer and this version is signed. *See* 5/11/02 Undavia letter attached as Exhibit 29.

Within five days of these Undavia letters, on May 16, 2002, Minu RX began making monthly payments to Samsher Flight. *See* excerpts of the Minu RX general ledgers attached as Exhibit 30. From then until January 2005, these payments totaled at least $1,093.500. *Id.* Minu RX deducted all of these payments for "Travel and Entertainment." *Id.* This was false, as these payments were made by Undavia to purchase Mohamed's interest in Samsher Flight. They were not ordinary business expenses of Minu RX, as there is no documentation or explanation for that matter why Minu RX, a "small pharmacy" according to its counsel, would have spent more than a million dollars for travel and entertainment relating to its business.

Furthermore, Samsher Flight is one of the entities in Mohamed's jointly administered bankruptcy proceedings.  In these proceedings, Mohamed and Undavia have represented that they still own 80% and 20% of Samsher Flight, respectively.  *See* Statement of Affairs attached as Exhibit 31.  Moreover, the schedules filed for Samsher Flight and signed by Mohamed under penalties of perjury identify unsecured creditors including Minu RX for $900,000.  *See* schedules for Samsher Flight, attached as Exhibit 32**.**  This was false.  The amounts that Samsher Flight received from Minu RX were not a loan.  Minu RX deducted those payments as business expenses and did not record them in its general ledgers as a loan receivable from Samsher Flight.

Notably, Mohamed was not the only one who filed fraudulent bankruptcy forms in connection with Samsher Flight.  Undavia executed, under penalties of perjury, a proof of claim form, declaring that Minu RX's $935,000 claim against Samsher Flight was based upon "money loaned" by Minu RX to Samsher Flight.  *See* Proof of Claim attached as Exhibit 33.  This was false for the same reasons discussed above.

> c.   Between March 2003 And December 2006, Minu RX Has Paid And Deducted More Than $935,000 To A Jeweler In Transactions Which Cannot Possibly Be Legitimate

Between March 2003 and December 2006, Minu RX has issued at least 55 checks to six different payees, all of which were deposited into one bank account for Amrut (75), Inc. dba Karat-22 Jewelers ("Karat 22 Jewelers").  The aggregate amount of these checks is more than $935,000, and there can be no legitimate explanation for most of these checks.

The chart attached as Exhibit 34 summarizes the 55 checks from Minu RX which was deposited into Karat 22 Jewelers' bank account. These checks make no sense for several reasons. First, one has to ask why Minu RX, a pharmacy, would pay hundreds of thousands of dollars to

Karat 22 Jewelers, a jeweler.[5]   Beyond that, however, one has to ask why Minu RX's checks to

Karat 22 Jewelers were not made payable to Karat 22 Jewelers.  Instead, the 55 checks in question

were issued to at least six different payees.  But they all went into the same Karat 22 Jewelers'

account.  Furthermore, as demonstrated in Exhibit 34, Minu RX frequently issued two sequentially

numbered checks on the same or consecutive days to two different payees.  *See* representative

example of two such checks attached as Exhibit 35.  There can be no legitimate explanation for these

checks, and the purpose can be explored in the contempt hearing.

**B.      Shell Companies Used To Funnel Money From Minu RX**

1.      Cita, NC, Inc and New Frontier

Three shell companies discussed above are Cita, NC Inc. and New Frontier.  Their primary

role was to enable Undavia to secretly funnel more than $4.6 million from Minu RX to Mohamed

between at least July 2001 and August 2003 pursuant to his ownership interest in Minu RX.

Mohamed never disclosed his interest in or income from any of these entities in his divorce or

bankruptcy proceedings or in his discovery responses in this case.

Mohamed also used New Frontier to obtain at least $100,000 in kickbacks from Vista

Surgical Center West, LLC ("Vista"), in return for referring his surgery patients to that facility in

late 2002 and early 2003.  *See* Funds Received, Transferred and Used by New Frontier attached as

Exhibit 36.  These kickbacks were paid by Vista to Mohamed pursuant to a Marketing Services

Agreement dated October 1, 2002, in which Vista agreed to pay New Frontier $25,000 a month

purportedly to provide marketing and advertising services for Vista.

---

5.      To be fair, it appears from Minu RX's ledgers that some of these expenses were treated as distributions to Undavia. The Minu RX ledgers for 2003, however, reflect that Minu RX paid approximately $120,000 to Karat 22 Jewelers (although the checks were made payable to different payees, they all went into Karat 22 Jewelers' bank account) and falsely deducted those payments as "cost of goods sold."

The Marketing Services Agreement between Vista and New Frontier was a sham.  New Frontier did not provide any marketing or advertising services to Vista.  Mohamed referred his surgery patients to that facility, and Vista stood to profit by billing the facility fees for those procedures.  Indeed, Vista's facility fee charges for such procedures were routinely more than $7,000.  *See* representative Vista bill for $7,056.29 for facility fees relating to Mohamed nerve block injections performed in October 2002, attached as Exhibit 37.  The Marketing Services Agreement between Vista and New Frontier was nothing more than an illegal kickback arrangement, and New Frontier was simply the shell company that Mohamed used to hide the fact that the kickbacks were actually being paid to him.  Despite being served with a subpoena and making a production, Vista has not produced any documents reflecting the performance of any marketing or other services in connection with the $100,000 payments.

Mohamed also has used NC Inc. and Cita to commit a fraud on the court in his divorce proceeding against Deborah Mohamed.  Specifically, on August 29, 2003 which was less than two months after Mohamed commenced that divorce case, Mohamed, his clinics, and his family partnership (Sussex 1999 Ltd.) purportedly signed promissory notes agreeing to pay $1,335,000 plus interest to NC Inc. and $225,000 plus interest to Cita.  *See* promissory notes dated 8/29/03 attached as Exhibit 38.  He has never produced any documents to support the validity of these promissory notes, and Travelers has obtained numerous personal financial statements for Mohamed from 2003 and 2004 which do not disclose any such liabilities.

These purported promissory notes to NC Inc. and Cita are a sham.  Based upon the timing of the notes, less than two months after Mohamed filed for divorce, they represent an effort by Mohamed to increase his liabilities and thereby reduce his financial exposure in those proceedings.[6]

The strategy of manufacturing phony liabilities to drive down Mohamed's net worth was not limited to his divorce proceedings.  To the contrary, it was discussed and employed by Mohamed in his bankruptcy proceedings.  Attached as Exhibit 39 is an April 6, 2005 e-mail from Naresh Yadav, Mohamed's bookkeeper and accountant who was responsible for providing information for Mohamed's bankruptcy filings, to Nishat Alibhai.  In the e-mail, Yadav implores Nishat Alibhai to revisit with Mohamed the issue of paying his malpractice insurance because malpractice claims are the wrong way to execute Mohamed's plan of "creating liabilities."   In relevant part, the e-mail states as follows:

> I would like to request you to kindly convince [Mohamed] to please renew his Malpractice and other insurances.  The reason I am stressing on renewing insurances is that [Mohamed] will end up remaining bankrupt for a long time if any claim comes up.  As per his thinking he wants to go ZERO and then restart again, but that will be possible only if he had insurance for claims arising after he restarts over again for his practice done before going zero. . . . **He wants to create liability but this is not the right way.**

Exhibit 39 (emphasis added).

2.     Satex Management Services, Inc.

May 2005 was a bad month for Mohamed.  He was thrown out of the worker's compensation system.  At the same time, Nishat and Nizam Alibhai quit working for him.  *See* May 12, 2005 letter of resignation of Nizam Alibhai attached as Exhibit 40.  Therefore, he recruited defendant Johnathan

---

6.     Also on August 29, 2003, Mohamed used another shell company, Brompton Medical Group, Ltd. to create another sham liability.  Specifically, on that date, Mohamed, his clinics and his family partnership (Sussex 1999, Ltd.) purportedly signed a promissory note agreeing to pay Brompton Medical $945,000 plus interest.  Mohamed has never produced any documents to support the validity of this note, and the personal financial statements of Mohamed from that period never identified any such liability.  This note, like the ones involving Cita and NC Inc., was a sham.

Boyd to replace Nishat Alibhai as the nominee owner of shell companies through which he could continue to secretly profit from the fraudulent practices at his clinics in Houston and San Antonio, and continue to receive money from Minu RX.  As discussed next, the primary shell company that Mohamed created for these purposes was Satex.[7]  Although Mohamed is and always has been the true owner of Satex, he denied any such ownership interest in his bankruptcy proceedings and his discovery responses in this case.

On June 8, 2005, Mohamed caused West Houston Management Services, Inc. to be incorporated in Texas, with Johnathan Boyd identified as its initial sole director, officer and shareholder.  *See* West Houston's Articles of Incorporation attached as Exhibit 42.  On July 20, 2005, articles of amendment were filed changing the name to Satex.  *See* Satex's Articles of Amendment, attached as Exhibit 43.  Satex's principal place of business was at 6228 Bandera in San Antonio, which was the location of Mohamed's San Antonio clinic.

The truth is that Boyd was a nominee owner of Satex.  He never had any actual involvement in the affairs of Satex, never received any money from Satex, and never acted as a shareholder, director or officer of the company.  In fact, as discussed below, Mohamed truly owned and controlled all of Satex's affairs and used it to secretly funnel hundreds of thousands of dollars to himself during his divorce and bankruptcy proceedings, as well as to funnel at least $28,000 to his bankruptcy counsel Dean Ferguson in 2006 without disclosure to or authorization from the Court in the Mohamed Defendants' bankruptcy proceedings.

---

7.     In May 2005, Mohamed also caused the stock certificates of several shell companies which had been set up by William Reed and Asset Protection Group, and for which Nishat Alibhai had served as the nominee owner, to be transferred from trusts to Johnathan Boyd.  *See* stock certificates attached as Exhibit 41.  This was a sham.  Like Nishat Alibhai, Boyd was simply a nominee owner of these shell companies to hide the fact that Mohamed was the true owner and beneficiary.

31

With Satex in place, Mohamed created agreements that were designed to defraud Deborah Mohamed in their pending divorce proceedings and his creditors in the bankruptcy proceedings that he filed two months later and was clearly contemplating by June 2005.

One such agreement was a Medical Consultant Agreement dated June 1, 2005, in which Satex agreed to pay Mohamed $12,000 a month to serve as a "Medical Consultant" and to "assist Satex in managing various medical practices."  *See* Medical Consultant Agreement attached as Exhibit 44.   During the next year and half or so, the only practices that Satex purportedly "managed" were the Mohamed clinics in San Antonio and Houston which continued to operate through Dr. Cerday and carried on the same fraudulent practices that Mohamed had established and refined over time.   This agreement created a pretext for Satex to pay Mohamed for his "consulting services."

Another agreement was a Purchase Agreement dated June 6, 2005, in which Mohamed and his clinics allegedly transferred all of their receivables to Satex to "bill and collect," the face value of which exceeded $5 million.   Under the Purchase Agreement, Satex agreed to purchase all such receivables which were validly due and owing for 20% of their face value.   This agreement immediately reduced the face value of the receivables held by Mohamed and his clinics by 80%, which amounted to a reduction in face value of up to $4 million.   Therefore, there would be that much less available to Deborah Mohamed in their divorce proceeding and ultimately to his creditors in the bankruptcy proceedings which he commenced two months later.

With Cerday and these agreements in place, Mohamed was in a position to continue to profit from fraudulent practices at his clinics and to use Satex as the primary vehicle through which he could funnel money to himself.   In that vein, on June 20, 2005, an account was established in Satex's name at Compass Bank.   That account had two signatories, Naresh Yadav and Jonathan Boyd.   *See*

32

opening account document attached as Exhibit 45.  Naresh Yadav was Mohamed's bookkeeper, and over the next year and a half while this account was opened, Yadav funneled more than $2,000,000 through this account.

The $2,000,000 that was deposited into the Satex account between June 20, 2005 (when it was opened) and March 21, 2007 (when it was closed) came almost exclusively from three sources: (1) Southwest Pan & Injury which was the name under which Mohamed illegally collected workers' compensation benefits based upon Cerday's services at the Houston and San Antonio clinics; (2) the receivables which Mohamed and his clinics had allegedly "sold" to Satex for 20% of their face value in June 2005, and (3) more than $450,000 in Minu RX checks payable to Jonathan Boyd of which Boyd was never aware and from which he never received any proceeds.

Mohamed used the money from the Satex account for various purposes.  Much of the money was used to pay the routine expenses for his clinics in Houston and San Antonio to continue to operate under Cerday and the name Southwest Pain.  These payments included salary to Cerday who continued to bill for nerve block injections that were either never performed or medically unnecessary, and to prescribe Compounds from Minu RX.

In addition, Mohamed used money in this account to secretly funnel at least $28,000 to Dean Ferguson.  Prior to April 2006, the law firm of Adams & Reese LLP had represented the Mohamed Defendants in their bankruptcy proceedings.  During that period, Dean Ferguson was Special Counsel at Adams & Reese and was the attorney-in-charge of representing Mohamed and his entities in the bankruptcy proceedings.  In approximately April 2006, Ferguson's relationship with Adams & Reese ended and Ferguson, as a sole practitioner, began representing Mohamed and his entities in the bankruptcies.  As discussed next, this is when Mohamed began funneling money to Ferguson that was never disclosed to nor approved by the bankruptcy court.

Specifically, from July 2006 through December 2006, Mohamed caused Satex to issue five checks amounting to $28,000 to Ferguson. *See* checks to Ferguson attached as Exhibit 46. There was no legitimate reason for Satex to make these payments to Ferguson. These were payments to compensate Ferguson for his services as bankruptcy counsel to Mohamed and his entities, which should have been disclosed to the bankruptcy court for approval but never were. Moreover, these were not the only payments that Mohamed made to Ferguson during this period.

Ferguson acknowledged in correspondence to his accountant that, between May 15, 2006 and September 15, 2006, Mohamed paid him an additional $38,500 in 2006. *See* Ferguson's 8/28/07 letter to his accountant attached as Exhibit 47. These amounts were never disclosed to nor authorized by the bankruptcy court.

Finally, as discussed below, between October 2006 and December 2006, Mohamed paid Dean Ferguson an additional $77,000 that was never disclosed to nor authorized by the bankruptcy court. This money originated with Minu RX and was funneled to Ferguson through Breezy, which is the shell company that he and Mohamed created in September 2006 for this and other illicit purposes. This is explained next.

      3.     <u>Breezy, AlfaTeck USA And Dean Ferguson</u>

In September 2006, Mohamed and Dean Ferguson formed Breezy for two illegal purposes. One illegal purpose was to facilitate a secret $100,000 investment by Mohamed in a company called AlfaTeck USA Medical Systems, Inc. ("AlfaTeck USA") which has the exclusive rights to market and sell the Bellacontour anti-cellulite device in the United States.[8] The funds used by Mohamed to make this investment originated with Minu RX. The other illegal purpose for forming Breezy was to

---

[8]     Not surprisingly, Bellacontour is listed as one of the exhibitors at Mohamed's upcoming anti-aging conference in India. *See* website advertising Mohamed's conference attached as Exhibit 48.

secretly pay approximately $77,000 in attorneys fee's to Dean Ferguson without disclosure to or approval from the bankruptcy court.

On September 1, 2006, Dean Ferguson incorporated Breezy in Nevada. *See* Breezy's Articles of Incorporation attached as Exhibit 49. Breezy's sole director was Ferguson, and its address was 4715 Breezy Point Dr., Kingwood, Texas, which is Ferguson's home address.

On September 7, 2006, Ferguson opened an account for Breezy at Sterling Bank. *See* opening account documents for Breezy attached as Exhibit 50. Between September 2006 and December 2006, Minu RX issued six checks totaling $180,000 payable to Breezy. *See* Minu RX checks to Breezy attached as Exhibit 51. Minu RX falsely characterized these payments as "costs of goods sold" and deducted them as business expenses. *See* pp. 13-18 of Minu RX'a general ledger for 2006, attached hereto as Ex. 52. In fact, Breezy provided no goods or services to Minu RX. As discussed next, these payments were solely to benefit Mohamed and Ferguson, without disclosure to or approval from the bankruptcy court.

Between September 2006 and December 2006, six Minu RX checks totaling $180,000 and payable to Breezy were endorsed by Ferguson and deposited into the Breezy account. *See* Ex. 51. During this same period, Breezy issued checks totaling $100,000 to AlfaTeck USA. *See* Breezy checks payable to AlfaTeck USA attached as Exhibit 53. These checks were signed by Dean Ferguson. In return for these payments: (1) Breezy acquired 100,000 shares of Alfa USA, and (2) Alfa USA and Breezy agreed to jointly form another entity, AlfaTeck Texas, Inc. ("Alfa Texas"), which would have the exclusive rights to market and sell the Bellacontour anti-cellulite device in Texas. *See* Agreement dated September 2006 between Breezy and Alfa USA attached as Exhibit 54. Consistent with this arrangement, Alfa Texas was incorporated in Texas on October 12, 2006

with Dean Ferguson identified as the sole director.  *See* Alfa Texas' articles of incorporation attached as Exhibit 55.[9]

In September 2006, when Breezy was formed and entered into the above arrangements to acquire 100,000 shares of AlfaTeck USA and to form Alfa Texas as a joint venture with Alfa USA, other arrangements also were made for Mohamed to secretly profit, without notice to or approval from the bankruptcy court, from the marketing and sale of the Bellacontour anti-cellulite device in the United Arab Emirates and India.  Specifically, in September 2006 two Letters of Intent were created between the patent holder for the Bellacontour anti-cellulite device, an Israeli company called AlfaTeck Medical Systems, Ltd. ("Alfa Israel"), and "Fataneh Ramji or her assigns."  *See* Letters of Intent attached as Exhibit 61.  The Letters of Intent state that the parties, Alfa Israel and Ramji "or her assigns," intend to form 50/50 joint ventures to market and sell the Bellacontour anti-cellulite device in India and the United Arab Emirates.  Fataneh Ramji was a former employee of Mohamed, and Mohamed used her name as a nominee to conceal from the bankruptcy court and his creditors that he was the true joint venture partner with Alfa Israel who together would market and sell the Bellacontour anti-cellulite device in India and the United Arab Emirates.

In sum, Mohamed  appears to own 100,000 shares of Alfa USA through the shell company that he and Dean Ferguson created in September 2006, Breezy.  Mohamed obtained the funds to make this investment by arranging for Minu RX to pay these amounts to Breezy, and Minu RX falsely deducted these payments to Breezy as "cost of goods sold." Furthermore, it appears that Mohamed used Fataneh Ramji as his nominee for a joint venture that he has entered into with Alfa Israel to market and sell the Bellacontour device in the United Arab Emirates and India.  Neither

---

9       Although his role and knowledge are not yet clear, J. Scott Douglass, an attorney and part owner of defendant Houston Community Hospital, filed the articles of incorporation for Alfa Texas.

Mohamed nor his attorney Dean Ferguson ever disclosed to or obtained approval from the Court in the Mohamed Defendant's bankruptcy proceedings for these transactions.

Approximately $77,000 of the remaining funds which were paid by Minu RX to Breezy were disbursed to Dean Ferguson through checks drawn on the Breezy account. *See* Breezy checks to the Fergusons attached as Exhibit 57. These checks are payable to Dean Ferguson and his wife Ramona Ferguson, and were issued between September 2006 and December 2006. In fact, these transactions were nothing more than the means by which Mohamed paid attorneys fees to Dean Ferguson without disclosure to or authorization from the bankruptcy court.

In addition to all of the above, between March and May 2007, Mohamed also transferred at least $34,000 to two principals of Alfa USA, Robin Owen and Michael Gradus. He did this through another of his shell companies, Newbury Personnel Services, Inc., which is discussed next.

    4.    <u>Newbury Personnel Services, Inc.</u>

Newbury Personnel Services, Inc. ("Newbury Personnel") was initially incorporated in Texas on September 20, 2000 under the name Huntsville Hospitality, Inc. *See* Huntsville Hospitality's articles of incorporation attached as Exhibit 58. On February 19, 2002, amended articles of incorporation changed the name to Newbury Personnel. *See* amended articles attached as Exhibit 59. Mohamed never disclosed to the bankruptcy court or his creditors or in his discovery responses in this case any interest in or income from Newbury Personnel.

It is not clear what purpose Newbury Personnel served prior to 2003. However, in mid-2003 at about the time that Mohamed commenced divorce proceedings against Deborah Mohamed, Mohamed began using Newbury Personnel for various illicit purposes. For example, between August 2003 and October 2005 the shell companies discussed at pp. 40-43 below issued checks totaling at least $2.2 million to Newbury Personnel purportedly for "management" and "payroll

services." *See* the chart reflecting payments to Newbury Personnel from Fountainview, Mirage, Orange Grove, and Woodward, attached as Exhibit 60.

Furthermore, between January 2004 and October 2004, Minu RX paid Newbury Personnel at least $660,000. *See* pp 109-110 of Minu RX's general ledger for 2004, attached hereto as Exhibit 61. There is no apparent legitimate reason for these payments, given that Minu RX paid its payroll expenses directly from its own bank account to its employees. This was simply a means for Undavia and Mohamed to secretly funnel an additional $660,000 to Mohamed during his divorce proceedings.

On March 29, 2007, an account was opened at Compass Bank for Newbury Personnel. The signatories for the account were Mohamed's father, Sadrudin (who lives in India), and Howard Fireman (who is the accountant/bookkeeper for AlfaTeck which is discussed at pp. 35-37 above). Between March 29, 2007 and July 30, 2007, at least $153,000 was deposited into this account. Most of these funds have been wire transferred to various payees in India and the United Arab Emirates where we all know Mohamed is sponsoring his anti-aging conferences and is engaged in a joint venture with Alfa Israel to sell the Bellacontour anti-cellulite device. In addition, from March through May 2007, at least eight checks totaling $34,000 were issued on the Newbury Personnel account payable to AlfaTeck Texas and two principals of Alfa USA (Michele Gradus and Robin Owen). *See* checks to AlfaTeck Texas, Gradus and Owen attached as Exhibit 62.

5.   <u>SHR Invests Corp. And Fataneh Ramji</u>

On September 8, 2005, SHR Invests Corp. ("SHR") was incorporated in Texas. *See* SHR's Articles of Incorporation attached as Exhibit 63. Fatanah Ramni, Mohamed's former employee, is identified as the registered agent and sole director of SHR.

On January 23, 2006, Ramji opened an account at Compass Bank for SHR ("the SHR Bank Account")  *See* opening account documents attached hereto as Ex. 64.  The next day, on January 24, 2006, Minu RX transferred $230,000 to the SHR Bank Account.  *See* account records attached as Exhibit 65.  According to documents received within the past few days from Ramji, this $230,000 was a loan from Mohamed which came from Minu RX.  *See* e-mails produced by Fataneh Ramji which are attached as Exhibit 66.  Within a few months, Ramji made a $250,000 payment to repay the loan.  At Mohamed's direction, however, Ramji wired this amount to a company called Medical Conferences International, Inc. ("MCII").  This $250,000 payment from Ramji to MCII represents a payment by Mohamed to MCII in return for which Mohamed has been granted the right to sponsor the anti-aging conferences in India and the United Arab Emirates which are discussed at pp37-38. above.

In sum, Mohamed and Undavia used Minu RX's funds to loan Ramji $230,000.  When Ramji was ready to repay the loan to Mohamed, he directed her to send the money to MCII to satisfy the amount he owed that organization for the right to sponsor anti-aging conferences in India and the United Arab Emirates.   These transactions were never disclosed to the bankruptcy court or Mohamed's creditors, or in Mohamed's discovery responses in this case.

### C.    The Shell Companies That Mohamed Formed To Secretly Bill And Collect Facility Fees For Nerve Block Injections

This section describes 15 shell companies ("the Facility Fee Shell Companies") that Mohamed set up with the help of William Reed, using Nishat Alibhai as the nominee owner, to secretly profit from facility fees for nerve block injections that he purportedly performed.  Mohamed never disclosed his interest in or income from these 15 Facility Fee Shell Companies in either his bankruptcy proceedings or discovery responses in this case..

As explained in the SAC, from January 1, 2000 through the spring of 2002, Mohamed secretly profited from the facility fees relating to the nerve block injections that he purportedly performed through an undisclosed 40% ownership interest in Memorial Surgical Center in Houston. *See* ¶¶ 23-30 of the SAC.   In April 2002, the other partners in Memorial Surgical Center forced Mohamed to relinquish his undisclosed ownership interest so that it would not become subject to execution by a former patients who had obtained a $1.7 million malpractice judgment against him. *Id.*

Shortly thereafter, in August 2002 Mohamed purchased an undisclosed ownership interest in Cypress Ambulatory Surgery Center, another facility in Houston. *See* ¶ 53 of the SAC.  Between October 2002 and December 2002, Mohamed paid William Reed and the Asset Protection Group to set up five sets of Facility Fee Shell Companies that are fully described in paragraphs 37 through 89 of the SAC.

Each set of the Facility Fee Shell Companies consisted of: (1) a Texas limited partnership ("the Texas LP"),  (2) a Texas corporation ("the Texas Corp.") which was the general partner and 1% stakeholder in the Texas LP, and (3) a Nevada corporation ("the Nevada Corp.") which was the sole shareholder of the Texas Corp. and the sole limited partner and 99% stakeholder in the Texas LP. *See* ¶¶ 37-89 of the SAC.  This structure essentially vested all control in the Nevada Corps., and the sole officer of those companies was William Reed who played that role as part of his *Bulletproof Asset Protection* program.

The Facility Fee Shell Companies were set up to enable Mohamed to secretly profit from the facility fees for nerve block injections that he, and later Cerday, purportedly performed. Specifically, the Texas LPs either: (1) purchased an undisclosed ownership interest in the facilities where Mohamed performed nerve block injections, or (2) entered secret and illegal kickback

arrangements in which they paid to "use" space in the facilities where Mohamed performed nerve block injections in return for which they were permitted to bill and collect the facility fees relating to those procedures. *See* ¶¶ 37-89 of the SAC. After collecting the fees, the Texas LPs were in a position to funnel those collections to the Nevada Corps. for which William Reed was the nominee officer, or use the collections to support Mohamed's far flung web of other shell companies.

Despite his failure to disclose his interest in or income from the Facility Fee Shell Companies in either his bankruptcy proceedings and discovery responses in this case, there can be no serious question that Mohamed is and always has been the true owner of the Facility Fee Shell Companies for at least seven reasons. First, Mohamed's family partnership, Sussex 1999, Ltd., paid more than $20,000 to William Reed's company, the Asset Protection Group, to form and maintain records for the Facility Fee Shell Companies. *See* Expenses By Vendor Summary for Sussex 1999, Ltd. reflecting these payments which is attached as Exhibit 67. Second, the Receiver for the Asset Protection Group has produced summary sheets for all the Facility Fee Shell Companies, representing that the Client and Consultant for all the Nevada Corps. are Nizam Alibhai and/or Denise Brigance (who was an in-house accountant for Mohamed) and their contact address was 22 Waugh Dr. in Houston which was Mohamed's business address. *See* documents produced by APG Receiver attached as Exhibit 68. Third, Nishat Alibhai was the nominee owner, director and officer of all the Facility Fee Shell Companies, and the address for all the Facility Fee Shell Companies was 22 Waugh Dr. in Houston. Fourth, between February 2003 and January 2004, accounts were opened at the Texas State Bank in the names of several of the Facility Fee Shell Companies with Nishat Alibhai as the sole signatory and the address of 22 Waugh Dr. in Houston. Fifth, in the fall of 2003 shortly after Mohamed commenced his divorce proceeding against Deborah Mohamed, shares of the Nevada Corps. were transferred into Delaware statutory trusts, to create yet one more layer of

protection for Mohamed.  Sixth, every activity of the Facility Fee Shell Companies solely benefited Mohamed by collecting facility fees for procedures that he or Cerday allegedly performed and using those funds to finance other aspects of his far-flung enterprise, some of which is discussed in the next section.  Finally, Mohamed kept a running tally of the receipts from the Facility Fee Shell Companies which he would have had no reason to keep unless he owned them.  *See* example of Deposits for Month and Comparative Statement of Receipts reports attached as Exhibit 69.

### D.    Five More Shell Companies That Mohamed Formed To Secretly Bill And Collect Fees For Physical Rehabilitation, MRIs and Vax-D Treatments

In 2003, Mohamed formed at least five more shell companies, identifying Nishat Alibhai as the nominee owner, and using the 22 Waugh Drive address in Houston.   Specifically, these shell companies were Fountainview Rehab, LLC, Elite MRI, Inc., Medical Spine Care Clinics of America, Inc., Medical Spine Care Clinic of Houston, Inc. and Medical Spine Care Clinic of San Antonio, Inc.  Mohamed has never disclosed in his bankruptcy proceedings or discovery responses in this case his interest in or income from these shell companies.

These shell companies billed and collected for physical rehabilitation services, Vax-D treatments and MRIs performed on Mohamed's patients, and Mohamed kept a running tally of the receipts from these facilities on the same reports that recorded that information for the Facility Fee Shell Companies.  *See* Exhibit 69 .  In addition, at the same time that accounts were opened at the Texas State Bank for the Facility Fee Shell Companies, accounts also were opened at the same bank for Fountainview Rehab, Elite MRI and the Medical Spine Care shell companies.  Nishat Alibhai was the sole signatory on these accounts and the business address was 22 Waugh Drive in Houston.  Furthermore, there were significant transfers between all of these Texas State Bank accounts and

between these accounts and other shell companies referenced above, including Newbury Personnel

Services and New Frontier.[10]

### E.   Mohamed's and Undavia's Violations of Court Orders And Other Discovery Abuses

1.   Mohamed Has Engaged In a Pervasive Pattern of Bankruptcy Fraud, Perjury, Obstruction Of Justice, Tax Fraud, Violations Of This Court's Orders And Continues To Persist In His Refusal To Engage in Discovery And Lies About the Existence of <u>Documents</u>

Mohamed's continuous and pervasive pattern of bankruptcy fraud, perjury, obstruction of

justice, and tax fraud over many years is documented in detail above.  This section describes his

history of stonewalling, lies and violations of this Court's orders during the past nine months.

On June 22, 2007, Travelers served Mohamed with its First Set of Document Production

Requests and Interrogatories (the "First Set") which were generally directed at three narrowly

tailored categories of information – (1) Mohamed's assets, liabilities, and income (as part of the

bankruptcy proceeding); (2) the scope and substance of the racketeering and fraud scheme, and (3)

medical issues related to the performance and billing of nerve block injections.  The responses to the

First Set were due July 23.  Not surprisingly, Mohamed did not respond by that date, much less

produce any documents.  As such, on July 26, Travelers contacted Mohamed's counsel and inquired

about the status of the responses.   Mohamed requested a 45-60 day extension.   The parties

compromised and agreed that Mohamed would answer the First Set ***and*** produce documents (not

merely object and produce nothing) by August 16.

On August 16, Mohamed did not produce a single document.  Further, he lodged boilerplate

objections to 30 of 32 document requests, and then failed to provide substantive answers to virtually

---

10.   The bank records referenced in this section are very voluminous. Therefore, Travelers has not attached them.  Travelers is prepared to produce them if the Court requests them or in connection with an evidentiary hearing on this motion.

all of the Interrogatories.   Travelers immediately contacted Mohamed and demanded that he abide by his earlier agreement and comply with his discovery obligations.  Mohamed agreed that he would (1) submit supplemental responses on August 24, (2) begin producing documents on August 24, and (3) on August 21, identify the objections upon which Mohamed intended to stand.

On August 21, Mohamed did not identify the objections he intended to maintain. Additionally, on August 24, Mohamed did not supplement his responses, nor did he produce any documents.  Rather, on August 24, Mohamed's counsel sent an e-mail indicating that he intended to supplement the responses in the next couple of days, but hedged his representations by stating that his ability to do so "depend[ed] on [his] ability to communicate with Dr. Mohamed who is out of the country."  *See* Exhibit 70.

Mohamed did not supplement his responses in the next couple of days.  Thus, Travelers once again reached out to Mohamed's counsel and attempted to secure compliance.  This time, however, Mohamed's counsel did not return Travelers' phone calls or e-mails.  Therefore, on August 30, 2007, Travelers sent Mohamed's counsel an e-mail stating that it could no longer wait for Mohamed to comply with his discovery obligations and that it would be filing a motion to compel.  Mohamed never responded to Travelers' First Set.  As such, Travlers was forced to file a motion to compel which it did on September 19, 2007.  [Doc. 38].

On October 22, 2007, the day before the Court was due to hear Travelers' motion, Mohamed supplemented his responses to the First Set and produced some documents.  However, his supplemental responses simply directed Travelers to documents that Mohamed allegedly produced in the bankruptcy proceeding.  Further, the documents Mohamed produced were primarily corporate minute books with little or no relevance to the case.  In contrast, Mohamed did not produce any

documents related to (a) his assets and income, (b) the nerve block injections, nor (c) did he produce a single e-mail related to any requests in the First Set.

At the hearing the following day, the Court granted Travelers' motion and ordered Mohamed, by November 7, to (a) identify documents responsive to the First Set or explain why he could not produce documents, (b) produce all responsive e-mails, and (c) produce all documents in his possession, custody, or control, like the records in the possession of his accountants. *See* pages 12-19 of the 10/23/07 transcript attached hereto as Exhibit 71 (hereafter the "October 23 Order.") Notably, during the hearing, Mohamed represented to the Court that there were only three places where responsive documents possibly could be found - with his former bankruptcy lawyer, Dean Ferguson, Mohamed's former business address at 22 Waugh Drive in Houston, and some unknown location in San Antonio. *See* 11/7/07 transcript attached as Exhibit 72. As discussed below, these representations were false. In fact, Mohamed had stored responsive documents and undisclosed assets related to the bankruptcy at various facilities throughout Houston, including Undavia's pharmacy. As for Mohamed's e-mails, he claimed that it would be difficult to produce them because his home recently was burglarized and all his computers were stolen. Although Mohamed agreed to produce police reports and insurance claims to confirm the burglary, no such documents have ever been produced.

On November 7, 2007, Mohamed produced nothing. In fact, to date Mohamed has not complied with the Court's October 23 Order.

On November 6, 2007, Travelers served its Second Set of Document Production Requests and Interrogatories ("Second Set"). Travelers issued the Second Set because it had discovered that Mohamed made numerous material misrepresentations and omissions on his bankruptcy schedules and statement of financial affairs. Additionally, Travelers sought information about Mohamed's

45

current financial activities.  For example, the Second Set requested information and documents about Mohamed's recent income sources, foreign bank accounts, credit card accounts, foreign investments in healthcare facilities in Africa, Dubai, and India, and check cashing facilities used by Mohamed.

Although the Second Set was due December 6, 2007, Mohamed requested and Travelers agreed to a one-week extension.  However, on December 13, Mohamed did not produce anything, nor did he contact Travelers requesting additional time.  Thus, on December 14, Travelers wrote to Mohamed, demanding that he not only respond to Travelers' discovery, but also comply with the October 23 Order.  Additionally, Travelers demanded that Mohamed serve his Rule 26(a) disclosures.  On December 19, Mohamed's counsel requested until December 31, 2007 to comply with all matters and Travelers agreed.  On December 31, 2007, Mohamed did nothing – he did not produce any documents, answer any interrogatories, comply with the Court's October 23 Order, nor serve his Rule 26(a) disclosures.  Moreover, Mohamed did not even contact Travelers explaining his failure to respond.

For several weeks, Travelers made numerous attempts to contact Mohamed and secure compliance, but to no avail.  Thus, on January 18, 2008, Travelers filed its Second Motion to Compel.  [Doc. 88].  On February 1, 2008, the Court held a hearing at which time Mohamed announced that, contrary to his earlier representations, he had located many boxes of dated, but allegedly responsive documents in a San Antonio storage facility along with some computer hard drives.  Additionally, other than his counsel's hectic professional and personal life, Mohamed had no explanation for his failure to produce the most current documents – those reflecting his recent financial activities.  Thus, the Court ordered Mohamed to produce, by February 12, 2008, all documents responsive to the First and Second Set, and serve his interrogatory answers and 26(a)

disclosures.  The Court also set a status conference for February 15, 2008, to determine the "completeness" of Mohamed's production.  [Doc. 127].

On February 11, Travelers' counsel flew to Houston to review Mohamed's document production which was to take place the following day.  At approximately 7:30 pm on February 12, Mohamed produced several boxes of documents which were supposedly representative samples of the materials discovered in the San Antonio storage facility.  However, the vast majority of documents in these boxes were either not responsive to Travelers' discovery or their relevance could not be discerned.  Moreover, Mohamed did not produce a single e-mail or other documents responsive to the requests in Travelers' Second Set which sought information about Mohamed's recent financial activities, like credit card statements, bank account information, and travel itinerary.

At the meeting, Mohamed also tendered his unverified answers to Travelers' Second Set of Interrogatories.  *See* Responses to Interrogatories, attached hereto as Exhibit 73.  These answers were either inadequate or false.  For example, in many of his answers, Mohamed simply referred Travelers to the documents he produced in the bankruptcy and divorce proceedings without identifying the particular documents.  The inadequacy of these answers were only surpassed by his patently false ones.  For example, Travelers asked Mohamed to identify any credit cards that he had used since January 2005.  In response, he identified a corporate American Express card issued in the name of Satex.  However, Travelers' investigation has revealed that shortly after Mohamed filed bankruptcy, Nizam Alibhai, Mohamed's co-defendant (and a felon), added Mohamed to one of his credit card accounts, and Mohamed used this card.

Another interrogatory asked Mohamed to identify all facilities where he was storing property.  In response, Mohamed gave false information.  Specifically, Mohamed never revealed that he was using a storage facility in Houston which he put in the name of one of his former employees,

Anup Agarrwal.  Approximately one week before Travelers discovered the existence of this storage facility, Mohamed instructed his former wife Deborah Mohamed to get the keys from Anup and clean out the facility.  Although Travelers does not have an inventory of the items in this storage facility, it is Travelers' understanding that there was at least an expensive laser treatment machine there.

Mohamed also never revealed that he was storing assets at Minu RX.  In particular, there is a large pallet sitting in the gated parking lot of Minu RX which contains thousands of dollars worth of granite tiles imported from Kenya.  Mohamed purchased and shipped these tiles from Kenya and then used some of them to remodel Minu RX.  Notably, Mohamed instructed his bookkeeper, Naresh Yadav, to omit these valuable tiles from his bankruptcy schedules.  These are just a few of the many false statements in Mohamed's interrogatories.

On February 15, 2008, the Court held a status hearing.  In light of Mohamed's failure to comply with the Court's Orders of October 23 and February 1, and his materially false statements in his interrogatories and all the lies, deceit, and perjury throughout the bankruptcy proceedings, Travelers stated that it would no longer waste the Court's scarce resources and its own time seeking the impossible – full, complete, and truthful discovery from Mohamed.

> 2.     The Undavia Defendants Have Engaged In a Pervasive Pattern of Bankruptcy Fraud, Perjury, Obstruction Of Justice, Tax Fraud, Violations Of This Court's Orders And Continue To Persist In Discovery Abuses and Violations of Court Orders.

As with the Mohamed Defendants, the Undavia Defendants' continuous and pervasive pattern of bankruptcy fraud, perjury, obstruction of justice, and tax fraud over many years is documented in detail above.  This section describes their history of stonewalling, lies and violations of this Court's orders during the past nine months.

Travelers first contact with Undavia in this proceeding occurred shortly after Undavia was served with a subpoena on August 27, 2007.  At that time, Undavia called Travelers' counsel and asked, "What is this shit?  I have nothing to do with Mohamed."  When Travelers explained that the subpoena sought, among other things, documents relating to any interests Mohamed held in Minu RX and any financial arrangements or compensation paid to Mohamed, Undavia responded by denying any relationship between Mohamed and Minu RX, stating, "There is [sic] no ties."  She then hired a lawyer, Aaron Keiter.

On September 4, 2007, without ever speaking to Travelers, Minu RX filed a meritless motion to quash the subpoena.  The motion simply presented frivolous, boilerplate objections without any effort to explain the basis of them.  After Minu RX filed the motion, Travelers' counsel spoke with Keiter, who could not offer any specifics for his objections.  After several pointed discussions, Keiter agreed that Minu RX would produce all documents responsive to the subpoena including Minu RX's tax returns, general ledgers, W-2s, and 1099s.  This agreement was memorialized on the record in the form of a stipulation when the parties appeared before this Court on October 23, 2007:

> Mr. Silverman:  I just want to put on the record, though, what I think is our understanding and obviously, Mr. Keiter will correct me if I'm wrong.  He has produced a box of documents.  We met before court this morning and I believe he's agreed to use his best efforts to produce to us the tax returns, 1099s and W-2s relating to Minu RX as well as the general ledgers and documents relating to the formation of the corporation and ownership, which would include stock certificates and the stock ledgers for Minu RX by November 5th.  Is that ---

> Mr. Keiter:  That is correct.  Some of the corporate documents, to the extent they exist, that I have already been produced but we're doing an additional search to see if we have any filled-in stock certificates.  That is correct, your Honor.

See 10/23/07 transcript attached as Exhibit 71.

Before producing any tax related documents, Minu RX replaced Mr. Keiter with Marcy Rothman.  In an effort to avoid wasting the Court's time, Travelers had numerous conversations and

e-mail communications with Ms. Rothman about the need to comply with Minu RX's stipulation and agreements to produce the documents at issue. However, Ms. Rothman refused on the ground that there was a "question" surrounding Mr. Keiter's authority to enter into the stipulation.[11]   On December 5, 2007, however, Keiter confirmed to Travelers' counsel that he had full authority to enter into the stipulation.

Nevertheless, Minu RX refused to produce the documents and on December 13, 2007, Travelers was forced to file a motion to compel. [Doc. 69].   On January 3, 2008, this Court held a hearing at which time Travelers laid out in great detail its reasons for seeking the financial information. *See* pages 7-13 of the 1/3/08 Transcript attached as Exhibit 74.   In response, Ms. Rothman responded that Travelers' arguments were conclusory, that the requests for tax returns and general ledgers were nothing more than a fishing expedition, and that Travelers' allegations against Undavia and Minu RX were a pretext so Travelers could collect a judgment in the event Mohamed proved judgment proof:   "And a concern we have, your Honor, is that this case doesn't resemble anything like the case it started out as.   It started out as a nerve block injection case.   It's essentially becoming a collection matter for the debt that Mohamed allegedly owes to Travelers that has not yet been liquidated."   *Id.* at 17.

When those arguments did not resonate with the Court, Ms. Rothman turned her attention to Travelers' lawyers and made the first of what have now been many accusations of unethical conduct and threats to seek Rule 11 sanctions:   "[A]t some point, I'm going to probably be before the Court asking the Court to take the snapshot look at what these - - Travelers understood and knew about my

---

[11]         When pressed on the basis for her claim that Mr. Keiter did not have proper authority, Ms. Rothman was coy but assured Travelers' counsel that she was taking a good faith position.   In fact, Ms. Rothman attempted to bolster her representation by making the vague, but ominous sounding statement that Mr. Keiter may have engaged in "grievable" conduct by entering into the stipulation.   Like all the

client, in specific, not conclusory, but in fact at the date they filed the allegations against my client."
*Id.* at 29.   In the end, the Court granted Travelers' motion and ordered Undavia and Minu RX to produce all its financial information in two weeks.   [Doc. 81].

Although the Court's order was clear, the Undavia Defendants did not produce all responsive within two weeks.   Specifically, they did not produce any tax returns or general ledgers for Minu GP, LLC.   They did not produce any W-2s for Minu RX, Inc., Minu RX, Ltd., nor Minu GP, LLC. They did not produce any general ledgers for Minu GP, LLC, Minu GP, Ltd., nor Minu RX, Inc. for the years 1999, 2000, and 2007.   They did not produce any tax returns for Undavia.   They also did not produce tax returns for Minu RX, Inc. for the years 1999 and 2000.   Although they did produce Minu RX, Ltd. tax returns for 2005 and 2006, those returns were not signed.   Finally, and perhaps most importantly, all the returns (except one) stated that they were "self-prepared."

On January 22, 2008, the parties appeared again before the Court and addressed a number of discovery issues.   This hearing became necessary because Ms. Rothman informed Travelers' counsel that while her motion to dismiss was pending, the Undavia Defendants had no intention of engaging in discovery other than what had been ordered by the Court.   As such, Travelers requested that the Court order the Undavia Defendants to serve their Rule 26(a) disclosures, allow an inspection of their pharmacy pursuant to FRCP 35, and produce all W-2s. *See* 1/22/08 transcript, attached as Exhibit 75.

Travelers requested the Rule 26(a) disclosures, in part, so it could identify all past and current employees.   In response to this request, the Court agreed and indicated that identifying all employees should not be burdensome because "there's not very many of them . . . ." *See Id*. at 46.

---

accusations of grievable conduct which Ms. Rothman has made against Travelers' lawyers in this case, Travelers is unaware of any grievances filed by the Undavia Defendants against Mr. Keiter.

The Court also ordered the Undavia Defendants to allow an inspection of the their pharmacy. *Id.* at 26. Travelers noticed such an inspection because it wanted to videotape any manufacturing equipment which might be present in the pharmacy. Travelers explained that the practice of compounding involves pharmacies making very small quantities of gels (typically two ounces or less) and tailoring them to the specific needs of the patient. In contrast, Travelers had learned that Minu RX was buying compounding drugs in kilo quantities, an amount which clearly suggested large-scale manufacturing, a practice in which compounding pharmacies may not engage without going through the U.S. Food and Drug Administration's rigorous approval process for new drugs. Finally, consistent with its January 3 Order, the Court once again ordered the Undavia Defendants to produce all W-2s.

When the Undavia defendants served their Rule 26(a) disclosures, they did not identify a single past or current employee. Rather, they identified the individual defendants, the "custodian of records" for the entity defendants, and the ***lawyers*** who represented them as individuals who may knowledge or information about the case. *See* FRCP 26(a). The only third-party individuals identified in the Undavia Defendants' disclosures appear to be people taken from the Travelers' subpoena list. Additionally, they did not provide a description of the knowledge or information the individuals and entities may have. A copy of the Undavia Defendants' deficient Rule 26(a) disclosures is attached as Exhibit 76. In other words, the Undavia Defendants did not provide any information not already known to Travelers and omitted information that they clearly knew was required. Setting aside the fact that Travelers expressly stated on the record that it wanted the Rule 26(a) disclosures so it could identify past and current employees, the fact that the Undavia Defendants would list all the attorneys in the case as fact witnesses is preposterous.

Eventually, the Undavia Defendants produced W-2s.  Incredibly, these tax documents were not the ones filed with the IRS.  Rather, the Undavia Defendants had taken a W-2 template from 2007, handwrote over the "7" in black marker with the last digit of the year they claimed to be producing (i.e., writing the number "1" over the "7" to make 2007 into 2001), and then filling-in the W-2 forms with the required information.  Travelers can only guess where the Undavia Defendants got the information to fill-in the W-2s.  A copy of one such W-2 is attached as Exhibit 77.

Although the Court had ordered the videotape inspection of the pharmacy and Travelers had informed the Undavia Defendants that it would take place on Thursday, January 31, 2008 at 5:15 pm, the Undavia Defendants informed Travelers' counsel minutes before leaving on a flight to Houston that it would not allow the inspection.  The Undavia Defendants had played games with scheduling the inspection and then tried to limit the scope of the inspection by informing Travelers that it could only videotape the compounding area of the pharmacy.  Because Travelers could not change its travel schedule at the last minute and because the Undavia Defendants were unilaterally limiting the scope of the inspection, Travelers was forced to seek the Court's assistance on an emergency basis.  The following day, the Court conducted an in-person, off-the-record conference with counsel for both parties.

Travelers explained that the Undavia Defendants were trying to limit the scope of the inspection, but that it was necessary for Travelers to videotape the *entire* pharmacy for two reasons.  First, the manufacturing equipment is portable so the Undavia Defendants could simply move it to an area of the pharmacy where Travelers could not videotape it.  By giving Travelers access to the entire pharmacy, it could videotape the equipment even if the Undavia Defendants moved such equipment from the compounding area.  Second, even if the Undavia Defendants took the manufacturing equipment off-site, Travelers would have a videotape of the entire pharmacy and

could ask current and former employees at trial to point out on the video tape where such equipment was normally kept.  In response, Ms. Rothman feigned outrage at the suggestion that the Undavia would ever remove such equipment and fought for a limited inspection claiming that all Travelers needed was access to the compounding area.  Consistent with its January 22 Order, the Court ordered the Undavia Defendants to give Travelers access to the entire pharmacy and ordered the inspection to take place the following morning at 7:00 am.

One notable event occurred at the inspection.  Travelers discovered that the Undavia Defendants were storing thousands of dollars of Mohamed's personal items and art work at the pharmacy.  An investigation is underway to determine which of these items were omitted from Mohamed's bankruptcy schedules.  However, like the thousands of dollars worth of imported granite tiles in the Minu RX parking lot, Travelers suspects that many of these assets were not disclosed.  Additionally, Travelers discovered boxes of Mohamed's business records stored in old examination rooms at Minu RX.  Travelers made Mohamed's counsel aware of these records and he was supposed to turn them over to the bankruptcy trustee.

During the off-the-record conference with the Court on February 1, Travelers also addressed the inadequate production of the Undavia Defendants tax records and general ledgers.  Additionally, Travelers provided the Court with the recently produced Undavia Declaration in which she declared her intention to transfer half her interest in Minu RX to Mohamed's mother.  Travelers showed the Court that this sworn affidavit contradicted Minu RX corporate tax returns which Undavia signed under penalties of perjury, swearing that she was the 100% owner of Minu RX.  In light of the doctored W-2s, the unsigned tax returns, self-prepared tax returns, and the contradiction between the Undavia Declaration and the tax returns, the Court ordered the Undavia Defendants to execute IRS release forms for all the entities and her individual returns.

In the absence of all the general ledgers, the Court also ordered the Undavia Defendants to provide Travelers with the contact information of anyone who assisted in the preparation of the Undavia Defendants' tax returns, including an individual named "Krupal," so Travelers could subpoena their work papers.  Finally, although the Undavia Defendants were required to produce all corporate formality documents, which includes all stock certificates and the stock ledgers, it had not done so.  In light of the recently produced Undavia Declaration, these documents were particularly critical.  The Court agreed, but Ms. Rothman made the bizarre argument that she could not produce the records because some corporate law, which she could not identify, prohibited her from copying them.

To date, the Undavia defendants still have not provided contact information for all the individuals who rendered accounting services or tax preparation.  As such, the Undavia Defendants have obstructed Travelers ability to review their work papers and other relevant documents.  Further, the Undavia Defendants still have not produced  stock certificates and ledgers.  Consistent with their strategy of stonewalling and obstruction, the Undavia Defendants informed Travelers' counsel that they would have to make a separate trip to Houston to review the stock certificates and ledgers because Travelers failed to ask for them at the pharmacy inspection.  The Undavia Defendants also have not produced a general ledger for 2007, a critical year for many of the unlawful transactions involving Mohamed which are described in the foregoing sections.  Finally, the Undavia defendants have failed to provide IRS release forms for those years in which they admittedly do not have signed returns or self-prepared returns.  For example, Undavia did not sign her personal return for 2005, yet she refuses to provide an executed IRS release form.

The Undavia Defendants have violated every discovery order entered by this Court to date.  Specifically, they have violated and are currently violating the January 3, January 22, and February 1

Orders by not producing all tax returns, general ledgers, IRS release forms, stock certificates and ledgers, and providing the contact information for any individuals who provided the Undavia Defendants with booking, accounting, and tax services.  These on going violations are designed to hide the truth about the Undavia Defendants' bankruptcy fraud, perjury, obstruction of justice, tax fraud, and healthcare fraud.  Indeed, the Undavia Defendants have tried at every turn to obstruct Travelers from learning all the facts supporting its claims.  Given their conduct and history to date, Travelers respectfully submits that the Undavia Defendants are incapable of complying with Court orders and operating with the integrity necessary to preserve the sanctity of our justice system.

## IV.    LEGAL STANDARDS AND ANALYSIS

As a sanction for their repeated violations of Court orders, systemic fraud upon this Court, perjury, and other criminal conduct, Travelers seeks the only appropriate remedy against these hopelessly contumacious defendants - entry of judgment.  There are two well established legal grounds upon which this Court may enter judgment against the Mohamed and Undavia Defendants.

Federal Rule of Civil Procedure 37(b)(2)(A) provides, in relevant part, that "[i]f a party or a party's officer, director, or managing agent . . . fails to obey an order to provide or permit discovery . . . the court where the action is pending may issue further just orders.  They may include the following:  (vi) rendering a default judgment against the disobedient party."  Although the entry of judgment is a harsh sanction, the United States Court of Appeals for the Fifth Circuit has not hesitated to affirm lower courts imposing such a sanction where the facts were far less egregious than here.  *See e.g.*, *Smith v. Smith*, 145 F.3d 335, 344 (5th Cir. 1989) (affirming entry of judgment against party after finding that they failed to appear twice for a deposition in case and after considering conduct in a related case); *McCleod, Alexander, Powell & Apffel v. Quarles*, 894 F.2d 1482, 1487 (5th Cir. 1990) (affirming default judgment against defendant who lodged frivolous

objections to document production requests and then for months failed to produce all relevant documents); *Emerick v. Fenick Industrs., Inc.*, 539 F.2d 1379, 1380-81 (5th Cir. 1976) (affirming default judgment against plaintiff after she only partially complied with two court orders to produce documents); *Bonaventure v. Butler*, 593 F.2d 625, 626 (5th Cir. 1979) (affirming entry of default against party who unreasonably delayed his deposition and then violated a court order to appear at deposition).

The decision to enter a default judgment is committed to the sound discretion of the court and will not be disturbed absent an abuse of discretion. *Nat'l Hockey League v. Metro. Hockey Club, Inc.*, 427 U.S. 639, 640 (1976) (affirming trial court's dismissal of plaintiff's complaint for its failure to timely answer interrogatories). When determining whether to enter judgment, courts may look at several factors, including willfulness, bad faith, motive, and whether the deterrent value of Rule 37 can be vindicated by less severe sanctions. *Smith*, 145 F.3d at 344.

In addition to the powers granted the judiciary under FRCP 37, courts also have the "inherent authority" to sanction parties for contemptuous conduct, including when "a fraud has been practiced upon it or that the very temple of justice has been defiled." *Universal Oil Prods. Co. v. Root Refining Co.*, 328 U.S. 575, 580 (1946). Indeed, the Supreme Court has recognized that the scope of courts' inherent authority casts a very wide net by "reach[ing] both conduct before the court and that beyond the court's confines . . . ." *Chambers v. Nasco Inc.*, 501 U.S. 32, 44 (1991). Further, a court exercising its inherent authority has the full panoply of sanctions available to it, ranging from an award of attorney's fees to litigation-ending sanctions. *See Link v. Wabash R. Co.*, 370 U.S. 626, 629 (1962). The United States Court of Appeals for the Fifth Circuit has held that case-terminating sanctions, exercised pursuant to a court's inherent authority, require a showing of "bad faith or

willful abuse of the judicial process." *Woodson v. Surgitek, Inc.*, 57 F.3d 1406, 1417 (5th Cir. 1995).

Bankruptcy courts are no different.  They too have all the inherent powers of any federal court.  The Fifth Circuit has recognized that such powers are particularly important to preserve the integrity of the bankruptcy process which depends in large part on the honesty of the debtors, the same individuals who would prefer to retain as much of their net worth and income as possible:

> Every bankruptcy statute since 1898 has incorporated literally, or by judicial interpretation, a standard of good faith for the commencement, prosecution, and confirmation of bankruptcy proceedings . . . .  Requirement of good faith prevents abuse of the bankruptcy process by debtors whose overriding motive is to delay creditors without benefiting them in any way or to achieve reprehensible purposes.

*Little Creek Dev. Co. v. Commonwealth Mortgage Corp.*, 779 F.2d 1068, 1071-72 (5th Cir. 1986) (citations omitted).  Indeed, the bankruptcy case law is replete with examples of courts imposing a variety of sanctions pursuant to its inherent authority, including everything from awarding attorney's fees,  *see e.g.*, *In re Ortiz*, No,. 05-39982, 2006 WL 2946500, at * 12 (Bankr. S.D. Tex. Oct. 13, 2006) (awarding creditors their attorney's fees for debtor refiling bankruptcy case, failing to pay prior sanction, failing to appear for hearings) (attached hereto as Ex. 78), to entry of judgment on an adversary complaint.  *In re Matter of United Markets Intern., Inc.,* 24 F.3d 650, 654 (5th Cir. 1994).

One case with strikingly similar facts to the case at bar is *Connecticut Gen. Life Ins. v. New Images of Beverly Hills*, 482 F.3d 1091 (9th Cir. 2007).  There, several insurance companies brought federal RICO claims against numerous individuals and entities which were engaged in a massive healthcare-fraud scheme.  *Id.* at 1094   The defendants, which included several doctors and ambulatory surgical centers, were billing for cosmetic surgeries with bogus diagnosis codes and then billing for services which were never rendered.  *Id.*  Defendant Dr. Harrell Robinson, who owned

co- defendant Providence Ambulatory Surgical Center, never responded to plaintiffs' initial discovery demands.  *Id.* at 1095.  After being compelled to do so, the court found that the "contumacious" responses were "calculated to prevent plaintiffs from learning the truth."  *Id.* Additionally, Dr. Robinson and his clinic claimed that documents had been "misplaced or lost" and they were "unable to locate" them.  *Id.*  The defendants' written discovery responses were no better.  Rather than provide the full names, addresses, and contact information of former employees who worked for defendants, the defendants simply listed first names and their position, such as "Lisa – Biller."  *Id.*

During the pendency of the RICO lawsuit, Dr. Robinson also filed for bankruptcy.  In those proceedings, the court found that Dr. Robinson and his lawyer went to similar lengths in compromising the integrity of the judicial system by engaging in perjury, lies, and deception.  Specifically, the court found that

> Dr. Robinson had failed to disclose his ownership of real property, incorrectly reported the value for his residential property, and failed to include Cigna as a creditor in its schedules, and both Robinson [and his attorney] knowingly deceived the court and acted in bad faith by submitting perjured declarations, fabricated evidence and frivolous pleadings.

*Id.* at 1094 (internal quotations omitted).

Based on the foregoing facts, the court reasoned that the only appropriate remedy to was case-dispositive sanctions:

> In deciding whether to impose case-dispositive sanctions, the most critical factor is not merely delay or docket management concerns, but ***truth***. . . .  There is no point to a lawsuit, if it merely applies law to lies. . . .  [Thus, w]here a party so damages the integrity of the discovery process that there can never be assurance of proceeding on the true facts, a case dispositive sanction may be appropriate.  This was just such a case.

The Court then entered judgment, pursuant to FRCP 37(b)(2), for plaintiffs in the amount of $2,034,954 - the actual amount of the fraudulent claims paid by plaintiffs multiplied by a factor of three under RICO's treble damages provision. *Id.* at 1094.

Here, the avalanche of evidence shows that the Mohamed Defendants and Undavia Defendants are incapable of submitting themselves to the truth seeking process. Not only have they defiled this Court, they have made a mockery of it.

Together, Mohamed and Undavia for years have: (a) denied and disguised Mohamed's ownership interest in Minu RX; (b) concealed Mohamed's ownership interest in and acquisition of undisclosed pre and post petition assets, including Mohamed's residential property in San Antonio, the exclusive right to sell the Bellacontour device in India and the United Arab Emirates, and the exclusive right to sponsor A4M conferences in Dubai and India; (c) funneled millions of dollars to Mohamed, both before and during his bankruptcy; and, (d) formed shell companies, like Breezy, for illicit purposes, including "off-the-books" payments to Dean Ferguson for his legal services during Mohamed's bankruptcy.

Additionally, Mohamed has concealed in his ownership interest in more than 30 shell companies through a complex web of corporate structures. These shell companies were created so Mohamed could unlawfully circumvent state and federal healthcare reporting requirements, including anti-kick back laws. They also were created so Undavia could funnel millions of dollars to Mohamed which he took as unreported income and Undavia falsely characterized as "cost of goods sold" on her taxes.

By engaging in such conduct, Mohamed and Undavia have committed bankruptcy fraud, tax fraud, obstruction of justice, and perjury. Their unlawful schemes began in 1998 and has continued through Mohamed's divorce case, bankruptcy proceedings, and this lawsuit. As a result, Mohamed

and Undavia have defrauded Debbie Mohamed, Travelers, bankruptcy creditors, and the Internal Revenue Service.  Just as importantly, they have damaged and undermined the integrity of this Court by using it as means to accomplish their unlawful purposes.

Since Travelers filed this case and undertook extensive but pointed discovery, Mohamed and Undavia have tried everything to obstruct and hide the facts which would reveal, not only their liability to Travelers under its RICO and fraud claims, but the criminal conduct discussed above.  Indeed, at every turn, Mohamed and Undavia have compromised the integrity of the judicial system by abusing the discovery process.

At one time or another, they have denied the existence of relevant documents, delayed the production of relevant documents through meritless objections, and/or refused to produce documents altogether.  They also have concealed the existence of documents by not disclosing their locations in various storage facilities and other locations around Texas.  Additionally, they have provided false, misleading, and/or incomplete interrogatory answers and Rule 26(a) disclosures.  They have violated *every* discovery order in this case.  Indeed, to this very day, the Mohamed and Undavia Defendants still have not produced everything the Court has ordered them to produce.  In short, they are incapable of submitting themselves to the authority of our justice system, and the only appropriate sanction is entry of judgment.  If ever there was a case which cried out for judgment, it is this one.  Indeed, none of the cases cited above, where courts have entered judgment as a sanction, come remotely close to the egregious facts of this case.

## V.     CONCLUSION

For the foregoing reasons, Travelers respectfully requests that the Court enter judgment in favor of Travelers and against the Mohamed Defendants and the Undavia Defendants.  To the extent the Court deems it necessary to determine appropriate sanctions, Travelers further requests that the Court conduct an evidentiary hearing where Mohamed, Undavia, and other witnesses are compelled to testify under oath about the serious matters raised herein.[12]

Dated:  March 4, 2008                                   Respectfully submitted,

                                            By:     /s/ Ross O. Silverman
                                                    Illinois Bar No. 6226560
                                                    KATTEN MUCHIN ROSENMAN LLP
                                                    525 West Monroe Street
                                                    Chicago, Illinois  60661
                                                    (312) 902-5200 telephone
                                                    (312) 902-1061 facsimile


Charles Chejfec                                 Joseph F. Nistico, Jr.
Illinois Bar No. 6230825                        Fed ID 1024
Kathy P. Josephson                              Texas Bar No. 15035300
Illinois Bar No. 6278242                        M. Micah Kessler
Patrick C. Harrigan                             Fed ID 21206
Illinois Bar No. 6289678                        Texas Bar No. 00796878
KATTEN MUCHIN ROSENMAN LLP                      NISTICO & CROUCH, P.C.
525 West Monroe Street                          5151 San Felipe, Suite 900
Chicago, Illinois  60661                        Houston, Texas 77056
(312) 902-5200 telephone                        (713) 781-2889 telephone
(312) 902-1061 facsimile                        (713) 781-7222 facsimile

---

[12] Travelers has attached a proposed Order setting the matter for an evidentiary hearing.

## <u>CERTIFICATE OF SERVICE</u>

Ross O. Silverman, an attorney, on oath states that he caused a copy of the foregoing TRAVELERS' MOTION FOR CASE TERMINATING SANCTIONS AGAINST THE MOHAMED AND UNDAVIA DEFENDANTS AND REQUEST FOR EVIDENTIARY HEARING IN SUPPORT THEREOF to be served upon the following through the court's ECF/CM filing system, or through electronic or U.S. Mail on this 4th day of March, 2008:

Peter E. Ferraro, Esq.
1609 Shoal Creek
Suite 305
Austin, Texas 78701
***Attorney for Shaffin Ali Mohamed***

Roderick J. Regan, Esq.
9901 IH 10 West, Suite 800
San Antonio, Texas 78230
***Attorney for the Alibhai Defendants***

Ronald Smeberg, Esq.
Attorney at Law, PLLC
11844 Bandera Rd., #725
Helotes, Texas  78023
***Attorney for Eddie Cerday, M.D.,
Southwest Pain & Injury P.A.***

Michael Duncan, Esq.
Cage, Hill & Niehaus, LLP
5851 San Felipe, Suite 950
Houston, TX 77057
***Attorney for Orthopedic Pain
Management, P.A., Pain Institute of
Texas, P.A., Advanced Rehabilitation
Associates & Pain Management, P.A.,
and Stein Pain Management, P.A.***

Marcy Lynn Rothman, Esq.
Brown McCarroll LLP
1111 Bagby, 47th Floor
Houston Texas 77002
***Attorney for the Undavia Defendants***

Robert Wilson, Esq.
Law Offices of Robert P. Wilson
720 N. Main
Boerne, TX 78006
***Attorney for the Boyd Defendants***

Mr. Kevin Boyd, Esq.
Mr. Anatole Barnstone, Esq.
Attorneys at Law
507 West 10th Street
Austin, Texas 78701
***Attorneys for Houston Community
Hospital***

Marcy Kurtz, Esq.
Bracewell & Giuliani
711 Louisiana Street
Suite 2300
Houston, Texas  77002-2770
***Attorney for the Undavia Defendants***

Jesse Pierce, Esq.
King & Spalding
1100 Louisiana Street, Suite 4000
Houston, TX 77002-5213
**Attorney for Kenneth S. Bayles and
John C. McConnell**

Ronald J. Salazar, Esq.
Katya S. Buck, Esq.
Woodfill, Salazar & Pressler
13750 San Pedro. Suite 600
San Antonio, TX 78232
**Attorneys for Tim Chowdhury, M.D.**

Glenn W. Patterson, Jr., Esq.
11 Greenway Plaza, Suite 2820
Houston, Texas 77046
**Attorney for Bobby Pervez, M.D.**

Geoffrey A. Berg, Esq.
Dow Golub Berg & Beverly, LLP
8 Greenway Plaza, 14th Floor
Houston, Texas 77046
**Attorney for Omar Vidal, M.D.**

James R. Clark, Esq.
James R. Clark & Associates
4545 Mt. Vernon
Houston, TX 77006
**Attorney for Ernest T. Roman, M.D.**

John P. Scott, Esq.
Lauren Held Harris, Esq.
Cruse, Scott, Henderson & Allen L.L.P
2777 Allen Parkway, 7th Floor
Houston, TX 77019
**Attorneys for Jose Ramon Reyes, M.D.**

John L. Green, Esq.
4888 Loop Central Drive
Suite 445
Houston, TX 77081
**Attorney for Will E. Moorehead, M.D.**

Sam Houston, Esq.
Cruse, Scott, Henderson & Allen L.L.P
2777 Allen Parkway, 7th Floor
Houston, TX 77019
**Attorney for Ihsan Shanti, M.D.**

___/s/_Ross O. Silverman___
Ross O. Silverman